# In the United States Court of Federal Claims

**No. 12-121T**
**Filed: June 25, 2014**
**Redacted Version Issued for Publication: July 16, 2014[1]**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * *  * | |
| | * |
| **ENRIQUE FREE-PACHECO,** | * |
| | * |
| **Plaintiff,** | * |
| | * |
| v. | * |
| | * |
| **UNITED STATES,** | * |
| | * |
| **Defendant.** | * |
| | * |
| * * * * * * * * * * * * * * * * * * * * * * * * * *  * | |

**Federal Tax Deductions; Foreign Nonresident; 26 U.S.C. § 871; Trade or Business; 26 C.F.R. § 1.183-2; Continuity and Regularity; Expectation of Profit; Gambling; Slot Machines.**

    **Jeff S. Hood**, Procopio, Cory, Hargreaves & Savitch LLP, San Diego, C.A., for plaintiff. With him was **Patrick Martin**, Procopio, Cory, Hargreaves & Savitch LLP.

    **Fredrick C. Crombie**, Trial Attorney, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Gregory S. Knapp**, Trial Attorney, Court of Federal Claims Section, **David I. Pincus**, Chief, Court of Federal Claims Section and **Kathryn Keneally**, Assistant Attorney General.

## O P I N I O N

<u>**HORN, J.**</u>

    Plaintiff, Enrique Free Pacheco, a Mexican citizen and nonresident of the United States, brought suit to recover a tax refund in excess of $16,360,455.00, not including interest, withheld by the United States Internal Revenue Service (IRS). This sum, according to plaintiff, represents the amount the IRS automatically withheld from plaintiff's jackpot winnings while plaintiff gambled at slot machines in Las Vegas from 2007 through 2010.[2] Plaintiff claims that he was engaged in slot machine gambling as a

---

[1] This opinion was issued under seal on June 25, 2014. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with some of the redactions that the parties proposed. Words which are redacted are reflected with the following notation: "[redacted]."

[2] The court adopts the following vocabulary terms and descriptions used by the parties: "jackpot" winnings are those winnings paid out by hand by the casino staff, as opposed

"trade or business" within the United States, and, therefore, that his taxes only should be based on his net income, consistent with I.R.C. § 871(b).[3] Plaintiff claims that he should be allowed to treat his slot machine wagers as business expenses, in accordance with I.R.C. § 165(d) (2006), and that he is due a substantial refund of his tax withholdings as a result.

## FINDINGS OF FACT

Plaintiff, Enrique Free Pacheco, is a "nonresident alien" under the terms of I.R.C. § 871, who lives in Los Mochis, Sinaloa, Mexico. Due to his poor health, plaintiff was not able to travel or give video testimony during the trial. Plaintiff's attorney filed a declaration, which included reports by two medical professionals, indicating to the court that plaintiff has been suffering from [redacted medical issues]. Defendant, therefore, agreed to take video testimony of plaintiff in lieu of trial testimony. On May 22, 2012, plaintiff's counsel conducted a "Videotaped Interview" of plaintiff in San Diego, California, which was conducted under oath. Plaintiff's and defendant's counsel were present during the interview. The next day, on May 23, 2012, defendant's counsel conducted a "Videotaped Deposition" of plaintiff in San Diego, California, which similarly was conducted under oath. Plaintiff's and defendant's attorneys were also present for the May 23, 2012 deposition. On August 16, 2012, approximately three months later, the parties returned and conducted another joint, videotaped deposition of plaintiff, under oath, once again in San Diego, California. Both parties questioned plaintiff during the August 16, 2012 deposition. The interview and both depositions were conducted

---

to those paid by the slot machine. Generally, smaller winnings are paid out by the slot machine, however, when winnings from a single slot machine wager are $1,200.00 or greater, these winnings are termed "jackpots," and the casinos pay these winnings by hand, after first completing an informational return required by IRS, and at that time deducting a tax withholding, in the case of foreign nonresident gamblers. See 26 U.S.C. (Internal Revenue Code or I.R.C.) §§ 871(a)(1)(A) (2006), 1441(a) (2006) (requiring withholding on foreign nonresident income, including gambling winnings, not connected to a trade or business); 26 C.F.R. (Treasury Regulations or Treas. Reg.) § 7.6041-1(a), (b)(1) (2010) (requiring casinos to make informational returns to the IRS for slot machine winnings paid out, equal to or exceeding $1,200.00, without accounting for the amount wagered). Non-jackpot winnings, which are winnings of less than $1,200.00 from a single wager, are paid out by the machine and referred to throughout the parties' briefs, the trial transcript, and this opinion, as "coin-out." Plaintiff has not claimed that his coin-out winning share has been withheld by the IRS. Plaintiff's slot machine wagers are referred to throughout the parties' briefs, the trial transcript, and this opinion, as "coin-in."

[3] The court applies the statutes and regulations in effect at the times plaintiff filed his 2007 through 2010 1040NR (non-resident) income tax returns. As the relevant sections of the statutes and regulations at issue in the above captioned case have not altered significantly between 2007 and 2010, in this opinion the court references the 2010 version of the statutes and regulations at issue, unless otherwise noted.

with the assistance of a translator, given Mr. Free's limited, English fluency. On December 20, 2012, plaintiff's attorney filed another declaration, which included a report by a medical professional, informing the court that plaintiff's condition had worsened [redacted], and that it was recommended to plaintiff not to travel away from his home in Mexico. The parties agreed, and the court admitted, plaintiff's earlier videotaped interview and deposition testimony into the record, instead of taking live testimony at the trial. Mario Uriel Ramos Vazquez, one of plaintiff's sons-in-law, likewise was not able to testify at trial. The court, with the parties' consent, also agreed to admit the transcript of Mr. Vazquez's deposition into the record.

On multiple occasions, the court and counsel for both parties discussed the impact of using plaintiff's videotaped interviews and depositions. Plaintiff's counsel stated: "I think that myself and Mr. Crombie [defendant's counsel] did a good job of addressing most, if not all, of the issues that we needed to address," and that the videotaped interview and depositions provide "an impression of Mr. Free, how credible he was when he testified." Plaintiff's counsel stated that "although there were some occasions during the testimony where, for example, everything seemed to be about 10 to 12 years ago," errata sheets were provided, and, nonetheless, "from a factual standpoint, I think that a lot of his testimony correlates to the documents. It was consistent with the other folks' testimony. So I don't have any real concerns back in May. And again, we came back in August, and the issues that we addressed at that time, I think they were accurate." Plaintiff's counsel also stated that Mr. Free, in his interview and depositions, "was lucid, coherent, and understood those questions when he was testifying that he was pursuing this as a trade or business." Plaintiff's counsel further indicated that that there was no difference between the interview and depositions in terms of the validity of plaintiff's statements.

Plaintiff stated at his interview that he is married to Maria Ines Wong Gonzalez, and has three daughters, Maria Dolores Free Wong, Diana Free Wong, and Deyra Erika Free Wong, all of whom live close to plaintiff in Mexico. Although plaintiff stated at his interview that he only completed up to his second year of middle school in Mexico, he indicated that he has had a successful career as a businessman, first in construction in Chihuahua, Mexico, and then in agriculture in Los Mochis, Mexico. Plaintiff also stated that he established a potato farming business, Tenabri,[4] which upon his retirement, around 2001, brought in an annual income of approximately Mex\$10,000,000.00[5] a year. Plaintiff's daughter, Maria Dolores Free Wong, and two of plaintiff's sons-in-law, Mario Uriel Ramos Vazquez, and Fernando Medina Llamas, testified at trial. All three of

---

[4] The name of plaintiff's agriculture business is spelled differently throughout the interviews and trial transcripts. The court uses the spelling from the errata sheet from plaintiff's May 22, 2012 interview, which states that the correct and full name of the company is "Tenabri S. de R.L. de C.V." (Tenabri).

[5] The court uses the currency designation "Mex\$" when referring to Mexican pesos. Plaintiff alleges that, at the exchange rate of the period, ten million pesos was equal to roughly \$750,000.00 a year.

them testified that plaintiff founded Tenabri. Plaintiff stated at his interview that, while he ran Tenabri, he "made all the decisions," including financing and planting. Mr. Vazquez agreed at his deposition that plaintiff had been "actively involved" with the company in the past.

Plaintiff further testified at his deposition that he ran the company without any written business plan, instead relying on experience learned from fifty years of work and from his parents, who were farmers. Plaintiff stated at his interview that it was a successful business. Plaintiff further stated that he retired ten to twelve years ago because of "the financial situation and because of my physical condition." Plaintiff testified at his deposition that, additionally, "the business [Tenabri] was not that good anymore." Plaintiff and Mr. Vazquez both suggested that Tenabri in recent years has been doing worse and currently may not be profitable.

Plaintiff testified at his deposition that, before retirement, he held an approximately sixty to seventy percent interest in the business, which was organized as a limited liability company. Plaintiff further indicated at his deposition that he sold the business to his family, including his daughters and their husbands. According to plaintiff's interview statements and deposition testimony, plaintiff currently owns between twenty to thirty percent of the company. Mr. Vazquez testified that plaintiff currently has a "small percentage" of the business. Mr. Llamas testified at trial and Mr. Vazquez indicated at his deposition that the two now manage the "day-to-day" operations of Tenabri since plaintiff's retirement. Plaintiff confirmed this during his interview. Plaintiff, Mr. Llamas, Mr. Vazquez, and Ms. Dolores Free Wong all stated that plaintiff still had played a role in the business between 2007 and 2010, as an advisor, but was not actively involved in Tenabri outside of advising. Plaintiff testified, and the two sons-in-law, Mr. Vazquez and Mr. Llamas, corroborated, that from 2007 through 2010 plaintiff helped advise on "what type of plants they should grow . . . what type of seeds we're going to use." Plaintiff stated in his interview that advising for Tenabri currently takes up "very little" of his time, but testified at his deposition that advising for Tenabri takes up ten to fifteen percent of his time, or one to two days a week. According to Mr. Llamas' testimony, between 2007 and 2010, plaintiff would spend two hours weekly consulting with him on the business. Mr. Vazquez did not testify as to how much time he spent with plaintiff. Although Mr. Vazquez testified at his deposition that plaintiff never received any compensation between 2007 and 2010, both plaintiff and Mr. Llamas testified that plaintiff received a dividend from the business in 2007, but no information was offered as to the amount of that dividend, or about any other dividend plaintiff received.

In addition to advising at Tenabri, plaintiff stated at his interview, and repeated at his deposition, that he actively traded stocks on the Mexican stock exchange. Plaintiff testified at his deposition that he traded in both "[i]ndividual stock [sic] and the index of the stock market" between 2007 and 2010. Plaintiff testified at his deposition that "right now most of my money's invested in mining companies as GMEXICO, as commercial entities like Walmart. I have a diversity of investments." Plaintiff and Mr. Llamas both indicated at some point during their statements that plaintiff's stock market activities

were a "business." At other times, however, plaintiff testified that he "played" the stock market or that he made personal investments. Plaintiff, additionally, testified at his deposition that at the relevant time he had financial advisors, "which I just listen to, but the decisions I make myself."

Mr. Free stated at his interview that he had a personal assistant, Nereyda Campos, who handled multiple aspects of his affairs. According to plaintiff, Ms. Campos' work included creating financial statements, such as balance sheets, gambling records, and tax-related documentation, as well as performing other administrative activities, such as trip planning, for him. Plaintiff stated at his interview that Ms. Campos' salary was approximately Mex$15,000.00 per month. Plaintiff testified at his deposition that he paid most of Ms. Campos' salary. Plaintiff also testified that part of her salary was "paid by the agricultural business for the work she does for the business." Mr. Llamas, plaintiff's son-in-law, testified, however, that Ms. Campos did no work for the agricultural business. Mr. Llamas testified that Tenabri paid her salary, and that this arrangement was in order to enable Ms. Campos to receive specific government benefits that were only available if she was employed through Tenabri.

Ms. Campos testified that she understood plaintiff's work to be in the "[b]etting business." Although Ms. Campos claimed to be hired to assist plaintiff's alleged "betting business," Ms. Campos testified that she also handled a number of plaintiff's personal tasks. According to Ms. Campos' testimony, this included scheduling vacations for plaintiff and his family, such as trips to his beach house three to four times a year, as well as other trips for fishing, golfing, and hunting. Ms. Campos testified that she maintained expenses for trips to the beach house, each of which took fifteen to twenty hours to plan. Ms. Campos also testified that she managed plaintiff's medical appointments, including travel, which occurred three to four times a year, increasing in 2009 and 2010. These appointments required two to three days on average to plan, according to Ms. Campos.

Ms. Campos also testified that, among other activities, she helped "manage his shares in the stock market." According to Ms. Campos, although it only involved a "minimum amount of time," this included carrying out plaintiff's investment decisions, keeping spreadsheet records in order to cross-check plaintiff's records with bank records, and providing plaintiff monthly bank statements about his investments. Plaintiff also testified at his deposition that Ms. Campos arranged "the daily register of the transactions in the stock market." Plaintiff testified at his deposition that in managing his investments he looked at the monthly records as well as daily market reports, tracked expenses, and had a goal to make a fifty percent profit on his investments. According to his deposition testimony, plaintiff made investment decisions based on the interest rate of bank capital, the information from his records, and stock price trends. In particular, plaintiff testified at his deposition that he checked to see if the price of a specific company was "low and if I know that it is a good company." Plaintiff testified at his deposition that he never reviewed financial statements about his investments, but read articles on companies in which he wanted to invest.

The parties stipulated that plaintiff reported the following as his net income on his 2007 through 2010 Mexican tax returns:

| Tax Year | Plaintiff's Mexican Net Income (Mex$) | Plaintiff's Mexican Net Income ($)[6] |
|----------|---------------------------------------|---------------------------------------|
| 2007 | Mex$58,891,155.00 | $5,177,700.00 |
| 2008 | Mex$32,999,408.00 | $2,841,837.00 |
| 2009 | Mex$10,622,824.00 | $755,643.00 |
| 2010 | Mex$45,863,364.00 | $3,487,443.00 |

From a review of the record, the reported income appears to have come primarily from plaintiff's Mexican stock market investments and his Tenabri dividend. Additionally, plaintiff testified that, sometime between 2007 and 2010, he was able to sell one hectare of land for one million Mexican pesos. In addition, both plaintiff and Ms. Campos testified that they believed stock market income was not taxed in Mexico.

Plaintiff testified at his deposition that he started gambling at slot machines twenty-five to thirty years ago, when he came with relatives to Las Vegas. He testified that "at that time I didn't consider myself a professional gambler because I -- at that time I didn't gamble often. It was not often and it was only small amounts." Plaintiff testified at his deposition that his gambling during that period was about $500.00 to $1,500.00 per day, and that he played on slot machines "very similar to the slot machines that they have right now," including "[t]he sevens or the progressive"[7] slot machines. Plaintiff testified at his deposition that he chose those slot machines at that time because "I would like the pictures that they had on." Plaintiff characterized the difference between his slot machine play from that period, compared to when he alleged he played professionally from 2007 to 2010:

Q. Now, how -- when you first started playing slot machines, how was that different from the way in which you currently play slot machines?

---

[6] Plaintiff's Mexican net income value appears to be reflected in "DETERMINATION OF THE INCOME TAX," under Box "C" of plaintiff's Mexican income tax returns. Defendant refers to these values as plaintiff's "investment income."

[7] A "progressive" slot machine, as explained by defendant's expert witness Frank Legato, is a machine "in which the top jackpot is augmented by a portion of wagers on all machines across a state or jurisdiction." Plaintiff's expert witness, John Robison, stated that there can be three types of progressives. First is a "stand-alone progressive" which only increases its top jackpot based on money played on that machine. Second is an "in-house progressive," which consists of two or more machines within one casino or company, in which "[m]oney played on any of the machines in the in-house progressive network increases the progressive payout on all machines in the network." Third is a "wide-area progressive," which can link multiple machines from multiple casinos or companies to create an even larger network by which to build the progressive jackpot.

A. The difference was the amount of money and the frequency of the gambling, mainly.

Q. Any other differences?

A. I don't recall. I believe that there is no other one.

Although plaintiff never offered a precise date as to when he claims to have started slot gambling as an alleged business, he did testify at his May 23, 2012 deposition that he "started to gamble in Las Vegas" in response to his taking a less active role in Tenabri "ten or 12 years ago." Mr. Llamas testified that he understood plaintiff to be in the "betting business" around ten years before March 2013, which would place the start date of plaintiff's alleged gambling business at around 2003. Ms. Campos estimated that plaintiff started his alleged gambling business at about the same time period, around 2003. Plaintiff's daughter, Ms. Dolores Free Wong, testified, however, that plaintiff started slot machine gambling as a profession "[s]ince 2007, when he started to leave his agricultural work behind." Plaintiff testified that he retained the law firm of Procopio, Cory, Hargreaves & Savitch LLP (Procopio) for his tax work related to his Las Vegas gambling seven years before his May 23, 2012 deposition, around 2005.[8] According to the testimony of Celso Jimenez, an accountant based in the United States who assisted plaintiff with his tax return filings, attorneys from the Procopio law firm prepared plaintiff's 2004 1040NR return, the first return in the record which listed plaintiff as in the business of professional gambling.

Between 2007 and 2010, the years at issue in the above captioned case, the parties stipulated that plaintiff travelled to Las Vegas the following times:

| Calendar Year | Number of Trips | Days Gambled | Trips to Las Vegas |
|---|---|---|---|
| **2007** | 8 | 44 | May 3–7; June 9–16; July 16–24; Aug. 10–15; Sept. 12–17; Oct. 11–15; Nov. 25–29; Dec. 29–31 |
| **2008** | 5 | 29 | Jan. 1–3[9]; Apr. 22–27; July 27–Aug. 4; Aug. 28–Sept. 2; Nov. 30–Dec. 4 |
| **2009** | 3 | 20 | May 31–June 9; July 9–16; Nov. 25–29 |
| **2010** | 5 | 25 | July 11–18; Aug. 12–13; Sept. 15–19; Oct. 20–25; Dec. 2–6 |

---

[8] The Procopio law firm also is the firm in which plaintiff's attorney of record in the above captioned case bases his practice.

[9] Plaintiff travelled to Las Vegas from December 29, 2007 to January 3, 2008. The parties, in their February 27, 2013 Joint Stipulation of Facts, separated this trip into two trips for accounting purposes, one covering the days travelled in 2007, and the other trip covering the days travelled in 2008.

Plaintiff claims that he travelled to Las Vegas less after 2007 "because I didn't get my money back from the taxes[10] and also the -- the stock market in 2008 was really bad. It lost 50 percent of its value, so that's the reason I traveled less." Ms. Campos also testified that "[a]fter 2007, he took fewer trips to Las Vegas the following year . . . because they were not making any returns on his taxes." Although plaintiff continued to gamble after 2010, plaintiff stated at his interview that, since September of 2011, plaintiff stopped traveling to Las Vegas. He further stated that the reason for stopping was "my physical problem and the financial situation." He described the financial situation, more specifically, to be "the lack of the money from taxes and because the year in the stock market has not been that good and all that."

According to the record, it appears that the vast majority, if not all, of plaintiff's gambling occurred in Las Vegas, Nevada. Plaintiff did state, however, during his interview, that he also played slot machines at least one time in Phoenix, Arizona. Plaintiff and Ms. Campos both indicated that his travel to Phoenix was primarily for a medical visit. Plaintiff elaborated that "I had some extra time" and "got bored." Ms. Campos noted in her testimony that the trip was not recorded in plaintiff's business records and was not treated as business activity, and, instead, that the Phoenix gambling was "just as a diversion." Plaintiff stated at his interview that he preferred Las Vegas because "the plane trips were easier and the jackpots were big." Additionally, plaintiff stated that he believed his winnings would not be taxed if he travelled to Las Vegas. Plaintiff further stated in his interview that had he not been refunded his returns in 2005, he would not have continued playing through 2010, "[b]ecause I [plaintiff] thought that -- that the returns were normal and more safe. If I would have known that, I wouldn't have continued playing."

Plaintiff stated at his interview that he arranged his trips to Las Vegas through his secretary, Ms. Campos. According to plaintiff, he would decide to travel "[s]ometimes one month before, sometimes three or four days" before, and that he himself specified the hotel where he would want to stay. Ms. Campos indicated that plaintiff would inform her to arrange a trip "two and three weeks before." Based on plaintiff's financial reports in the record, as well as his interview statements and deposition testimony, between 2007 and 2010, plaintiff played at the Aria, Bellagio, MGM Grand, Mirage, Treasure Island, Venetian, and Wynn, all located in Las Vegas. Plaintiff testified, however, that

---

[10] Although not dispositive in the above captioned case, in plaintiff's 2004, 2005, and 2006 tax returns, Mr. Free stated that he was a "GAMBLING PROFESSIONAL," and included as a business expense his "WAGERING EXPENSES" or "WAGERING COST." For those three years, plaintiff requested a refund from the IRS for a total of $3,114,413.00, although it is not specified in the record before the court what plaintiff actually received from the IRS. According to the testimony of Jon Schimmer, a tax partner at the Procopio law firm responsible for plaintiff's United States tax filings, plaintiff's 2004 refund request was paid by the IRS "a little over a month after the return was filed." Due to a dispute with the IRS, plaintiff's 2005 tax return was not refunded until "July or August of 2007." Mr. Schimmer testified that the 2006 return was refunded only in 2009, due to a "mixup" at the IRS.

most of plaintiff's time and resources were spent at the Bellagio, Mirage, and Wynn, with the Aria becoming equally popular only in 2010. An examination of plaintiff's gambling records reflects that the majority of Mr. Free's time over the years at issue was spent at those four casinos.

Ms. Campos testified that she arranged plaintiff's trips through casino contacts assigned to plaintiff's accounts in Las Vegas. For travel to the Mirage casino, Ms. Campos testified that the contact was Antonio Aguilar. At the time of trial, Mr. Aguilar testified that he was the Director of Latin American Marketing for the MGM Grand, but from 2007 through 2010, he was first a "Marketing executive" and then "Director of Latin America" for the Mirage casino. He testified that Ms. Campos would reach out to him "anywhere from a month up to the next day" to arrange plaintiff's visits. For travel to the Wynn casino, Ms. Campos testified that she reached out to Anne Barbara Morejon. Ms. Morejon testified that she was a casino host at the Wynn casino from 2004, and was still a casino host at the Wynn at the time of the trial. She testified that Ms. Campos would give notice of plaintiff's travel "[m]aybe a couple weeks" in advance. For travel to the Bellagio casino, Ms. Campos testified that she reached out to Arturo DeCastroverde, who testified that he was the Vice President of Latin American Marketing at the Bellagio from the November of 2009 to 2012, and before then, at the Mirage casino from October 22, 1989. Mr. DeCastroverde testified that he would also assist plaintiff while he worked at the Mirage casino. Mr. DeCastroverde stated that he was informed about plaintiff's travel to the Bellagio or the Mirage "[u]sually a week, two weeks" in advance.

Plaintiff stated at his interview that he perceived himself to be a professional gambler for "the last ten years, approximately." Plaintiff testified at his deposition that he believed he was a professional gambler because of his frequency and amount of play.

Q. Okay. What did you do to make yourself a professional slot machine player?

A. I think I am a professional player because of the frequency I gamble and the amounts I bet.

Q. Was there anything else that you think makes yourself a professional slot machine player?

A. No, that's all. The frequency and the amount I bet.

Mr. DeCastroverde testified that "[h]e did tell me a long time ago that he was a professional player," although he didn't testify if that was at the Mirage or at the Bellagio casinos. As mentioned above, Ms. Campos, and two members of plaintiff's family, Ms. Dolores Free Wong, and Mr. Llamas, also testified that they understood plaintiff's job to be that of a professional gambler.

Plaintiff further stated at his interview that one of his desires was to attain a very large jackpot:

Q. Do you consider your trips to Las Vegas business or pleasure?

A. Well, business, but one day -- I have the hope that one day I'm going to win because I am -- I am a hunter and it is said that who persists, gets the deer.[11]

Plaintiff further stated in his interview:

Q. And when you say you have the hope to win, how much money are you talking about?

A. Well, the more the better. I have seen jackpots of 20 plus million dollars. I don't want that much. I would be happy with 5, 10 percent of that.[12]

Mr. Free also stated at his interview: "I thought that I could win big amounts because the prizes are big, the jackpots," and that the "big amounts" were equal to "[f]ive to $10 million." Plaintiff indicated at his deposition that he wanted to get a "big jackpot," but also noted that winning was "practically impossible."

Q. Okay. And if I understand correctly, you -- you -- while you were in Las Vegas, you would wake up, and you would play the slot machines until you had to eat or go to sleep.
Correct?

A. That's right, trying to win the most -- trying to win. But I realized it was practically impossible.

Q. Right.

A. And even more so, with the taxes that are so expensive that they're charging you.

Q. But in terms of waking up and playing until you had to eat or go to sleep, you would do that regardless of whether you were winning or losing.
Right?

---

[11] Plaintiff's post-trial brief refers to plaintiff's interview statement, "I am a hunter and it is said that who persists, gets the deer," as his "business motto." Plaintiff in his post-trial brief further contends that his "business motto is dependent on his continuous and regular pursuit of the multimillion dollar jackpot."

[12] The record before the court indicates that, on at least one occasion, plaintiff achieved a jackpot of $1,290,661.00 at the Aria casino on October 21, 2010.

A.  That's right.

Q.  And you would do that --

> MR. HOOD [Plaintiff's counsel]: Wait, wait. He wasn't done.
> THE WITNESS: -- looking for the big jackpot.

When asked about his profit target at his interview, plaintiff responded: "I would like to win a large price with a lot of money, but it's very difficult." Plaintiff stated in his interview, however, that he believed he could be profitable, and also testified at his deposition: "Well, my whole life, my expectation was to win and make a lot of money."

The court found no evidence in the record that plaintiff had conducted research or created a written business plan for his alleged gambling business. In fact, plaintiff testified at his deposition that he never had a written business plan in connection with his stock market activities or agricultural business. Plaintiff also stated at his interview that he never had an expectation or goal for a yearly income or a profit margin per trip. When asked at his deposition if he had ever set a target profit margin of, for example, ten or twenty percent, plaintiff responded: "Well, I wanted the 100 percent, but that never happened." According to plaintiff's statements during his interview, "depending on my capital, I decide what percentage I'm willing to risk in Las Vegas." Plaintiff's later deposition testimony suggests, however, that plaintiff gambled until he ran out of money. Plaintiff stated:

> Q. Before you leave for Las Vegas, do you have a set amount that you are going to gamble?
>
> A. No, normally no. That's determined by the line of credit that I have and the money that I have.
>
> Q. Okay.
>
> A. If I run out it's all over.
>
> . . .
>
> Q. And did you ever -- well, before taking a trip, did you ever attempt to fit those amounts into your -- into a budget for your gambling activities?
>
> A. No, because I -- I take into account the money -- the extra money that I have every month for my capital and those were the amounts that I would gamble with.

Ms. Campos also testified that plaintiff never returned with money, and instead, would "always come back in debt." Plaintiff also testified at his deposition that he could

not recall an instance returning with cash. Plaintiff stated that he never attempted to discern a payout rate, profit, or loss based on play from individual machines, or between different types of slot machines. Plaintiff further testified at his deposition that he never attempted to discern if there was a pattern to the machines themselves, and that he never attempted to compare his gambling profits to his profits from the stock market.

Ms. Campos testified that, working with other individuals hired by plaintiff, she created win/loss reports for plaintiff on a per-trip and yearly basis. At his deposition, however, plaintiff indicated that he used this financial information to a limited extent outside of tax filing purposes:

Q. How did you use that information [the end of year analysis]?

A. Well, that's what would be declared for taxes.

Q. Did you use it for any other purposes?

A. Well, just to have personal information for myself.

Plaintiff also testified at his deposition that, despite having lost money in 2007 and 2008, he never changed the way he played slot machines. Plaintiff testified at his deposition, after being asked why he did not change his strategy after suffering losses in 2007 and 2008: "I don't know. But I just didn't." He also testified at his deposition that he never altered his gambling habits based on losses, explaining that, "[w]hat happened is that there was no way to alter anything."

At his interview, plaintiff stated that before each trip, plaintiff did "practically nothing" to prepare. He also testified at his deposition that he only read one book about slot machines, titled Slot Machine Report, which was translated from English to Spanish and was given to him by an attorney at the Procopio law firm. Plaintiff testified at his deposition, however, "[t]hat was 25 years ago.[13] I don't even remember anymore what it said." Plaintiff also testified at his deposition that he never read any other books or magazines on slot machines because, according to plaintiff, there were "hardly any books in Spanish."

The eighty-page Slot Machine Report, which was introduced at trial, "was written with the intention of giving those who chose to gamble a basic knowledge of how slot and video machines work." Frank J. Balcerzak, Slot Machine Report 1 (3rd ed. 2005). The Slot Machine Report purported not to offer strategies for making money gambling, but instead called such a rationale "a mistake." Id. Nonetheless, the Slot Machine Report did offer and endorse potential strategies to increase a player's performance. For example, for non-progressive payoff machines, the report suggested that "[c]ounting spins on a machine can be an advantage at times but isn't a guarantee it will work every

---

[13] Later at his deposition, plaintiff testified that he had read the Slot Machine Report fifteen to twenty years prior.

time, or on every game." Id. at 15–16. The report also stated that, "[e]ventually all machines will pay a jackpot no matter where there [sic] located." Id. at 28 (emphasis in original). The report indicated that there is no system capable of beating a slot machine, and commented: "One of the top executives at IGT [International Game Technology, a manufacturer of slot machines] said, 'As much as I love my job, if there was a way to beat them I'd quit my job and play the machines instead of doing what I do.'" See id. at 12. The report counselled gambling for smaller amounts of money, to maximize entertainment value at lowest cost. Id. at 13–16. According to the report, "[t]he longer you gamble the more likely you are to dig yourself further into debt." Id. The report discussed how slot machines operate using random number generators, and that, "odd-wise, the progressive games are the worst to play because they have the most losing combinations programmed into them." Id. at 5, 16, 26. Additionally, the report guided non-high-rollers against "foolishly establishing lines of credit with casinos," id. at 11, and counselled readers to "[l]eave your credit and debit cards at home," stating "[c]onsider ATM machines as your worst enemy." Id. at 18.

Plaintiff also testified that he never requested anyone to assist him in researching slot machines, and further testified that he never read the charts on the slot machines themselves to determine what the winning combinations were. Plaintiff stated that he did not ask for more advice or information, "because nobody knows how to play, otherwise they would do that themselves." Mr. Vazquez testified at his deposition that plaintiff never asked him to provide any help, including advice or research, on slot machines. At trial, Ms. Campos could not recollect any instance in which she was requested by plaintiff to purchase any books or conduct research about slot machines. Mr. Aguilar, speaking about his time at the Mirage, testified that he could not recollect if he was ever asked by plaintiff about books or magazines on slot machines, and that he never saw plaintiff alter his playing style from 2007 through 2010. Ms. Morejon, from the Wynn, testified that she was never asked about how to play slots, did not often observe plaintiff having conversations with other players, and never observed him taking notes about the machines. She also testified that she never saw plaintiff play slot machines differently than others. Mr. DeCastroverde also testified that, while working at either the Mirage or the Bellagio casinos, he was never asked by plaintiff about books or articles on slot machine gambling, and never saw plaintiff take notes or change his method of play between 2007 and 2010.

At his deposition, plaintiff testified that he occasionally inquired about the mechanics of slot machines with casino employees, asking them, for example, "how often the machines will pay out," and "which machine they thought was the best or better, but normally they don't know." Plaintiff additionally testified at his deposition that he also took mental notes of others that played slots around him, to see "the type of machine, the amount they're betting." Plaintiff testified at his deposition that he learned from a casino employee "that the machines had millions and millions of combinations and that there was no way to know a certain pattern." Although plaintiff testified at his deposition that he watched others around him play slot machines, he stated it was "[b]ecause I like to watch when they got the jackpots."

Plaintiff also testified at his deposition that he believed for a time that all machines had the same volatility and "gave you back 12 percent" of the money put in, but he later found that out not to be true. It is unclear how plaintiff came to the twelve percent figure. Plaintiff testified, however, that the <u>Slot Machine Report</u> "mentioned that -- that machines under the order of the U.S. government would return -- will return 15 to 20 percent of the money, but lately it seems like that's not that way. It's only 1 percent or nothing."

In lieu of more formal research and preparation, plaintiff indicated at his deposition that his overarching strategy was, "you have to feed them [the slot machines] in order to get a good jackpot." He testified that "[y]ou had to put in a lot of money to get a return," that "the more money the machine gets in, the more often it pays," and that, "the money in the places where I played or in the casinos that I played at in some way has to be doled out for the -- the jackpots." Plaintiff also stated:

A. Well, that the more money that you put in the machine, the more likely you'll get a jackpot, even though you don't know what size jackpot you're going to get.

Q. Do you know if there was a limit to that rule, a large amount of money up to a certain amount, or is there any sort of outer limit on that strategy?

A. No. It was a lot of money that I could put in the machine so that it would start coming back to me. Maybe I'd get back five percent of what I invested or a hundred and fifty percent. I didn't know.

Plaintiff testified at his deposition that he came up with this strategy based on his "own experience, from so many years gambling." Plaintiff also testified that he had no other strategy, and that "I just played on days that there were a lot of people and put a lot of money in the machines." When gambling, plaintiff stated that he typically made $100.00 wagers on slot machines, with a double play, resulting in an average wager of $200.00 per play. Plaintiff stated at his interview that, on limited occasions, he would raise the stakes up to $5,000.00 per play, when he wanted to "recover some money."

It appears from plaintiff's deposition testimony that he attempted to operationalize his strategy through a number of what he called "hunches." One of plaintiff's hunches was to travel during higher-traffic times of the year, because the "more people go there and so they play more and you have more chances to win what other people put in." Plaintiff testified at his deposition that he preferred to travel "in springtime, vacation time, New Year's, Christmas, how you call it, the Vet- -- the Veteran's day here, those are the days where you find more people in Las Vegas and I like that." Additionally, plaintiff noted that he considered the September 15, November 1, Christmas, New Year's, and July 4 dates as also higher-traffic times. Plaintiff testified at his deposition that at least one of his visits was driven by an invitation to a $25,000.00 buy-in slot machine tournament. From the record before the court, it appears that plaintiff did not consult anyone or any resource in determining when Las Vegas was busier than usual,

but instead indicated his determinations came from personal observations. He stated that he made his determinations, "[b]ecause the time when I have come is when I see more people."

Mr. Vazquez recalled travelling with plaintiff on "[s]ummer vacations, New Year's; September 16 -- it's a holiday in Mexico, Independence Day, probably two or three times," and noted that plaintiff "likes to go when it's more crowded." Mr. Aguilar testified that plaintiff typically visited the Mirage during "[t]he Mexican holidays primarily," including Cinco de Mayo (May 5), and the Mexican Independence Day (September 16), as well as plaintiff's birthday, July 16. Mr. DeCastroverde, who previously worked at both the Mirage and the Bellagio from 2007 through 2010, testified that Mr. Free typically travelled to Las Vegas around plaintiff's birthday.

The parties disagree as to whether plaintiff actually followed his stated strategy or hunches. Both plaintiff and defendant elicited testimony from casino employees as to what days of the year were the busiest for the casinos. Mr. Aguilar, who worked at the Mirage during the years at issue, testified that both Cinco de Mayo and the Mexican Independence Day are boxing dates, which increases attendance to the casinos. Additionally, he testified that the period around New Year's Eve is "extremely busy." Ms. Morejon testified that "New Year's, Super Bowl, whenever we have an event," like a boxing match, increases casino attendance. Gregory R. Hudson, who at the time of the trial, was the Director of Slot Operations at the Wynn, and before 2010, slot manager at the Wynn, confirmed that, "certain events like boxing matches or UFC [Ultimate Fighting Championship] fights or concerts, those can also impact the busy-ness [sic] of the hotel." Additionally, Mr. Hudson stated that the Super Bowl, Memorial Day weekend, Labor Day weekend, as well as slot events were busy periods. Lawrence Whelan, the Director of Casino Accounting at the Wynn since 2005, testified that "New Year's is busy, the holidays are busy," as well as when there are events in town such as boxing matches, UFC fights, and concerts. Mr. DeCastroverde, speaking about his time at the Bellagio, testified that slot tournaments, large concerts, and boxing matches would increase casino traffic. John M. Clinton, the Vice President of Slots at the Bellagio, and before then the Executive Director of Slots and Director of Slot Marketing at the Bellagio, further testified:

Q. And what are your busiest months?

A. March is a particularly busy month, February with Super Bowl and a few of our other events we hold. October is a very busy month, the spring season. May is a good month.

Q. And what are some of your less busy months of the year?

A. The latter part, like the second half of August, early September even though the Labor Day weekend's in there. That's a tough time. People are going back to school, so that's a slower period. The second half of

December around Christmastime [sic] is a slow period. I'm speaking specifically for slots for the most part.

Plaintiff indicated at his deposition that he had another hunch, to play slot machines in the high-traffic areas of the casino. He testified that, "the machine located in a place where people pass by or in holidays I think you have more possibilities." Plaintiff testified at this deposition that he determined whether an area was high traffic through experience, "[b]ecause normally you know the hallways -- the aisles, I should say, and sometimes you see when the people passing by." Plaintiff also testified at his deposition that he played in both the regular slot machine areas, as well as the high limit area, but primarily in the "high limit" area.

Whether or not plaintiff actually played in high traffic areas, however, is contested. Both plaintiff and defendant elicited testimony from casino employees as to the level of traffic in the areas where plaintiff played. Mr. Hudson testified that, at the Wynn, plaintiff's preference for $100.00–$200.00 slot machines made him a "high limit player," requiring "high denom [denomination]" machines, which are located in areas that are less travelled. According to Mr. Hudson's testimony, "I wouldn't say it's high traffic where a lot of players would play. I'd say high traffic would be a penny, nickel, quarter area." Mr. Hudson instead referred in his testimony to an area with high denomination machines as a "low traffic area." Mr. Hudson, however, did note that he never saw plaintiff in the special high limit room that the casino also offered, but in the area with high denomination machines on the casino floor itself, and that this area has restaurants and a corridor where more people would travel. Ms. Morejon from the Wynn stated that she saw plaintiff sometimes on the casino floor, and sometimes in the high limit room, but that "[h]e played a lot more in our high limit slot area," in reference to the high-limit slot room. Mr. DeCastroverde remarked that, at the Mirage, "[t]he high limit slots area is usually in a room by itself," walled on two sides, which is a "[r]elatively low traffic area." Mr. Aguilar testified that plaintiff played primarily in the high-limit area at the Mirage, and on the main floor about five to ten percent of the time. He also stated that the high-limit area was "[l]ow-traffic," and that "[y]ou would have to look for it." Mr. Clinton stated that at the Bellagio plaintiff "played machines mostly in what's called our high-limit slot room," and that area of the casino is "normally a low-traffic area." Plaintiff's family, when they visited plaintiff while he was playing the slot machines, testified that they saw him in a high limit room or area, as opposed to on the main floor.

Finally, plaintiff responded affirmatively to a question at his deposition as to whether he had a hunch to play machines that were "due to hit because somebody else had lost a lot of money at that machine," based on his theory that "the more money the machines get fed the more money they return." Plaintiff indicated at his deposition that he based his theory on his impressions, and generally "thought it was logical." Plaintiff and defendant provided expert testimony about the effectiveness of this and other slot machine strategies, which is discussed further below.

Plaintiff also testified that he had a "notion," "[i]n that usually, you could win more in some casinos over others." Plaintiff did not always choose casinos ahead of

schedule. Plaintiff elaborated that, between 2007 and 2010, "maybe half of the times I -- the trips were planned and the other half were just . . . . spur of the moment. Sometimes I am flying and I decide which casinos I'm going to go to." Plaintiff stated at his interview that he would change casinos during a trip because "sometimes the machines are very hard -- hard to -- to give you jackpot, so I have a preference for four or five casinos, not only one." Plaintiff also testified that he would change casinos because "the machines felt hard or I felt like playing a different type of machine because somehow the machines are different in every casino." Plaintiff clarified that a machine felt "hard" if it "didn't give you any jackpot for a certain period of time." Additionally, plaintiff testified at his deposition that he considered the credit lines available to him in deciding what casino to stay at, and that it took him "one week up to four months" to pay off a casino credit line, but that this by itself did not prevent plaintiff from going to Las Vegas. He stated at his interview that "because since I use many different casinos and I have a credit line in many casinos so I can get money also from another one."

Plaintiff also maintained a preference for the types of machines he played. As discussed above, plaintiff stated at his interview that he preferred $100.00 denomination machines. Testimony from casino employees and the expert witnesses confirms that the high limit areas plaintiff frequented contained machines in that denomination. Plaintiff also expressed a preference to play "[t]he sevens or the progressive ones when they have a bonus price." Plaintiff's stated preference for both types of slot machines appears to be consistent with his stated preference for "machines that they have a big -- the bigger or highest jackpot price." Plaintiff described during his interview the "sevens" as the "figures," and noted that, with the sevens machines, "the bonuses, when there is a bonus, you get -- you have the opportunity to play 15 or 20 times automatically." During plaintiff's deposition, plaintiff testified that, "almost all of the slot machines have sevens." Plaintiff's expert witness, John Robison, indicated that progressive machines produce larger dollar value jackpots than non-progressive machines. According to plaintiff's interview statements, plaintiff preferred progressive machines "when they have progressive [sic] within the same casino." Plaintiff's expert witness termed these machines in his report as "in-house progressive" slot machines. Whether plaintiff actually adhered to any preferences is contested and unclear in the record. Plaintiff also testified that he may have played "Double diamonds" machines, as well as testified that, "I played everything." Additionally, plaintiff stated at his interview that he preferred "machines that I know and where I have played and gambled at some other time."

Ms. Dolores Free Wong, plaintiff's daughter, testified that, based on her observations, plaintiff "like[d] sevens and the ones that have large amounts of money." Mr. Vazquez, plaintiff's son-in-law, similarly testified that, based on his observations, plaintiff "prefers sevens figures and he likes the progressives, the ones with bonuses," and in particular that plaintiff liked the progressives "that give you bonuses and that increases your possibility 15 to 20 times automatically." Mr. Llamas, another of plaintiff's sons-in-law, testified, however, that based on his observations, plaintiff "usually played -- and it's a newer machine -- multiple options or multiple choices, multiple choice. And before that, when those didn't exist, he would play sevens." Mr. Aguilar, according to his testimony, did not notice a preference by plaintiff between machines at the Mirage

within the high-limit area, but testified that the high-limit area contained progressive machines. Mr. Clinton testified that, at the Bellagio, plaintiff played the machines in the high limit room, with the most common games in the room being the "Top Dollar as well as other games called Double Diamonds, Triple Double Diamonds, traditional reel machines with spinning reels."

Multiple witnesses testified that plaintiff evidenced dedication to his gambling activity when in Las Vegas. Plaintiff's daughter, Ms. Dolores Free Wong stated that, "[o]nce he [plaintiff] arrived, we would register with the hotel. They would give him his key, and then he would get to playing." Mr. Llamas, plaintiff's son-in-law, testified that plaintiff would start gambling approximately half an hour after he received his room key. Mr. Vazquez, another son-in-law, put the time between plaintiff's arrival and when plaintiff started gambling at "10 to 15 minutes." Casino staff recalled a similar pattern. According to Mr. Aguilar, at the Mirage, "we try to have everything ready for him to just go shake hands, sign, and get him going to the slot machines." Mr. Aguilar recollected that plaintiff would be gambling within twenty minutes of arrival at the casino, and that there are times plaintiff brought cash so as to start gambling immediately. Ms. Morejon, from the Wynn casino, recalled that plaintiff would start gambling "[r]ight away," within minutes after arriving at the casino. Mr. DeCastroverde, speaking about his time at both the Mirage and the Bellagio, similarly recalled it taking only "20, 30 minutes" between plaintiff's arrival to when he started gambling. Plaintiff testified at his deposition that he brought $6,000.00 to $8,000.00, but not over $10,000.00, with him to Las Vegas in order to "start gambling while the line of credit was authorized." Ms. Campos, from the Wynn, confirmed in her testimony that plaintiff would typically bring approximately $5,000.00 to Las Vegas, which she would withdraw for him.

Plaintiff stated during his interview that he never travelled to Las Vegas alone. Plaintiff testified at his deposition that he travelled with family and friends, including his wife. Mr. Llamas testified at trial that a reason he travelled with others was due to "the language, and later because of his health." At his deposition, plaintiff put the number of total travelers in his group, whether family or friends, at usually "six to eight." Ms. Morejon, from the Wynn, put the typical number of travelers with plaintiff at eight, although Mr. Aguilar, speaking about his time working at the Mirage, saw "[n]o less than ten" with plaintiff. Mr. Vazquez put the total size of his party in Las Vegas in December of 2007 at twelve. According to Mr. Vazquez, plaintiff typically travelled with his family more than with friends, and when plaintiff travelled with friends, it generally was once a year, usually on a Mexican holiday. Plaintiff also testified at his deposition that his physician accompanied plaintiff to Las Vegas in 2009 and in 2010.

Plaintiff's family and friends enjoyed the benefits of plaintiff's "complimentary goods and services provided to Mr. Free in connection with his gambling activities," while in Las Vegas, also known as "comps." As explained during the trial, comps are issued by a casino as a reward for playing at their casino. Although each casino's program is slightly different, comps generally can be used to pay for hotel amenities such as accommodations, food and beverage, show and event tickets, spa services, and plane flights. The parties jointly stipulated to "the total amount of complimentary

goods and services provided to Mr. Free" as $82,650.00 in 2007, $106,220.00 in 2008, $81,156.00 in 2009, and $102,821.00 in 2010. Plaintiff's family members, Maria Dolores Free Wong, Mario Uriel Ramos Vazquez, and Fernando Medina Llamas, all testified that their rooms, food and beverages, and many of their activities, such as shows, were paid for through plaintiff's comps when they travelled with him to Las Vegas. In addition, plaintiff's daughter, Ms. Dolores Free Wong, and plaintiff's son-in-law, Mr. Llamas, both testified that plaintiff also gave them "[b]etween $4,000 and $5,000" each trip for personal use. According to the record, plaintiff himself only used his comps for his room, food, and to attend one boxing match and one show during the period of 2007 through 2010. Plaintiff stated at his interview that he gave away tickets he had to events in order to continue gambling. Mr. Vazquez testified that he never once saw plaintiff attend shows, go to the pool, or go shopping with the family.

The exact amount of time plaintiff spent each day gambling is unclear. Plaintiff testified at his deposition that he gambled sixteen hours a day, but this included his breaks of between three to five hours to have meals with family. Plaintiff stated at his interview that he would start gambling at "4:00 or 5:00 a.m." and go to bed at "[a]round 10:00 pm and 11:00 pm." Defendant, however, alleges that documents provided by the Bellagio, Mirage, and Wynn indicate that plaintiff gambled approximately an average of 10.3 hours per day while in Las Vegas. Mr. Llamas observed plaintiff getting up "very early" from the hotel room, before breakfast, to go gamble. Based on conversations with plaintiff, Mr. Vazquez testified that plaintiff "would get up at probably 5:00 am, 6:00 am" to start gambling, and generally go to sleep at around 8:00 to 9:00 pm. Plaintiff's family members, Ms. Dolores Free Wong, Mr. Vazquez, and Mr. Llamas testified that they only saw him just at breakfast, dinner, and when they visited him at the slot machines. Mr. Vazquez testified that plaintiff would eat dinner with the family "[o]n very few occasions." Mr. Llamas, however, testified that plaintiff would join the family for breakfast and dinner "the majority of the time." When plaintiff sat down to eat breakfast and dinner with the family, according to Mr. Llamas, he would only stay for forty five minutes, enough to order and eat. Mr. Vazquez put the time plaintiff stayed to eat for dinner at just twenty to thirty minutes. According to Ms. Morejon, from the Wynn, plaintiff played slot machines "[a]t all hours. In the morning, afternoon, night." Mr. DeCastroverde, speaking about his time at the Mirage and the Bellagio, testified that plaintiff "played during the day, during the night. He was always there. He had to go eat, then he went back."

Mr. Vazquez, plaintiff's son-in-law, testified at his deposition that he would visit plaintiff two to three times a day, and that each time, he would be in the high limit area gambling, not on the main casino floor or doing any another activity. Mr. Vazquez stated that plaintiff would drink "a lot of coffee" and eat snacks while playing. Plaintiff's daughter, Maria Dolores Free Wong testified that she visited plaintiff approximately five to ten times a day, and that when she visited he would be in the high limit area. Ms. Dolores Free Wong further testified that when she visited plaintiff, "he would be very focused on what he was doing at his job. He didn't like to talk much. And so I would just see in, see if he was okay, if he needed anything, and then I'd go." She commented that plaintiff did not seem to be enjoying himself. Mr. Llamas, plaintiff's son-in-law testified at trial that he visited plaintiff four to five times a day, and saw him "[a]t the high limit" area,

drinking coffee, a malt, or cocoa, and having chocolate. Mr. Llamas further testified that plaintiff "was concentrated on his business" and not enjoying himself. When plaintiff won a jackpot, Mr. Llamas and Ms. Dolores Free Wong both testified that plaintiff would not react or celebrate his success, but just switch to the next machine while the jackpot was being processed. Plaintiff stated at his interview that he occasionally drank alcohol, but from other witness statements it did not appear to be frequent. Casino employees corroborate plaintiff's statements and family observations. Mr. Aguilar and Ms. Morejon both testified that plaintiff did not require much support. According to Mr. Aguilar, when he observed plaintiff play slot machines at the Mirage, he observed that plaintiff was "a man of few words. I've never seen him laugh out loud. I've never seen him get upset." Mr. Hudson, from the Wynn, testified that plaintiff never appeared excited when he won a jackpot.

Mr. Aguilar testified that, at the Mirage, when plaintiff hit a jackpot at a slot machine the machine would lock up and the casino staff would issue plaintiff his tax documentation before giving him his payout, and at that point the casino would take out a thirty percent tax on plaintiff's entire jackpot winnings from that wager. Mr. Aguilar also testified that when a machine locked up, plaintiff started playing at another machine until the prior machine was unlocked.[14] Ms. Morejon and Mr. Hudson, both from the Wynn, and Mr. DeCastroverde, speaking about his time at the Bellagio, testified that the same would occur at the Wynn and the Bellagio casinos. Mr. Hudson testified that, at the Wynn, the process of issuing plaintiff his tax documentation and unlocking the machine would take "[f]ive to eight minutes," but that during that time plaintiff would move to another machine to continue playing. Mr. DeCastroverde testified that, at the Bellagio, the process would take "at least five minutes," but during that time plaintiff would move to another machine. The record indicates that when plaintiff hit a jackpot, plaintiff was issued an IRS Form 1042-S, titled "**Foreign Person's U.S. Source Income Subject to Withholding**." (emphasis in original). A completed Form 1042-S contained player's winnings, tax rate, tax withheld, plaintiff's social security number, plaintiff's home address, and information about the casino. (emphasis in original). Plaintiff stated at his interview that he received 100 to 150 of them a day when gambling.

Plaintiff stated at his interview that he relied on casino credit lines to fund his gambling activities. Plaintiff further stated that he relied on the credit lines approximately "[t]en to one" over his credit cards. Mr. Aguilar, speaking about his time at the Mirage, testified that cash extended through a credit line "is strictly for play" at the Mirage. He explained further that, although the casino staff cannot necessarily control where the money goes after it has been given out, any violations of the policy would limit a player's

---

[14] As noted above, when winnings from a single slot machine wager are $1,200.00 or greater, these "jackpots" winnings are paid by the casino, after the casino first makes an informational filing and deducts a thirty percent tax withholding on plaintiff's total winnings, in the case of foreign nonresident gamblers. See I.R.C. §§ 871(a)(1)(A), 1441(a); Treas. Reg. § 7.6041-1(a), (b)(1). The trial testimony generally indicates that slot machines are programmed to automatically put themselves out of operation or "lock up" when a jackpot of $1,200.00 or greater is won, to facilitate the tax filing.

ability to obtain credit on future trips. Mr. Aguilar also testified that, when extending future credit, Mr. Aguilar would check to see if all of his prior credit from the credit line had been expended on gambling. Ms. Morejon from the Wynn also testified that if plaintiff wanted to extend his line of credit at the Wynn, the staff first would check to see if his previously allocated credit line was used at the casino first. Mr. Whelan, also of the Wynn casino, testified that, at the end of each trip, a player's credit line and players card information are examined. He stated that players who do not use their credit lines to gamble at the Wynn will be approached by the casino and are less likely to receive credit from the Wynn in the future. Ms. Morejon testified that she was not aware of any instance when she, or any other Wynn employee, ever had to confront plaintiff for not using Wynn credit lines for gaming at the Wynn. Mr. Clinton testified that at the Bellagio, when a customer draws money from a credit line, the "understanding is that it is intended for play at the Bellagio . . . ." Mr. Clinton further testified that the casino can use players card wagering data to make a determination whether a credit line was used for gambling.

Plaintiff testified at his deposition that when he was unable to draw from his credit lines, he would take cash advances from his personal credit cards to continue gambling. Plaintiff also testified at his deposition that he used credit card advances to fund his gambling activities. The documents in the record indicate that defendant withdrew $2,549,306.00 in credit card advances in 2007 to fund his gambling activities, but significantly less in the years following. Plaintiff testified that he did not maintain a separate credit card account for gambling. Plaintiff also testified, and the record indicates, that plaintiff's credit card cash advances, typically, would result in an additional charge of three percent if the amount advanced was over $2,000.00. Mr. Aguilar testified that, at the Mirage, when plaintiff advanced money from a credit card, a casino cannot track how that money is used. Ms. Morejon testified similarly that at the Wynn, when money is advanced from a credit card, the casino cannot track whether or not that money was used for gambling. Mr. Clinton, from the Bellagio, also indicated that the casino has no involvement in managing credit card advances, or determining how they are used. Mr. Hudson, from the Wynn, testified, however, that certain large cash transactions between a casino and patron, such as when a patron converted cash or took money from an ATM from inside a casino "cage" area to buy slot tickets, are logged at casinos using Currency Transaction Reports. According to Mr. Hudson, at the Wynn, transactions of a "single incident of $10,000 or more multiple incidents of $10,000" over a single day would trigger a Currency Transaction Report. Currency Transaction Reports in the record from the Mirage, Wynn, and Bellagio indicate that plaintiff, on multiple instances, converted cash, or withdrew money from casino facilities, to purchase "casino chips, tokens, or other gambling instruments."

Plaintiff testified at his deposition that when he returned from his travels, he paid off his credit lines within "one week up to four months," and paid off his credit card advances when they came due. Ms. Morejon testified that plaintiff paid off his credit line at the Wynn "[w]ithin 60 days." Mr. DeCastroverde also testified that plaintiff paid back his credit line at the Bellagio within two months. Plaintiff testified at his deposition that he did not maintain bank accounts specifically for gambling, although it was suggested

by others to do so, and, instead, paid off these credit lines using his personal accounts. Plaintiff testified that, "[f]rom 2007 to 2009 the account at Merrill Lynch was the principal account, but I also used others." Ms. Campos testified that, in 2011, plaintiff paid back certain of his credit lines using his daughter's account, because the "exchange rate was very high in Mexico." Ms. Campos testified that plaintiff later paid back his daughter for those amounts.

Plaintiff indicated at his deposition that he relied on his players card to track his gambling "taxes, gain and losses." Mr. Clinton described in his testimony what a players card is and how it operates at the Bellagio. He stated:

> Players card is the card that we issue to our players, both slots and table games players. It's a membership program, a loyalty program. They utilize the card in slots. They insert the card into the machine in the respective slot that's provided, similar to an ATM machine, and all the play that takes place during that session is recorded in our database via having the card in.

Mr. Clinton further testified that a players card, when inserted, tracks all of a player's coin-in, coin-out, and jackpots. Mr. Clinton indicated that a players card looks like an ATM card, and that when it is properly inserted the light on the receptor turns from orange to green. He added that any time a machine is used without a players card in the system, that play is not tracked. Mr. Clinton testified that players use a players card to

> earn complimentaries based on their play. They also earn point play, and then they convert that to free play which they can then use and actually gamble with, so it's almost like a payback program referred to as point play, and based on each of their wages, they earn points, and those points have a value.

Mr. Aguilar testified that a players card operates at the Mirage in a similar fashion, and records a player's wagers and play on a particular machine. He also testified that it was not possible to record this information without the players card inserted into the machine. Ms. Morejon also testified that the players card at the Wynn, likewise, operates as described above.

Plaintiff testified at his deposition that he decided to use a players card "[b]ecause the -- the hotels offered that to you there on the tables and also you -- you get points and you get more." Plaintiff testified at his deposition that he inserted his players card into a slot machine before use, and understood how it operated. Plaintiff, however, went on to testify that "sometimes the -- the machine doesn't register it because you inserted it wrong, the wrong way," but added that this happened "maybe two, three percent of the time, but very few times, really." Plaintiff testified that he did not notice those instances also "[b]ecause many times we don't pay attention those -- to those little details." Mr. Free testified that he did not notice any difference in the slot

machine's operation with or without the player's card inserted. Mr. Aguilar, speaking about his time at the Mirage, testified that plaintiff made an effort to use his players card, and upon arriving at the casino, would ask for multiple players cards. Ms. Morejon, from the Wynn, testified that plaintiff used his players card, but that on "[i]nfrequent" occasions it would be inserted improperly. Mr. DeCastroverde, who worked at both the Mirage and the Bellagio between 2007 through 2010, testified that plaintiff made an effort to try to use his players card.

From the record, it appears that the efforts of multiple people were involved in preparing and managing plaintiff's travels to Las Vegas, managing plaintiff's records after his travel, and filing plaintiff's United States 1040NR tax returns. Plaintiff indicated through his interview statements and deposition testimony that he hired Roberto Dominguez[15] in 1994 to perform accounting and tax work related to his agriculture business, but then transitioned Mr. Dominguez in 2002 to "assist me in all my personal matters, including gaming." Plaintiff stated at his interview that: "When he [Mr. Dominguez] handled all my matters he used to earn $80,000 pesos per month, but when he handled only the taxes from Vegas the payment fluctuate [sic] according to the hours he dedicated to the business." Plaintiff also stated that Mr. Dominguez at times worked on both plaintiff's agriculture and gambling tax accounting. Plaintiff, however, later testified that, when plaintiff was gambling as an alleged business, Mr. Dominguez would spend most of his time on plaintiff's gambling work, and the two would meet "[e]very month or every two weeks or every -- every time that we had to make the income tax return." Mr. Dominguez's responsibilities, according to plaintiff's testimony, included having "all the information regarding the gambling activity, complete and accurate," so plaintiff could file his income taxes. Plaintiff testified at his deposition that he would meet Mr. Dominguez about "a month after" each trip. Plaintiff further testified at his deposition that, when working on plaintiff's gambling records, Mr. Dominguez spent about five days a week, two hours a day working for plaintiff. Plaintiff did not recall what Mr. Dominguez did in between trips, aside from managing the Form 1042-S records and helping file plaintiff's United States tax returns, but, according to plaintiff, Mr. Dominguez also had other accounting clients. Mr. Vazquez testified that plaintiff paid for Mr. Dominguez's services directly.

Ms. Campos testified at the trial that Mr. Dominguez was an accountant, who was in charge of plaintiff's Mexican tax returns, and who supervised Ms. Campos' work in relation to creation of the spreadsheet of Form 1042-S information. Plaintiff stated that he had an office that Mr. Dominguez would work out of, with "five, six, rooms, with air-conditioning, computers and everything." Plaintiff testified at his deposition that he paid for Mr. Dominguez's and Ms. Campos' office space. Ms. Campos testified that she and plaintiff would work out of that office as well, and that she would see plaintiff in that office from Monday through Saturday.

---

[15] Mr. Dominguez declined to travel from Mexico to appear and testify at the trial, and the parties did not move to admit any deposition testimony or statements from Mr. Dominguez.

Ms. Campos also testified that she was hired by plaintiff to work on "the administrative aspect of his betting business." She described her work in accordance with Mr. Free's gambling activities as "very stressful." Ms. Campos testified that there had not been a year since she started working for plaintiff in which she did not schedule multiple trips for plaintiff to go to Las Vegas. When plaintiff decided to go on a trip, Ms. Campos testified she would be informed "between two and three weeks before," and that Mr. Free would specify who was going, where, when, and the number of rooms. She stated that she would arrange all flights and rooms, although, on occasion, the family would book rooms on their own. Ms. Campos testified that she would also arrange for plaintiff's lines of credit with the casinos to be available. Additionally, she testified that she arranged with plaintiff's banks so that his credit cards were paid off and available for use in Las Vegas. Ms. Campos testified that this took approximately thirty hours per trip on average. Ms. Campos claimed that the "hard work" began after plaintiff's return from Las Vegas. According to Ms. Campos' testimony, plaintiff would hand over, or Ms. Campos would be mailed, all the Form 1042-S records plaintiff had obtained related to his jackpot winnings. She stated that plaintiff would also return with other documentation showing his charges from his stay in Las Vegas, including "his card statements that showed the withdrawals" from his credit or debit accounts. Ms. Campos also stated, however, that "sometimes two [the withdrawal receipts] were missing because he withdraws money and then gets gambling and . . . [t]he money disappears in the machine." Ms. Campos testified that she would organize the Form 1042-S records by casino, date, and bets, and then proceed to enter the data from the Form 1042-S records into a spreadsheet. After creating the spreadsheet, she testified that she would double-check the data and enter it into their accounting system, titled "MS-2," in order to create a record for each trip. After every trip, Ms. Campos testified that she would also manage the payment of plaintiff's credit lines from the casinos. Ms. Campos stated that she also helped plaintiff pay off his credit cards, and incorporated his credit card withdrawals into the accounting reports. Ms. Campos testified that she spent eighty hours per trip on these tasks.

Ms. Campos further testified that she also created an annual "state of results" report, based on the casinos' year-end reports and plaintiff's Form 1042-S information. According to Ms. Campos and plaintiff, the casinos would submit both the casinos' spreadsheet of plaintiff's Form 1042-S records, as well as separate year-end reports that contained the jackpots, coin-in, and coin-out information obtained from plaintiff's players card activity throughout the year. In calculating plaintiff's jackpot totals, Ms. Campos explained that she would compare the Form 1042-S spreadsheets submitted by the casinos with their own records and reconcile any differences. She explained that any discrepancies between their records and those of the casinos, regarding plaintiff's total jackpot amount, were usually due to the casino forgetting to send a Form 1042-S after plaintiff's travels. Unlike with plaintiff's jackpot data, however, Ms. Campos testified that she had to accept at face value the casinos' year-end reports regarding plaintiff's coin-in and coin-out amounts, which were derived from plaintiff's players card data, because there was no other source of information available. The "state of results" reports created by Ms. Campos included plaintiff's "REVENUE PER GAME," "COST OF REVENUE PER GAME," "GROSS PROFIT," "OVERHEAD EXPENSES," which

included travel costs, and "NET PROFIT OR LOSS." (capitalization in original). The 2010 "state of results" report also included plaintiff's comps earned as "OTHER PRODUCTS." From a review of Ms. Campos' testimony and the record, it appears that none of plaintiff's reports accounted for the expenses related to the time of the people involved in preparing the forms. Ms. Campos testified that she would work daily with Mr. Dominguez to prepare the per-trip and annual accounting summaries. She also testified that he would make decisions on what to include in the annual reports. In total, Ms. Campos estimated that she spent approximately fifty to eighty percent of her time per week on activities related to plaintiff's gambling activities, although she made no effort to segment her time between her gambling-related and other work for plaintiff. Plaintiff stated during his interview that Ms. Campos, between 2007 through 2010, spent about fifty percent of her time, on average, but sometimes up to eighty percent of her time, on his gambling activities.

Attorney Jon Schimmer, a partner at the Procopio law firm, testified that he was the primary attorney responsible for plaintiff's United States tax filings. Mr. Schimmer testified that he had not previously represented any nonresident aliens who operated a gambling business. Mr. Schimmer testified that after being contacted by plaintiff, his firm analyzed whether or not a slot machine player could be in a trade or business. Mr. Schimmer testified that he "did research, evaluated the existing case law, and there was case law out there that somebody could in fact be a professional gambler by playing slot machines." Mr. Schimmer testified that the firm also analyzed whether or not plaintiff would be a resident or nonresident for the purposes of his tax returns, and that the firm concluded he was not a resident under I.R.C. § 7701(b).

Mr. Schimmer explained that he would collect the per-trip and year-end spreadsheets and reports created by Ms. Campos and Mr. Dominguez, as well as the original documents, such as the credit and debit card ATM withdrawal receipts and casino credit line markers.[16] He indicated that, "whatever record was associated with the gambling business I would receive in very detailed and meticulously maintained binders." Mr. Schimmer testified that he himself spot-checked the data by randomly sampling certain Form 1042-S records with the spreadsheets, and discussing any issues with Mr. Dominguez and Ms. Campos. Mr. Schimmer testified that Mr. Dominguez would travel to visit him every year. Mr. Schimmer testified that he would help reconcile the casino year-end win/loss statements with plaintiff's records, and use this information to calculate plaintiff's net profit or loss for the year. According to Mr. Schimmer, plaintiff's revenue would be calculated by adding together "the jackpot

---

[16] Mr. Aguilar, speaking in reference to his time at the Mirage casino, explained that a "marker" is "a promissory note that the casino is giving you X amount of money, and you're responsible to repay it." Mr. Aguilar testified that casinos would issue these when gamblers withdrew from their credit lines, and that the casinos would maintain the physical copies. According to Ms. Morejon, at the Wynn, casino markers and casino win/loss statements have to be requested by the gambler for the casino to provide them. Mr. DeCastroverde testified that at either the Mirage or the Bellagio casinos, "if he sends in the payment the markers are sent to him if he requests it."

information that he had that was listed on the voluminous 1042s that he received each year," with the "coin out component from the casino year-end win/loss statement." Plaintiff's comps were not included as income prior to 2010, because, according to Mr. Schimmer, the casinos would not provide the information. Mr. Schimmer explained that plaintiff's expenses would be calculated by taking "the coin in from the casino year-end win/loss statement, and that would represent the total wagering cost." Mr. Schimmer did not indicate in his testimony that any of the costs related to the time of Mr. Dominguez, Ms. Campos, Mr. Jimenez, or his law firm, or any other person that assisted plaintiff in his gambling activities, was factored in as an expense on plaintiff's tax filings.

Mr. Schimmer testified that plaintiff's accounting information would then be transmitted to Celso Jimenez, an accountant in the United States, who prepared plaintiff's 1040NR income tax forms. Mr. Jimenez testified that he personally never confirmed or examined Ms. Campos' numbers for accuracy. Mr. Jimenez testified:

> Q. Did you do anything to independently verify whether or not the numbers carried on the income summary provided to you matched the casino statements or the 1042s?
>
> A No.
>
> Q Who did you rely on in order to accurately reflect that information?
>
> A On the bookkeeper, which was Nereyda Campos, and it was somewhat verified by Attorney Jon Schimmer.

Using the information provided by Mr. Schimmer, Mr. Jiminez testified that he would complete plaintiff's 1040NR returns, treating plaintiff's gambling activity as a business, with his annual wagering costs deducted from his annual gambling winnings as business expenses. Mr. Jiminez testified that he would pass the completed return to Mr. Schimmer, who would eventually file it. Mr. Jimenez stated that he took one to two hours to complete plaintiff's 1040NR, and was compensated directly by plaintiff between $900.00 and $1,000.00 for his effort. Mr. Schimmer testified that, after receiving a draft completed return from Mr. Jimenez, Mr. Schimmer would review the return, and then Mr. Jiminez would finalize it. Mr. Schimmer testified that he would mail the finalized return to the IRS, along with all of plaintiff's original Form 1042-S records attached as substantiation, as well as any spreadsheets which cataloged the 1042-S records. In total, Mr. Schimmer testified that he spent twenty-five to forty hours per year preparing plaintiff's tax returns, at a cost of $300.00 to $420.00 per hour. Plaintiff stated at his interview that, in total, the costs of these accounting, tax, and related services cost him "[a]pproximately $150,000 dollars per year."

During trial, there were some discussions regarding whether plaintiff could have been eligible to be exempt from the automatic tax withholding requirement. Mr. Schimmer testified that an IRS Form W-8ECI (Effectively Connected Income), titled "Certificate of Foreign Person's Claim That Income Is Effectively Connected With the

Conduct of a Trade or Business in the United States," Form W-8ECI (Feb. 2006 Rev.), was part of a

> whole series of W-8 forms that a nonresident alien can give to a U.S. payor. The Form W-8ECI in particular is for a nonresident to give to a U.S. payor to say that the nonresident is in a U.S. trade or business and the amounts that that nonresident is going to receive from the U.S. payor are not subject to withholding.

Mr. Schimmer testified the casinos are not required to accept the W-8ECI form. Mr. Schimmer testified that he evaluated whether it was appropriate for plaintiff to submit a Form W-8ECI to the casinos, and concluded that, based on his experience, casinos would "[a]bsolutely not" accept the form in plaintiff's case. Mr. Schimmer went on to explain that the "potential penalty exposure for accepting the form and not withholding" could be a deterrent for casinos accepting a form W-8ECI. Nonetheless, Mr. Schimmer testified that he still suggested to plaintiff to ask the casinos if they would accept a Form W-8ECI, "but explained the unlikelihood that it would be accepted." Plaintiff testified at his deposition that he never asked the casinos about a Form W-8ECI, nor ever attempted to claim to the casinos that his winnings were exempt from the withholding requirement. Mr. Aguilar, recalling his time at the Mirage, testified that plaintiff never claimed to be exempt from income tax withholding, but, that he also was not aware of any way a gambler, like plaintiff, could become exempt from withholding taxes. Mr. DeCastroverde, who worked previously at both the Mirage and the Bellagio, also testified that plaintiff never claimed that he was exempt.

Although covering years prior to the years at issue in the above captioned case, and, therefore, not dispositive on the issues before the court, plaintiff reported that he was a "GAMBLING PROFESSIONAL" on his 2004, 2005, and 2006 United States 1040NR tax returns. (capitalization in original). Plaintiff reported on his 2004 tax return a gross business income of $1,405,020.00, "WAGERING EXPENSES" of $1,877,823.00, travel costs of $5,225.00, for a net loss of $478,028.00. (capitalization in original). Plaintiff reported on his 2005 tax return a gross business income of $2,425,479.00, a "WAGERING COST" of $1,697,833.00, and travel expenses of $4,058.00, for a "net profit" of $723,588.00. Mr. Jimenez, plaintiff's accountant, also testified that plaintiff's profit in 2005 was "a little over $720,000." A later stipulation, however, filed in a case plaintiff brought at the United States Tax Court, determined plaintiff's gambling profit for 2005 to be $1,088,004.00. Plaintiff reported on his 2006 tax return a gross business income of $6,813,240.00, a "WAGERING COST" of $6,759,274.00, travel costs of $10,613.00, for a "net profit" of $43,353.00. (capitalization in original).

On the 2004, 2005, and 2006 returns, plaintiff requested a refund of his jackpot winnings withheld by the casinos. According to Mr. Schimmer, plaintiff's 2004 return was accepted by the Internal Revenue Service (IRS), and the requested refund of $421,508.00 was remitted to plaintiff by the IRS "a little over a month after the return was filed." According to Mr. Schimmer, after plaintiff filed his 2005 tax return, in which he requested a refund of $654,669.00, plaintiff was provided a refund in "July or August

of 2007." Mr. Schimmer testified that later, after the refund for the 2005 return was already issued, the IRS performed its own examination and submitted a "revenue agent's report" and a "statutory notice of deficiency" to Mr. Schimmer. According to Mr. Schimmer, the statutory notice of deficiency sought to disallow "the wagering costs that were reported on the 2005 tax year." After initial difficulty reaching the IRS, Mr. Schimmer testified that he assisted plaintiff in filing a United States Tax Court petition to contest the statutory notice of deficiency, and stated that "it may have been in early 2008 where we filed the Tax Court petition to basically contest the statutory notice of deficiency." According to Mr. Schimmer, after filing the United States Tax Court petition, but before trial, "in the interim, the case gets transferred to IRS appeals where there's negotiations to discuss the issues and to settle the dispute ideally before trial." Mr. Schimmer testified that "we started working with the IRS, the appeals officer and with the [Internal Revenue Service] attorney, and we were ultimately able to resolve the 2005 Tax Court case with a stipulated decision." The parties in the case before this court stipulated that: "a Stipulated Decision Document was issued, reflecting a net income for Plaintiff of $1,088,004.00 for 2005." Mr. Schimmer also testified that after plaintiff filed his 2006 tax return, in which he requested a refund of $2,038,236.00, he was refunded that amount finally in 2009. Mr. Schimmer testified that a "mixup" at the IRS delayed the refund: "[F]rom what I [Mr. Schimmer] understand, the return was actually misplaced along with all the 1042s that were filed with it, so we had to send another complete set of 1042s . . . ." After receiving the 2006 refund in 2009, Mr. Schimmer testified that he also received a revenue agent's report "about a month later," proposing to disallow all of the wagering costs reported on the 2006 return. Mr. Schimmer testified that after again having trouble reaching the IRS, he was able to utilize a taxpayer advocate and get a "no-change" letter issued by the IRS. Mr. Schimmer testified that the 2005 and 2006 audits did not expressly discuss the status of plaintiff's gambling activities as a trade or business, but were instead "substantiation cases in that they were disallowing or proposing to disallow the wagering expenses." Although the parties stipulate to plaintiff's 2005 net income, defendant disagrees that plaintiff's net income from gambling was $43,353.00 in 2006, and alleges that, "given the flaws in his [plaintiff's] accounting methodology, the [sic] is no reason the Court should find that figure credible." Plaintiff's accounting methodology is discussed further below.

Turning to the tax years at issue in the above captioned case, Mr. Schimmer testified that he filed plaintiff's 2007 through 2010 1040NR tax returns. The parties stipulate that plaintiff submitted his 2007 tax return on October 29, 2008. Plaintiff, in his 2007 tax return, requested a refund of $4,947,055.00 from his withheld taxes. The parties stipulate that plaintiff submitted his 2008 tax return on December 8, 2009. Plaintiff, in his 2008 tax return, requested a refund of $4,310,356.00 from his withheld taxes. The parties stipulate that plaintiff submitted his 2009 tax return "[o]n or about May 21, 2010." Plaintiff, in his 2009 tax return, requested a refund of $3,095,037.00 from his withheld taxes. The parties stipulate that plaintiff submitted his 2010 tax return on

December 15, 2011. Plaintiff, in his 2010 tax return, requested a refund of $4,006,647.00 from his withheld taxes.[17]

Mr. Schimmer testified that he was first notified about an issue related to the 2007 and 2008 returns in March of 2010. According to Mr. Schimmer, the IRS requested substantiation of the tax return income and expense items, which, according to Mr. Schimmer, is "where you're essentially providing source support for the numbers that you've put on the tax return." In response, Mr. Schimmer testified that he "put together very voluminous binders with all the expense and income substantiation information." Mr. Schimmer testified that although the IRS agent started with the 2008 return, Mr. Schimmer requested that the 2007 and 2009 tax returns be incorporated into the review as well, "because we had a point of contact and somebody that was working with the casinos and getting amounts confirmed and so forth." Mr. Schimmer testified that, in January of 2011, he first became aware that the scope of the audit was more than substantiation, "when the revenue agent issued an information document request . . . . essentially to evaluate the profit motivation factors under the [I.R.C.] § 183 regulations." Mr. Schimmer testified that he was the main contact person with the tax examiner for plaintiff. Mr. Schimmer generally described his experience with the IRS during this period as "frustrating" because "it just seemed like a lot of different levels of review and substantiation and things were just delay, delay, delay." He testified, however, that he had a "decent working relationship" with the tax examiner for plaintiff's 2007 through 2010 tax returns. Mr. Schimmer testified that he provided all documents requested by the IRS, cooperated with the IRS, and the IRS never complained that documents were not provided in a timely manner or that he was uncooperative. Defendant has not produced any evidence or testimony that indicates plaintiff did not cooperate with the IRS. A January 17, 2012 letter from Mr. Schimmer to Derek Turpin, an IRS examiner responsible for auditing plaintiff's 2007 through 2010 tax returns, indicates that plaintiff was still in discussions with the IRS at the time about his status as a professional gambler. This letter offered arguments as to why plaintiff was in the trade

---

[17] Plaintiff's requested refund for his 2009 and 2010 tax returns has changed slightly since the filing of plaintiff's tax returns. Plaintiff is now requesting a refund of $3,072,024.00 from his 2009 withheld taxes, and a refund of $4,031,545.00 from his 2010 withheld taxes. This change is a result of the parties jointly stipulating the value of the comps plaintiff received in 2009 and 2010. According to plaintiff, a change to the value of plaintiff's comps impacts plaintiff's refund request whenever he reported a net profit from his gambling activities, which was in 2009 and 2010, because comps are treated by plaintiff as gross income. When plaintiff filed his 2009 tax return, plaintiff did not report any comps, because the casinos appear to have resisted divulging this information. The parties now stipulate that plaintiff received $81,156.00 in comps in 2009. Plaintiff, for his 2010 tax return, took a different approach than on his 2009 tax return, and estimated the value of comps he received in 2010, at $153,839.00, and represented this estimate on his 2010 tax return. According to Mr. Schimmer's testimony at the trial, this estimate was ascertained by one of plaintiff's sons-in-law calling the casinos to ask for the values. The parties now stipulate that plaintiff received only $102,821.00 in comps in 2010.

or business of gambling, and requested "the IRS to resolve this issue with a finding that Mr. Free was in the trade or business of gambling during each of the tax years 2007, 2008 and 2009."

On February 22, 2012, plaintiff filed suit in this court, alleging that "[a]s a direct and proximate result of the IRS's refusal to refund the federal taxes owed claims for tax years 2007, 2008, 2009, and to make the appropriate adjustments, TAXPAYER has been damaged in a sum of at least $12,352,448, according to proof, together with interest thereon as provided in the Internal Revenue Code." Plaintiff subsequently amended his complaint to include his 2010 tax refund request. Plaintiff, in his second amended complaint, claimed damages "in a principal sum in excess of $16,359,095," as well as interest, reasonable attorney's fees, the costs of the suit incurred, and for any such relief as the court deems just and proper. Plaintiff alleges that, "[t]he IRS's failure and refusal to fully refund taxes owing to TAXPAYER is without substantial justification." Subsequently, the amount of the claimed refund changed slightly. In plaintiff's post-trial brief, plaintiff alleged the refund amount should be $15,910,455.00. During closing arguments, plaintiff alleged that the refund amount should be $16,360,455.00, and the prior designated amount was in error.

## DISCUSSION

Plaintiff filed suit citing 28 U.S.C. § 1346 (2006), which gives the United States Court of Federal Claims jurisdiction in "[a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected." Defendant does not contest jurisdiction.

"[A]mount[s] received from sources within the United States by a nonresident alien individual," not engaged in a trade or business, are taxed at thirty percent. See I.R.C. § 871(a)(1). "[A]mount[s] received" includes "interest (other than original issue discount as defined in [I.R.C.] section 1273), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, and other fixed or determinable annual or periodical gains, profits, and income." Id. § 871(a)(1)(A). Gambling winnings, such as slot machine winnings, have been accepted by some courts as falling under the I.R.C. § 871(a)(1)(A) tax, because they qualify as "other fixed or determinable annual or periodical gains." See Barba v. United States, 2 Cl. Ct. 674, 678 (1983) (quotation omitted); Park v. Comm'r, 722 F.3d 384, 386 (D.C. Cir. 2013); Abeid v. Comm'r, 122 T.C. 404, 406 (2004) (citing Barba v. United States, 2 Cl. Ct. 674). To assist the IRS in collecting the thirty percent tax from nonresident alien gamblers not established as engaged in a trade or business, taxes are withheld at the casino. See I.R.C. § 1441(a), (b), (c)(1) (requiring the paying institution, such as the casino, to withhold taxes on income taxable under I.R.C. § 871(a), earned by nonresident aliens not engaged in a United States trade or business). Although not discussed by the parties, it appears the casinos plaintiff played at take this withholding when a nonresident foreign recreational gambler hits a jackpot of $1,200.00 or more, because jackpots of that amount or higher trigger a responsibility on the casinos to file informational returns with the IRS. See Treas. Reg. § 7.6041-1(a) (requiring casinos to

file informational returns with the IRS for slot machine winnings equal to or exceeding $1,200.00); Treas. Reg. § 7.6041-1(b)(1) (For the purposes of "determining whether such winnings equal or exceed the $1,200" amount, "the amount of winnings shall not be reduced by the amount wagered."); see also Treas. Reg. § 1.1461-1(a)–(c) (2010) (indicating Form 1042-S as the preferred document for casinos to use when filing an informational return to the IRS, for "amounts paid to a foreign payee"). As plaintiff's expert witness, John Robison, indicated, if the jackpot winning is "$1,200 or more, the machine will actually lock up and a slot person is going to have to come over and do the tax paperwork and then release the machine so it can be played again." See also Lyszkowski v. Comm'r, T.C. Memo. 1995-235, 1995 WL 325624, at *8–10 (1995) (discussing the withholding requirements pertaining to slot machines gambling winnings, as applied to United States resident recreational gamblers), aff'd, 79 F.3d 1138 (3d Cir. 1996).

If gamblers, however, are "engaged in a trade or business within the United States," they are taxed pursuant to I.R.C. § 871(b)(1), which results in taxation "in the same manner and at the same rates as that of a U.S. person." See Park v. Comm'r, 136 T.C. 569, 579 (2011), rev'd on other grounds, 722 F.3d 384 (D.C. Cir. 2013). Taxation under I.R.C. § 871(b) allows for deductions for gambling losses, "to the extent of the gains of such transactions." I.R.C. §§ 165(d), 873(a) (2006). This allows the business taxpayer to deduct gambling losses from his or her winnings. See Chow v. Comm'r, T.C. Memo. 2010-48, 2010 WL 985242, at *7 (2010) ("We conclude, however, that petitioner was a professional gambler during 2004 and 2005 and may deduct her gambling losses to the extent of her gambling winnings on Schedule C."), aff'd, 481 F. App'x 406 (9th Cir. 2012), cert. denied, 133 S. Ct. 1304 (2013); Shollenberger v. Comm'r, T.C. Memo. 2009-306, 2009 WL 5103973, at *2 (2009). The parties have jointly agreed that the first issue before the court, therefore, is "whether plaintiff's gambling activity was 'effectively connected with the conduct of a trade or business within the United States' within the meaning of I.R.C. § 871(b)(1)."[18]

Neither Congress nor the IRS have explicitly defined what constitutes a "trade or business" under I.R.C. § 871. See, e.g., 161 A.L.R. Fed. 245 § 2 (2000) ("Despite the importance of the phrase trade or business. [sic] neither the Internal Revenue Code nor the Internal Revenue Regulations generally defines the phrase trade or business.") (quotations omitted). Available as guidance, the United States Supreme Court discussed what comprises a "trade or business" within section 162 of the Internal Revenue Code, in the seminal case, Commissioner v. Groetzinger, 480 U.S. 23 (1987).

---

[18] After the trial testimony was taken, plaintiff offered a new argument contending that, even if plaintiff is determined not to be gambling in a trade or business, pursuant to I.R.C. § 871(a), the taxes on plaintiff's gambling winnings should be collected only after a session of gambling, and not after each individual wager. Plaintiff refers to this as a "per-session" approach to tax collection. The IRS has calculated plaintiff's tax liability, however, based on his income per individual wager, or on a "per-bet" basis, treating each individual wager as a taxable event. Defendant contends that the per-bet approach is consistent with the history and purpose of I.R.C § 871.

The United States Supreme Court in <u>Groetzinger</u> discussed the concept of "trade or business" as applied to just one section of the Internal Revenue Code, I.R.C. § 162, titled "**Trade or business expenses**." <u>See</u> I.R.C. § 162 (1984) (emphasis in original). The Court indicated, however, "[w]e caution that in this opinion our interpretation of the phrase 'trade or business' is confined to the specific sections of the Code [I.R.C. § 162] at issue here. We do not purport to construe the phrase where it appears in other places." <u>Comm'r v. Groetzinger</u>, 480 U.S. at 27 n.9. In <u>Groetzinger</u> the Court stated:

> We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity [(1)] with continuity and regularity and [(2)] that the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify.
>
> . . .
>
> [I]f one's gambling activity is pursued full time, in good faith, and with regularity, to the production of income for a livelihood, and is not a mere hobby, it is a trade or business . . . .

<u>Comm'r v. Groetzinger</u>, 480 U.S. at 35.

Section 162 of the Internal Revenue Code is contained in Chapter 1, Subchapter B of the Internal Revenue Code, titled "**Computation of Taxable Income**." I.R.C. §§ 61–291 (2006) (emphasis in original). The case currently before the court turns on the definition of "trade or business" as applied to a different part of the Internal Revenue Code, I.R.C. § 871, titled "**Tax on Nonresident Alien Individuals**." <u>Id.</u> (emphasis in original). This section is contained in Chapter 1, Subchapter N of the Internal Revenue Code, titled "**Tax Based on Income from Sources Within or Without the United States**." I.R.C. §§ 861–999 (2006) (emphasis in original). Despite the United States Supreme Court's limitation, the <u>Groetzinger</u> standard has been applied by some courts to determine the meaning of "trade or business" in other parts of the tax code beyond section 162, including I.R.C. § 871. <u>See</u> <u>Park v. Comm'r</u>, 136 T.C. at 579 (applying the <u>Groetzinger</u> standard to I.R.C. § 871, the provision at issue in the above captioned case); <u>see</u> <u>also</u> <u>Clearmeadow Invs., LLC v. United States</u>, 87 Fed. Cl. 509, 525–26 (2009) ("While the Court 'confined' its construction of the phrase 'trade or business' to section 162 of the Code, <u>Groetzinger</u>, 480 U.S. at 27 n. 8, 107 S. Ct. 980, other courts have found its definition equally applicable in interpreting many other Code requirements dependent upon the existence of a 'trade or business.'") (footnote omitted); <u>id.</u> at 525 n.20 (A judge of this court discussed the application of the <u>Groetzinger</u> standard to sections 165, 167, 174, 183, 195, 358, 469, and 531 of the Internal Revenue Code, but admitted that, "[t]his is not to say that the phrase 'trade or business' has precisely the same meaning in every one of the over fifty sections in which it appears in the Code."); <u>Johnson v. United States</u>, 32 Fed. Cl. 709, 714 (1995) (applying the <u>Groetzinger</u> standard to a "trade or business" determination under I.R.C. § 183 (2006), titled "**Activities not engaged in for profit**" (emphasis in original)), <u>aff'd</u>

sub nom. Drobny v. United States, 86 F.3d 1174 (Fed. Cir.) (unpublished), reh'g denied (Fed. Cir. 1996), cert. denied, 519 U.S. 1055, reh'g denied, 520 U.S. 1110 (1997); Chow v. Comm'r, 2010 WL 985242, at *5 (same); Cent. States, Se. & Sw. Areas Pension Fund v. Messina Products, LLC, 706 F.3d 874, 883 (overturning a prior decision and stating: "When Ditello was decided, it was not yet settled in our circuit that the Groetzinger test is the test for determining whether entities are 'trades or businesses' under [I.R.C.] section 1301(b)(1). There is no more uncertainty; that issue is settled."). But see MedChem (P.R.), Inc. v. Comm'r, 295 F.3d 118, 132 (1st Cir. 2002) (adopting its own definition of trade or business for I.R.C. § 936 (2000), and stating that "[o]ther circuits construing the phrase 'trade or business' have also concluded that the phrase has different meanings in different sections of the Internal Revenue Code") (citations omitted).

Therefore, without specific legislative or regulatory guidance, the Groetzinger guidance is an excellent place to start to determine whether plaintiff was engaged in a "trade or business" under I.R.C. § 871(b), recognizing that the analysis of whether an activity is a "trade or business" is a heavily fact-based inquiry, and different sections of the Internal Revenue Code may require different analyses. See Comm'r v. Groetzinger, 480 U.S. at 35–36 ("We therefore adhere to the general position of the Higgins Court, taken 46 years ago, that resolution of this issue 'requires an examination of the facts in each case.'" (quoting Higgins v. Comm'r, 312 U.S. 212, 217 (1941)); Eastman v. United States, 225 Ct. Cl. 298, 304 (1980) ("Whether plaintiffs had the requisite intention is a question of fact to be determined on the basis of all the facts and circumstances . . . ."); Park v. Comm'r, 136 T.C. at 580 ("Whether the taxpayer engages in an activity with the primary purpose of making a profit is a question of fact to be resolved on the basis of all the facts and circumstances in a particular case." (citing Golanty v. Comm'r, 72 T.C. 411, 426 (1979), aff'd, 647 F.2d 170 (9th Cir. 1981))); Dreicer v. Comm'r, 78 T.C. 642, 645 (1982) ("His motive is the ultimate question; yet, it must be determined by a careful analysis of all the surrounding objective facts, and greater weight is given to such facts than to his mere statement of intent."), aff'd, 702 F.2d 1205 (D.C. Cir. 1983); Barker v. Comm'r, T.C. Memo. 2012-77, 2012 WL 947134, at *4 (2012) ("Whether a taxpayer is engaged in a trade or business is determined using a facts and circumstances test . . . ."). "When reviewing the assessment of taxes and penalties, '"[t]he ruling of the Commissioner of Internal Revenue enjoys a presumption of correctness and a taxpayer bears the burden of proving it to be wrong."'" Litman v. United States, 81 Fed. Cl. 315, 318 (2008) (quoting Conway v. United States, 326 F.3d 1268, 1278 (Fed. Cir.), reh'g denied (Fed. Cir. 2003) (quoting Transamerica Corp. v. United States, 902 F.2d 1540, 1543 (Fed. Cir. 1990))). "As a general rule, the burden of proof is on the taxpayer in tax refund cases." Okerlund v. United States, 53 Fed. Cl. 341, 356 (2002) (citing Welch v. Helvering, 290 U.S. 111, 115 (1933)), reconsid. denied, 2003 WL 1547563 (Fed. Cl. Feb. 14, 2003), aff'd, 365 F.3d 1044 (Fed. Cir. 2004).

Defendant initially argues that the activity of slot machine gambling fundamentally cannot be a trade or business, because the chance to make a profit is extremely unlikely. According to defendant, "[a]t its most basic, slot machine gambling is a losing proposition. Slot machines are computerized gambling devices designed with a

33

pre-programmed mathematical advantage that favors the casino . . . ." Defendant claims that, "given a sufficient number of spins, slot machines present not just a losing proposition, but also the virtual guarantee that the player will lose and the casino will win." Defendant estimated that plaintiff made over 700,000 wagers, and concluded those wagers "would constitute long-run activity that, with at least 95% confidence, would not produce any income or profit even if Mr. Free were 'very lucky.'" Defendant also states, "[w]ith slots there is no skill a player can leverage to optimize his play and gain the advantage." Defendant's expert witness, Mr. Frank Legato, in his testimony and in his expert report, described in detail how slot machines in Las Vegas are operated using a "random number generator," which produces a result for each wager that is not affected by the player, prior results, or any external circumstances. Mr. Legato also stated in his report that, in his twenty-eight years covering the slot machine industry, he never came across a slot machine professional gambler, because the slot machine random number generator "cannot be predicted and cannot be influenced by any skill or insight of the player." Defendant's expert witness Mr. Legato points to the Nevada Gaming Board Regulation 14.040(2)(a), which, according to Mr. Legato, at the time he filed his expert report, states: "Each possible permutation or combination of game elements which produce winning or losing game outcomes must be available for random selection at the initiation of each play." (emphasis removed). The existence and operation of the random number generator is not disputed by plaintiff's expert witness. Both parties' expert witnesses testified that it would not be difficult to learn about the existence and implications of the random number generator. In fact, the only document that plaintiff ever indicated he had read regarding the operation of slot machines, titled Slot Machine Report, discussed slot machine random number generators.

Both plaintiff's and defendant's expert witnesses testified that slot machines are installed with payback programs that predetermine the casino's theoretical hold and the gambler's overall payback from any machine. Defendant's expert in his report testified that a casino's "theoretical hold" is "the portion of wagers expected to be kept by each slot machine as profit." This is the opposite of a "payback percentage," which was described by defendant's expert witness as the portion of wagers the slot machine returns, or pays back, a gambler over time. Both parties' expert witnesses testified that "payback programs" are installed on slot machines, and that they determine the slot machine's overall, theoretical hold by placing more or less losing combinations on the program's "virtual reel," which is from where the random number generator picks results. According to both experts' testimony, if, for example, a casino wanted to increase its theoretical hold, and therefore decrease its payback percentage to the gambler, it could change its payback program to add more losing combinations to the slot machine's "virtual reel," decreasing the chance that the random number generator would pick a winning combination per wager. No casino employee or expert witness testified that the machines were ever programmed to give a positive theoretical return to the user. Casino representatives testified that changing the hold percentage of a slot machine is a difficult process, involving the Nevada Gaming Commission, and as a result it is not done often, an observation also mentioned in the Slot Machine Report, which plaintiff stated he had read. The trial demonstrated that slot machines provided for a stable income stream for the casino over the life of the machine. Plaintiff actually

admits this in one of the headings in plaintiff's post-trial brief, which reads: "**Slot Machines Are Engineered With A 'House Edge.'**" (emphasis in original). Plaintiff notes in the same brief, however, that, "a probability of loss does not mean a player cannot, in fact, win."

Plaintiff points to Treasury Regulation § 1.183-2(c), which he alleges provides an example of a trade or business that operates similar to plaintiff's situation, as follows:

> "A, an independent oil and gas operator, frequently engages in the activity of searching for oil on undeveloped and unexplored land which is not near proven fields. He does so in a manner substantially similar to that of others who engage in the same activity. The chances, based on the experience of A and others who engaged in this activity, are strong that A will not find a commercially profitable oil deposit when he drills on land not established geologically to be proven oil bearing land. However, on the rare occasions that these activities do result in discovering a well, the operator generally realizes a very large return from such activity. Thus, <u>there is a small chance that A will make a large profit from his soil exploration activity. Under these circumstances, A is engaged in the activity of oil drilling for profit.</u>"

(quoting Treas. Reg. § 1.183-2(c)) (emphasis in original). Plaintiff notes that the potential income from a large slot machine jackpot can be quite high, just as if "A" in the example were to find oil. Plaintiff also points to United States Tax Court decisions which conclude that an activity was a trade or business despite having incredibly low chances of success. <u>See</u>, <u>e.g.</u>, <u>Snyder v. Comm'r</u>, T.C. Memo. 1987-539, 1987 WL 49151 (1987) (finding the taxpayer's horse-breeding activity to be a trade or business despite seven years of losses and potentially "undue optimism on petitioner's part as to the chances for success"); <u>Metcalf v. Comm'r</u>, T.C. Memo. 1963-277, 1963 WL 702 (1963) (holding that plaintiff's farming operation was a trade or business, despite twenty-four straight years of losses, because he operated "with the intent and expectation of eventually making a profit from the operation").

Decisions in the United States Tax Court also have concluded that slot machine gambling can be a trade or business. <u>See</u>, <u>e.g.</u>, <u>Chow v. Comm'r</u>, 2010 WL 985242, at *6–7 ("This is a close case, and petitioners would be prudent to abandon [slot machine] gambling as a potential source of income. We conclude, however, that petitioner was a professional gambler during 2004 and 2005 . . . ."); <u>Le v. Comm'r</u>, T.C. Summ. Op. 2010-94, 2010 WL 2813420 (2010); <u>Myers v. Comm'r</u>, T.C. Summ. Op. 2007-194, 2007 WL 4117442 (2007).[19] The IRS also has determined that slot machine gambling can be

---

[19] Pursuant to I.R.C. § 7463, titled "**Disputes involving $50,000 or less**," the two United States Tax Court Summary Opinions cited above, <u>Le v. Commissioner</u>, and <u>Myers v. Commissioner</u>, "shall not be reviewed in any other court and shall not be treated as a precedent for any other case." I.R.C. § 7463(b) (2006) (emphasis in original). Nonetheless, the two decisions indicate that the United States Tax Court has

acknowledged as a trade or business under the proper circumstances. See Kochevar v. Comm'r, T.C. Memo. 1995-607, 1995 WL 760397, at *2 (1995) (An IRS Appeals Officer, an employee of the IRS, agreed that the taxpayer's slot machine gambling was a trade or business under I.R.C. § 162, and stated in a letter to the taxpayer: "You and I discussed you and your wife's approach to slot machine playing and I told you that I accepted that you were in a trade or business.").

As noted above, the analysis of whether an activity is a trade or business "'requires an examination of the facts in each case.'" Comm'r v. Groetzinger, 480 U.S. at 36 (quoting Higgins v. Comm'r, 312 U.S. at 217). The United States Supreme Court, in Groetzinger, stressed its "concern that an attempt judicially to formulate and impose a test for all situations would be counterproductive, unhelpful, and even somewhat precarious for the overall integrity of the Code." Id. The United States Supreme Court wrote:

> If a taxpayer, as Groetzinger is stipulated to have done in 1978, devotes his full-time activity to gambling, and it is his intended livelihood source, it would seem that basic concepts of fairness (if there be much of that in the income tax law) demand that his activity be regarded as a trade or business . . . .

Id. at 33. Although slot machine gambling appears to be a risky business at best, the high probability of loss does not mean a player absolutely could not be in the trade or business of gambling. Using the Groetzinger factors discussed above as a good way to approach the issues, the court, therefore, will look to the unique "facts and circumstances" of plaintiff's case to determine whether or not his activity was a trade or business. See Eastman v. United States, 225 Ct. Cl. at 304; Dreicer v. Comm'r, 78 T.C. at 645; Golanty v. Comm'r, 72 T.C. at 426; Barker v. Comm'r, 2012 WL 947134, at *4.

Continuity and Regularity

Mr. Free claims that he "gambled far more than a player just playing for recreation." Plaintiff gambled 44 days in 2007, 29 days in 2008, 20 days in 2009, and 25 days in 2010, He claims that a mere per-day calculation discounts his true playing time, since his play was more than eight hours a day. According to plaintiff, he "would start gambling first thing in the morning before breakfast, and continue until after dinner, with typically only meal breaks during the day." Plaintiff stated at his interview that he gambled on average fifteen to sixteen hours a day, and, therefore, claims that his days should count as double-shifts. Plaintiff also states that he was limited in how many days he could gamble in Las Vegas for two reasons. First, plaintiff claims that he had to stay in the United States for less than 122 days total per year. Otherwise, he alleges he would have been deemed a United States taxpayer, and taxable on his "worldwide income," including, his Mexican income, citing to I.R.C. § 7701(b), and IRS Publication

---

not decided, as a rule, that slot machine gambling cannot be classified as a trade or business.

519. Additionally, plaintiff stated during his interview that the withholdings not returned by the IRS of his jackpot winnings prevented him from financing further gambling trips. Plaintiff's assistant Ms. Campos also testified that plaintiff took fewer trips because of the lack of tax refunds.

Defendant's response focuses on the language in Groetzinger; that "'continuity and regularity'" requires the conduct to be "'pursued full time, in good faith, and with regularity.'" (quoting Comm'r v. Groetzinger, 480 U.S. at 35). Defendant argues that in order for plaintiff's activity to be continuous and regular, far more hours would be required. In its post-trial brief, defendant claims that, "where taxpayers have engaged in gambling activities with something significantly less than full time devotion, most courts have found those activities insufficient to satisfy the continuity/regularity requirement of a trade or business." Defendant asks the court to compare Commissioner v. Groetzinger, 480 U.S. at 23 (finding that taxpayer's sixty to eighty hours a week spent on the activity was continuous and regular), and Busch v. Commissioner, 713 N.W.2d 337, 340 (Minn. 2006) (finding that taxpayer's forty to sixty hours a week playing slot machines was continuous and regular), with Hastings v. Commissioner, T.C. Memo. 2009-69, 2009 WL 814227, at *1, *4 (2009) (finding that taxpayer's gambling over sixty days a year on holidays and weekends was "irregular[]"), and Byrd v. Hamer, 943 N.E.2d 115, 131 (Ill. App.) (finding that taxpayer's 2.57 casino visits per week was not akin "with the regularity exemplified in Groetzinger"), appeal denied, 949 N.E.2d 1096 (Ill. 2011).

Defendant also challenges how long plaintiff spent each day gambling, alleging that plaintiff's players card data indicated he, on average, only played eight to eleven hours a day during his trips between 2007 and 2010. Finally, defendant argues that plaintiff's trips were sporadic, and that they "simply coincided with a holiday or family vacation." Defendant notes that plaintiff sometimes travelled for his birthday, and that his play also coincided with "'summer vacations.'" In addition, defendant alleges that plaintiff travelled on a "'spur of the moment.'" Instead of being held back by withheld taxes, defendant claims that plaintiff decreased his travel to Las Vegas in line with decreasing returns from his Mexican stock exchange activities.

Defendant also maintains that "even if tax withholding were a plausible justification for plaintiff's infrequent gambling . . . . the potential effect of withholding on plaintiff's Las Vegas travel was present only for years after 2007." Defendant claims that the trial testimony supports its argument because, according to defendant, Ms. Campos indicated in her testimony that plaintiff took fewer trips to Las Vegas "[a]fter 2007" because of a lack of return of his withheld jackpot winnings. Defendant also alleges that plaintiff stated he only made less frequent trips "in 2010 . . . because I didn't get my money back from the taxes." (modification in original). According to defendant, even in 2007, "plaintiff's 'busiest' gambling year . . . he gambled only 44 days" and that this "does not satisfy the continuity/regularity requirement of Groetzinger." Defendant does not specify, nor does the record indicate, which tax years Ms. Campos and plaintiff were referring to as the years in which the refunds were not returned to Mr. Free, thus precipitating a decrease in plaintiff's gambling trips.

Groetzinger does not define what constitutes continuous and regular activity, other than to indicate that a "sporadic activity, a hobby, or an amusement diversion does not qualify," and that the taxpayer in Groetzinger put forth "[c]onstant and large-scale effort on his part." Comm'r v. Groetzinger, 480 U.S. at 35–36. There also is not a great deal of analysis by other courts on this prong of Groetzinger. Considering the capital requirements plaintiff would have had, somewhere on the order of 5,000 to 10,000 wagers a day, at approximately $200.00 a wager, the Groetzinger sixty to eighty hours a week, or the Busch forty to sixty hours a week, would be hard to match. To focus on hours spent gambling, therefore, may not be the only means by which to judge the issue. See Int'l Painters & Allied Trades Indus. Pension Fund v. KKB, 421 F. Supp. 2d 71, 76–77 (D.D.C. 2006). The United States District Court for the District of Columbia, in KKB, concluded that the defendant KKB's real estate leasing activities constituted a trade or business, despite apparently only operating a few hours a year. See id. at 76. The court in KKB stressed that an activity can be operated "with regularity if it is operated 'constantly, continually, steadily, sustainably,' and if it is operated 'in a . . . methodical way.'" Id. (modifications in original) (quoting FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 259 (1990) (Scalia, J. concurring in part and dissenting in part); see also Schultz v. City of Cumberland, 228 F.3d 831, 849 (7th Cir.) ("'Regularly' means 'in a regular, orderly, lawful, or methodical way,' and 'regular' means 'returning, recurring or received at stated, fixed or uniform intervals <in the [regular] course of events> [sic].'" (quoting Webster's Third New International Dictionary 1913 (1986)) (modifications in original)), reh'g and reh'g en banc denied (7th Cir. 2000).

Plaintiff usually gambled in the second half of the year, in particular, every year in July, and most years in August, September, November, and December. The specific dates within the years under review, however, appear chosen somewhat randomly, and more for personal motives, than for business considerations. Moreover, the record suggests that often plaintiff's trips were arranged for plaintiff by Ms. Campos on short notice, "between two and three weeks before." Mr. Aguilar from the Mirage testified that he was informed of plaintiff's travels "anywhere from a month up to the next day," and other casino staff indicated that they were notified only several weeks in advance.

Plaintiff correctly states that, "**there is no requirement, in Groetzinger or elsewhere, that a full-time endeavor must begin January 1st of each year to be considered 'full-time,'**" citing Rusnak v. Comm'r, T.C. Memo. 1987-249, 1987 WL 40301 (1987). (emphasis in original). Comparing plaintiff's travel pattern and number of trips to Las Vegas, along with his lack of study and short-term preparation in advance of his trips, to cases in which the activity in question was found to be regular and continuous, plaintiff's efforts do not measure up. For example, the taxpayer in Rusnak, after starting his business, pursued it methodically on and off the racetrack, having "devoted approximately 35 hours per week to this endeavor, attending the track, studying racing forms, interviewing horse owners and riders, and placing bets." Id.; see also Comm'r v. Groetzinger, 480 U.S. at 35–36 (taxpayer applied "[c]onstant and large-scale effort"); Int'l Painters & Allied Trades Indus. Pension Fund v. KKB, 421 F. Supp. 2d at 76–77 (Because KKB leased advertising space, incurred continuous

administrative expenses, and "KKB's owners and their family members donated time to repair and maintain the land and to deal with administrative matters related to the lease with Tri-Valley Glass," the District Court concluded that "KKB's owners were regularly involved with the real estate at issue.").

In the above-captioned case, the parties stipulate that between 2007 and 2010, plaintiff travelled to Las Vegas, Nevada the following times:

| Calendar Year | Number of Trips | Days Gambled | Trips to Las Vegas |
|---|---|---|---|
| 2007 | 8 | 44 | May 3–7; June 9–16; July 16–24; Aug. 10–15; Sep. 12–17; Oct. 11–15; Nov. 25–29; Dec. 29–31 |
| 2008 | 5 | 29 | Jan. 1–3; Apr. 22–27; July 27–Aug. 4; Aug. 28–Sep. 2; Nov. 30–Dec. 4 |
| 2009 | 3 | 20 | May 31–June 9; July 9–16; Nov. 25–29 |
| 2010 | 5 | 25 | July 11–18; Aug. 12–13; Sep. 15–19; Oct. 20–25; Dec. 2–6 |

Plaintiff testified at his deposition that he had a method or strategy that would govern his activities and travels: He wanted to play when casinos were more crowded. Looking at the record, however, this strategy may not have been consistent with his actual activity. Plaintiff did not consistently travel during the times that were testified to as busiest for the casinos, such as the New Year, Superbowl, or certain other American holidays. For example, although Mr. Clinton, from the Bellagio casino, stated that "March is a particularly busy month, February with the Superbowl and a few of our other events we hold," plaintiff never travelled to Las Vegas during those two months. Although Mr. Clinton further stated that October and May are good months, the record indicates that plaintiff only travelled during those months in 2007 and 2010, and his trip in 2009 only covered May 31. Although Mr. Aguilar, speaking generally about Las Vegas, testified that the New Year and the Super Bowl holidays are potentially the busiest times of the year in Las Vegas, plaintiff never travelled to Las Vegas during the Super Bowl and did so only once over the New Year holiday, even though plaintiff testified that he preferred to travel during the New Year period because it was busier. Mr. Clinton testified that casinos are less busy in "the second half of August, early September," and the record indicates that plaintiff did travel to Las Vegas in August and September in 2007, 2008, and 2010. In fact, plaintiff testified at his deposition that he travelled to Las Vegas "on less popular weekends." Although plaintiff's post-trial brief argues that Mr. Free's travel coincided with busy times of the year, because the Mexican holidays often have boxing matches, and those make Las Vegas "extremely busy," the record indicates that plaintiff only visited Las Vegas once for Cinco de Mayo, in 2007, and twice for Mexican Independence Day, September 16, in 2007 and 2010, despite testimony from casino employees that these two days of the year are "always a boxing date" and very busy times. Overall, the record indicates that plaintiff primarily chose to travel in line with personal events, like his birthday or family summer vacations. The record indicates, for example, that plaintiff was in Las Vegas on his birthday, July 16, in three of the four years at issue, 2007, 2009, and 2010, although the record does

not indicate that this was a normally busy time for the casinos. In addition, plaintiff did not indicate at his deposition or interview that he made long-term or regularized trip planning decisions or that he actively thought about events that would increase casino attendance, such as boxing matches.

Many of plaintiff's trips appear to have been relatively spontaneous, planned, at best, only weeks in advance. In fact, plaintiff testified at his deposition that only half of his trips were "planned." Ms. Campos testified that, generally, she would be notified just two to three weeks before each trip, and casino staff testimony suggests that sometimes she would reach out to the casinos only a day in advance. Plaintiff's daughter testified that, for the most part, his family was notified of trips a week or two before. Plaintiff's statements indicate that he also did not plan the duration of a trip to align with key dates, but appears generally to have gambled until he ran out of money, after which he left. In determining whether plaintiff was in a trade or business, objective facts are more telling than plaintiff's own statements of his intent. See Comm'r v. Groetzinger, 480 U.S. at 36; Barker v. Comm'r, 2012 WL 947134, at *5. The facts in the record before the court suggest that plaintiff's lack of methodology in planning his trips, as well as the unplanned duration of the trips, do not support a finding of the continuity or regularity necessary for plaintiff's trips to Las Vegas to qualify as trade or business trips. See Comm'r v. Groetzinger, 480 U.S. at 35.

Plaintiff contends that he could only spend 121 days a year in the United States without other tax consequences. This does not mean that plaintiff could not spend any time in Mexico, with continuity or regularity, operating his gambling business. When in Mexico, however, plaintiff stated he did "practically nothing" relating to his gambling activities, although the records were assembled for him in Mexico by Ms. Campos and Mr. Dominguez. Moreover, the record reflects that he did no research or solicit information or advice about how slot machines operate when not in Las Vegas. Plaintiff asserts that, in evaluating continuity and regularity: "What may be 'regular and continuous' for a 30-year old is likely not the same as that for a 70-year old." The pattern here, however, with short intensive gambling trips, which concluded when his money ran out, separated by large time gaps, would appear to indicate that his activity was less like "extensive business activity over a substantial period," and more like "sporadic activity." See Comm'r v. Groetzinger, 480 U.S. at 35–36; Barker v. Comm'r, 2012 WL 947134, at *8; see also Busch v. Comm'r, 713 N.W.2d at 347 ("[T]he [Groetzinger] Court appears to have considered a hobby as something one is involved in part time or as a side activity.").

Plaintiff also claims that, in addition to, or even regardless of, plaintiff's own activity, the work and expenses of those who worked for him should be considered in determining whether his activity was continuous and regular. In particular, plaintiff points to Ms. Campos' time planning plaintiff's trips, sorting documents upon his return, managing his accounts, and creating reports on his play. Plaintiff claims that, in 2007, Ms. Campos worked a significant amount of time on the alleged gambling business, almost daily from May to December. Plaintiff further claims that the work of Mr. Dominguez, Mr. Schimmer, and Mr. Jiminez should also be considered. In support,

plaintiff points to International Painters & Allied Trades Industries Pension Fund v. KKB, 421 F. Supp. 2d 71, and Storey v. Commissioner, T.C. Memo. 2012-115, 2012 WL 1409273 (2012). As stated above, in KKB, the United States District Court for the District of Columbia held that defendant KKB's activity constituted a trade or business, despite only operating allegedly very few hours a year, see Int'l Painters & Allied Trades Indus. Pension Fund v. KKB, 421 F. Supp. 2d at 76, and included within its consideration "expenses associated with a business that operates on a regular and continuous basis, such as bookkeeping expenses, accounting expenses, and legal expenses." Id. at 77. The District Court also noted that the costs KKB's owners spent in maintaining the real estate were not indicative of sporadic or intermittent activity, but rather, "show[ed] that KKB's owners were regularly involved with the real estate at issue." Id. In Storey, the United States Tax Court considered that the taxpayer "engaged qualified professionals to work on her Smile 'Til It Hurts activity," in concluding that her activity was a trade or business. Storey v. Comm'r, 2012 WL 1409273, at *11. Defendant disagrees and argues that Ms. Campos' allocations of time should not be counted because they "do not add up," and because she made no effort to segment her time. In support, defendant points to Merkin v. Commissioner, T.C. Memo. 2008-146, 2008 WL 2316491 (2008), in which a gambler's testimony as to his time spent gambling, unsubstantiated by players card data, was discarded. Id. at *4. Defendant also argues that focusing on the time of others, as opposed to plaintiff's time, is "letting the tail wag the dog," and that the United States Supreme Court in Groetzinger intended for the calculus to focus on the taxpayer's direct activities. Defendant also argues that, in plaintiff's case, unlike the taxpayer in KKB, it was not the alleged business that paid for Ms. Campos' time, but instead a separate entity, Tenabri.

A taxpayer's ordinary business expenses has been considered in determining whether an activity was pursued with continuity and regularity. See Int'l Painters & Allied Trades Indus. Pension Fund v. KKB, 421 F. Supp. 2d at 77; see also I.R.C. § 162(a) ("There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . ."). It appears from the record, however, that Ms. Campos, Mr. Dominguez, Mr. Jimenez, and Mr. Schimmer contributed only a portion of their times towards plaintiff's activities, including his gambling activities. Even though plaintiff alleges that Ms. Campos spent much of her time on plaintiff's gambling activities, it appears, after a thorough review of the record, that none of the individuals mentioned by plaintiff were primarily devoted to gambling support. Coming to an accurate estimation of the time Ms. Campos spent on plaintiff's gambling activities is difficult since Ms. Campos testified that she did not keep records of her time spent working on plaintiff's various activities, and her testimony appears inconsistent. For example, Ms. Campos testified that she spent approximately 110 hours per trip on activities related to plaintiff's gambling, approximately thirty hours preparing for plaintiff's trips, and eighty hours during the weeks after plaintiff's trips, creating and maintaining plaintiff's records. Considering that plaintiff flew to Las Vegas eight times in 2007, this would mean Ms. Campos spent approximately 880 hours working on plaintiff's gambling activities before and after his trips; but considering that plaintiff only flew to Las Vegas three times in 2009, this would mean that Ms. Campos put in closer to 330 hours towards plaintiff's gambling activities in 2009, apart from her

other record-keeping requirements. This appears inconsistent with Ms. Campos' other testimony that she spent "[a]pproximately 50 percent of the time. Between 50 to 80 percent" of her forty-eight hour work week on plaintiff's gambling activities from 2007 through 2010. In addition, Ms. Campos testified that she performed multiple other operations for plaintiff, and that she did "manage his shares in the stock market," "keep track of all his medical appointments," and arrange plaintiff's other vacations. Although Ms. Campos testified that she spent a "minimum amount of time" on these other activities, she also testified that it would take "between two to three days" to arrange for one of plaintiff's medical visits, and "[a]round 15 to 20 hours" to plan each of plaintiff's beach vacations. Mr. Dominguez appears to have worked about ten hours a week on plaintiff's gambling around the times plaintiff travelled to Las Vegas, according to plaintiff at his deposition, and also worked additional time when creating plaintiff's tax filings. Plaintiff stated at his interview that Mr. Dominguez was paid Mex$70,000.00 to Mex$80,000.00 a month, although not all of it was for gambling-related work. According to the record, Mr. Schimmer spent approximately twenty-five to forty hours per year preparing plaintiff's tax returns, and Mr. Jiminez just one to two hours per year on the same activity.

Both the KKB and Storey cases cited by plaintiff are distinguishable. In the above captioned case, plaintiff never considered any of his accounting expenses in his business filings, or even as business expenses. None of plaintiff's annual reports of his gambling activity, or his United States 1040NR tax returns, account for the expenses or time of Ms. Campos, Mr. Dominguez, the Procopio law firm, Mr. Jimenez, or others, or account for any portion of his office, travel costs, or the costs of the doctor who sometimes travelled with plaintiff, as business expenses. The following colloquy with plaintiff is illustrative:

Q. Who pays for your secretary [Ms. Campos]?

A. I pay most of her salary; the rest is paid by the agricultural business for the work she does for the business.

Q. So other than -- other than -- well, what sort of services does she provide relating to your gambling activities?

A. Well, she is the one who organizes the Forms 1042 for taxes. She's the one who drafts the 16 income tax returns and -- and when I say "personal," it's everything that is personal.

Moreover, in his financial statements, tax returns, and court filings, plaintiff argues that his alleged gambling business was profitable, while at the same time, not deducting these overhead costs. Plaintiff wants the court to consider the efforts of Ms. Campos, Mr. Dominguez, his law firm, and others as part of his business, yet without distinguishing the part time nature of their work for him and work for other clients. Moreover, he appears to have treated portions of their time as for personal or Tenabri matters, not for gambling business costs.

42

In <u>KKB</u>, and <u>Storey</u>, the courts looked at whether the effort and claimed expenses were more relevant to maintaining the business than for personal reasons. The District Court in <u>KKB</u> noted that "KKB's owners and their family members donated time to repair and maintain the land and to deal with administrative matters related to the lease with Tri-Valley Glass." <u>Int'l Painters & Allied Trades Indus. Pension Fund v. KKB</u>, 421 F. Supp. 2d at 77 (internal citations omitted). The District Court held that "'activities taken with regard to the property,' such as the ones taken by KKB's owners, are regular and continuous trade or business conduct." <u>Id.</u> (quoting <u>Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson</u>, 238 F.3d 891, 896 (7th Cir.), <u>reh'g</u> and <u>reh'g en banc</u> <u>denied</u>, 238 F.3d 891 (7th Cir.), <u>cert.</u> <u>denied</u> (2001)). In <u>Storey</u>, the tax court stated: "Petitioner credibly testified about the many evenings and weekends spent on film production, and her work product demonstrates time-consuming care and attention to detail." <u>Storey v. Comm'r</u>, 2012 WL 1409273, at *7. The court, however, considered her hiring of outside professionals in the context of determining plaintiff's profit motive. <u>See id.</u> at *10. By contrast, in <u>Central States, Southeast & Southwest Areas Pension Fund v. White</u>, 258 F.3d 636 (7th Cir. 2001), the United States Court of Appeals for the Seventh Circuit decided that the activity of homeowners in renting out their garage apartments, "was more akin to purely personal investment, and thus was not sufficiently continuous or regular to constitute a trade or business." <u>Id.</u> at 643. The court concluded that the taxpayer's "activities did not benefit a trade or business that could be easily separated from the normal maintenance and upkeep that every homeowner performs." <u>Id.</u>

In the above captioned case, there is a clear question as to whether the accounting activities undertaken were for maintaining a business or primarily for filing taxes and for personal use. Although Ms. Campos and Mr. Dominguez created numerous reports on plaintiff's gambling activities, plaintiff testified:

Q: How did you use that information [end-of-the-year analysis]?

A: Well, that's what would be declared for taxes.

Q: Did you use it for any other purpose?

A: Well, just to have personal information for myself.

There is no evidence in the record that plaintiff used any of these reports to inform his play. In fact, plaintiff testified that he never changed his playing approach from 2007, or analyzed prior results. Casino witnesses testified that plaintiff never mentioned research, or observed that he had a strategy. Although the efforts of others can be a factor in determining whether a taxpayer pursued an activity for the purpose of making a profit, <u>see</u> <u>Storey v. Comm'r</u>, 2012 WL 1409273, at *9–10, the focus of the <u>Groetzinger</u> analysis regarding "continuity and regularity" is on the taxpayer, and whether a "[c]onstant and large-scale effort on his [or her] part was made." <u>See</u> <u>Comm'r v. Groetzinger</u>, 480 U.S. at 36. Mr. Free's efforts would appear to be more oriented

towards vacationing with his family and friends than towards a serious business venture. He appears to have been a savvy, successful businessman in his other moneymaking ventures, farming and stock market investing, in both of which it appears he evidenced consistent dedication for many years. The amount of time and sporadic nature of his gambling efforts further reduces the appearance of a business venture.

Profit Motivation

In analyzing the second prong of the Groetzinger test, whether a "'taxpayer's primary purpose for engaging in the activity'" is for income or profit, the United States Supreme Court has clarified that profit means "economic profit," such that the taxpayer "*intended* to earn gross income in excess of total costs." See Portland Golf Club v. Comm'r, 497 U.S. 154, 169–71, 170 n.19, 171 n.22 (1992) (emphasis in original) (quoting Comm'r v. Groetzinger, 480 U.S. at 35). The United States Supreme Court further stated that "[w]e accept petitioner's contention that § 162 requires only an intent to earn an economic profit," and in Portland found that the taxpayer "has failed to show that it intended to earn gross income from nonmember sales in excess of its total (fixed plus variable) costs . . . ." Id. The United States Tax Court has adopted the "economic profit" approach when evaluating a taxpayer's profit motivation. See, e.g., Roberts v. Comm'r, T.C. Memo. 2014-74, 2014 WL 1688127 (Apr. 29, 2014) ("Profit is generally defined as receipts in excess of costs." (citing Portland Golf Club v. Comm'r, 497 U.S. at 166)); Johnson v. Comm'r, T.C. Memo. 2012-231, 2012 WL 3235565, at *9 (2012) (same); Cheh v. Comm'r, T.C. Memo. 1992-658, 1992 WL 323606, at *4 (1992) ("A profit objective entails an intent to produce gross income in excess of related expenses." (citing Portland Golf Club v. Comm'r, 497 U.S. 154)).

Both parties also cite to Treasury Regulation § 1.183-2 (2010), which provides a list of nine "factors which should normally be taken into account" when "determining whether an activity is engaged in for profit." Treas. Reg. § 1.183-2. Treasury Regulation § 1.183-2 factors overlap with the Groetzinger test measures, although the regulation specifically is directed at determining whether a profit motive exists. The nine factors are the: (1) "[m]anner in which the taxpayer carries on the activity," (2) "expertise of the taxpayer or his advisors," (3) "time and effort expended by the taxpayer in carrying on the activity," (4) "[e]xpectation that assets used in activity may appreciate in value,"[20] (5) "success of the taxpayer in carrying on other similar or dissimilar activities," (6) "taxpayer's history of income or losses with respect to the activity," (7) "amount of occasional profits, if any, which are earned," (8) "financial status of the taxpayer," and (9) "[e]lements of personal pleasure or recreation." Id. (emphasis removed).

Under Treasury Regulation § 1.183-2, "[i]n determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent." Id. § 1.183-2(a); see Beck v. Comm'r, 85 T.C. 557, 570 (1985) (citing Siegel v. Comm'r, 78 T.C. 659, 699 (1982)); Barker v. Comm'r, 2012 WL

---

[20] The parties agree that factor 4, regarding appreciation of assets, does not apply in the context of slot machine gambling.

947134, at *5. When considering the list of factors, all of the facts and circumstances of each case are to be considered, and "no one factor is determinative." Beck v. Comm'r, 85 T.C. at 570; Barker v. Comm'r, 2012 WL 947134, at *5 (citing Golanty v. Comm'r, 72 T.C. at 425–26). Moreover, the list is not exclusive, and it is up to the court to determine how to weigh each factor. See Treas. Reg. § 1.183-2(b). In addition, "the absence of a particular indicia of profit may be more significant to our determination than the superficial presence of another indicia . . . ." See Rose v. Comm'r, 88 T.C. 386, 412 (1987) (citing Beck v. Comm'r, 85 T.C. at 570), aff'd, 868 F.2d 851 (6th Cir. 1989); Kelly v. Comm'r, T.C. Memo. 1993-495, 1993 WL 432467, at *15 (1993).

In analyzing whether an activity was engaged in for profit under Treasury Regulation § 1-183.2, the profit motive has to be "overriding." See Eastman v. United States, 225 Ct. Cl. at 304 ("[I]if the activity is carried on for personal or family recreation and the taxpayer does not show an overriding profit motivation, no deduction will be allowed." (citing Monfore v. United States, 214 Ct. Cl. 705, 720-21 (1977))); see also Lemmen v. Comm'r, 77 T.C. 1326, 1340 (1981) ("The courts have used words such as 'basic,' 'dominant,' 'primary,' 'predominant,' and 'substantial' to describe the requisite profit motive." (citations omitted)), acq., 1983-2 C.B.1 (1983); Dell v. Comm'r, T.C. Memo. 1984-556, 1984 WL 15199 (1984) ("While profit need not be the sole motive in undertaking or continuing an activity, it must be predominate or overriding." (citing Lemmen v. Comm'r, 77 T.C. 1326)). The taxpayer's actual and honest intent to generate a profit is more relevant than his or her actual chances of doing so. See Treas. Reg. § 1.183-2(a) ("Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit."); Ranciato v. Comm'r, 52 F.3d 23, 25 (2d Cir. 1995) ("Under the regulations enacted pursuant to the statute, '[a]n activity is engaged in for profit if the taxpayer entertained an actual and honest, even though unreasonable or unrealistic, profit objective in engaging in the activity.'" (quoting Campbell v. Comm'r, 868 F.2d 833, 836 (6th Cir. 1989), nonacq., 1993-2 C.B. 1 (1993) (internal modification omitted))); Dreicer v. Comm'r, 665 F.2d 1292, 1294 (D.C. Cir. 1981) ("We hold that a taxpayer engages in an activity for profit, within the meaning of § 183 and the implementing regulations, when profit is actually and honestly his objective though the prospect of achieving it may seem dim."); Golanty v. Comm'r, 72 T.C. at 425–26 ("[I]t is sufficient if the taxpayer has a bona fide expectation of realizing a profit, regardless of the reasonableness of such expectation."); see also Lopkoff v. Comm'r, T.C. Memo. 1982-701, 1982 WL 10994, at *5 (1982) (describing the evolution of the rule). If the taxpayer's intent is not clear through other means, the fundamental likelihood of the activity's profitability can help indicate whether or not there was a profit motive. Cf. Meyers v. United States, 26 Cl. Ct. 1004, 1010 (1992) ("In view of Meyers' lack of business records for this venture and the lack of profit associated with the project, especially in light of testimony that indicates that no profit could be made, the court finds that this activity was not profit motivated.").

Treasury Regulation § 1.183-2 clarifies I.R.C. § 183, is titled "**Activity not engaged in for profit**," and is contained in Subtitle A, chapter 1, subchapter B of the Internal Revenue Code, "**Computation of Taxable Income**," but the regulation has not

been explicitly extended to apply to "trade or business" determinations under I.R.C. § 871, "**Tax on nonresident alien individuals**," contained in subchapter N, "**Tax Based on Income from Sources Within or Without the United States**," of the same Internal Revenue Code chapter. (emphasis in original). Other decisions, particularly those issued by the United States Tax Court, have looked to the Treasury Regulation § 1.183-2(b) factors to assist in their determinations of the taxpayer's profit motive under the Groetzinger decision. See, e.g., Johnson v. United States, 32 Fed. Cl. at 715; Park v. Comm'r, 136 T.C. at 580–81; Wilmot v. Comm'r, T.C. Memo. 2011-293, T.C. Memo. 2011-293, at *3–4 (2011); Chow v. Comm'r, 2010 WL 985242, at *5; Hastings v. Comm'r, 2009 WL 814227 at *3–4; Merkin v. Comm'r, 2008 WL 2316491, at *3. At the same time, many courts have resolved the question by looking primarily to Groetzinger. See, e.g., DKD Enters. v. Comm'r, 685 F.3d 730, 735 (8th Cir. 2012); Sealy Power, Ltd. v. Comm'r, 46 F.3d 382, 400 (5th Cir. 1995), nonacq., 1995-33 I.R.B. 4 (1995); DeGuzman v. United States, 147 F. Supp. 2d 274, 281–82 (D.N.J. 2001); Ohio Farm Bureau Fed'n, Inc. v. Comm'r, 106 T.C. 222, 234 (1996); Woody v. Comm'r, T.C. Memo. 2009-93, 2009 WL 1230790, at *3–4 (2009), aff'd, 403 F. App'x 519 (D.C. Cir. 2010); Cloud v. Comm'r, T.C. Memo. 1999-400, 1999 WL 1120406, at *3–5 (1999); Ciaravella v. Comm'r, T.C. Memo. 1998-31, 1998 WL 24217, at *9–10 (1998).

*Treasury Regulation § 1.183-2 Factor 1: The Manner in Which the Taxpayer Carries On the Activity*

Under Treasury Regulation § 1.183-2, the first factor to consider in evaluating the presence of a taxpayer's profit motive is:

> (1) *Manner in which the taxpayer carries on the activity.* The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Similarly, where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated. A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive.

Treas. Reg. § 1.183-2(b)(1) (emphasis in original).

Plaintiff claims that he maintained comprehensive and good records for his gambling activity, and hired help to do so. Plaintiff's post-trial brief indicates: "Mr. Free did not feel he could personally handle the accounting necessary for his gambling business." According to plaintiff, he hired the services of Ms. Campos, Mr. Dominguez, the Procopio law firm, and Mr. Jimenez to help track his records and submit his tax filings. Plaintiff also claims that it was proper to use his players card as part of his record keeping to track gambling records, along with the Form 1042-S data. According to plaintiff, the times when the players card was not inserted were "very small," "maybe two, three percent of the time, but very few times, really." Plaintiff points the court to the

United States Tax Court decision in <u>Hardwick v. Commissioner</u>, T.C. Memo. 2007-359, 2007 WL 4257478 (2007), which plaintiff alleges supports the use of players cards as a legitimate means of recordkeeping for gambling as a trade or business. The United States Tax Court in <u>Hardwick</u> stated:

> The record provides no satisfactory basis for estimating petitioners' gambling losses in excess of the $170,215 allowed by respondent. . . . Petitioners could have avoided this result by keeping complete records of their gambling activities or perhaps by simply using their Players' Club cards to track their slot machine play on each of their gambling trips.

<u>Id.</u> at *4. Defendant in response challenges the accuracy of plaintiff's players card data, because "not all of his gambling activity was recorded to his player card, including activity that produced both 'coin-out' wins and 'coin-in' losses." Defendant points to two decisions, in which it alleges "the Tax Court has refused to accept the taxpayer's reliance on demonstrably incomplete player card statements." (citing <u>Hastings v. Comm'r</u>, 2009 WL 814227; <u>Merkin v. Comm'r</u>, 2008 WL 2316491).

The parties use different approaches to determine plaintiff's actual profit or loss during the tax years at issue. Plaintiff calculated his gambling profit as revenue minus expenses. Plaintiff determined his gambling revenue to be equal to his coin-out, jackpot winnings, and the value of his comps, combined. Plaintiff determined his gambling expenses to be equal to his coin-in and travel costs.

| Plaintiff's Accounting Approach[21] | | | | | | |
|---|---|---|---|---|---|---|
| Tax Year | Plaintiff's Revenue | | | Plaintiff's Expenses | | Profit (Loss) |
| | Coin-Out | Jackpots | Comps | Coin-In | Travel | |
| 2007 | $11,084,585[22] | $16,699,826 | $82,650 | $28,586,958 | $13,102 | ($732,999) |
| 2008 | $7,808,086 | $14,367,536 | $106,220 | $22,926,949 | $3,414 | ($648,521) |
| 2009 | $5,348,292 | $10,401,541 | $81,156 | $15,634,451 | $932 | $195,606 |
| 2010 | $5,228,139 | $13,773,967 | $102,821 | $18,748,132 | $2,922 | $353,873 |
| Total | $29,469,102 | $55,242,870 | $372,847 | $85,896,490 | $20,370 | ($832,041) |

---

[21] The following charts do not include values of less than one dollar.

[22] The parties stipulate that plaintiff's coin-out in 2007 was $11,084,585.00. However, in plaintiff's records, plaintiff indicates that his coin-in in 2007 was $10,873,024.00, less than the value stipulated to by the parties. Plaintiff relies on the lower, $10,873,024.00 value in calculating his gambling revenue for his 2007 1040NR tax return, and for his post-trial brief. The court instead uses the stipulated value, $11,084,585.00, agreed to by the parties, for plaintiff's coin-out. Using this value, however, results in a smaller loss for plaintiff in 2007, $732,299.00, as opposed to the $944,560.00 plaintiff alleges he lost in his post-trial brief.

Using plaintiff's accounting method, it would appear plaintiff lost $832,041.00 over the four years, 2007 through 2010. Plaintiff, using this approach, concludes that his gambling activities were profitable in 2009 and 2010.

The various values plaintiff used to calculate his profit over the four years at issue came from different sources, which, as discussed further below, at times produced inconsistent results. The parties stipulated to the values for plaintiff's "documented" coin-in and coin-out, based on the casino win/loss reports, which were populated using his players card data.[23] Plaintiff's jackpot winnings, on the other hand, were calculated using the Form 1042-S data collected from the casinos by Ms. Campos, and reviewed by Mr. Dominguez and Mr. Schimmer. Plaintiff's jackpot winnings, "pursuant to Forms 1042 issued to Plaintiff," also were stipulated to by the parties. In addition, the "total amount" of plaintiff's comps, and plaintiff's travel expenses, were stipulated to by the parties. Atypical for a professional activity, for each of the years, 2007 through 2010, plaintiff did not account for any of the following as fixed costs: the employment of Ms. Campos, Mr. Dominguez, Mr. Schimmer, Mr. Jimenez or the Procopio law firm, all or part of the rent or utility usage costs for the office used by Ms. Campos and Mr. Dominguez, the doctor who occasionally travelled with plaintiff to Las Vegas, the costs of any part of his travel in Las Vegas that was not comped, or the "two to three percent" transaction charges and commissions on his cash advances, although plaintiff testified at his deposition that "everything, everything was tracked down."

Defendant proposes a different approach: "By taking the amount plaintiff paid to casinos and subtracting therefrom the amount of withholdings remitted to the IRS by the casinos, we can determine the amount of revenue the casinos generated on plaintiff's activity. The inverse of that amount is plaintiff's real net income." This strategy assumes that plaintiff did not return home from his trips to Las Vegas with any cash, which appears from the record to be correct, and, therefore, that the money plaintiff withdrew in Las Vegas either had to be paid to the casinos or given to his family. Under defendant's approach, whatever money was given to the casinos that was not part of an IRS tax withholding was the casino's profit, and, therefore, plaintiff's loss. Defendant, using this accounting method, alleges the following was plaintiff's gambling revenue, expenses, and profit from 2007 through 2010:

---

[23] Plaintiff's total coin-in and coin-out were not stipulated to by the parties, only "documented" coin-in and coin-out. The parties stipulated that "[t]here may have been additional 'coin-in' [and coin-out] amounts" for the years at issue.

| Defendant's Accounting Approach | | |
|---|---|---|
| Tax Year | Plaintiff's Revenue (Plaintiff's Winnings, Withheld by IRS) | Plaintiff's Expenses (Amount Plaintiff Paid to Casinos) | Plaintiff's Profit (Amount Paid to Casinos minus IRS Withholdings) |
| 2007 | $4,946,530 | $6,093,306 | ($1,146,776) |
| 2008 | $4,310,356 | $5,406,800 | ($1,096,444) |
| 2009 | $3,120,512 | $3,264,500 | ($143,988) |
| 2010 | $4,132,235 | $4,870,150 | ($737,915) |
| Total | $16,509,633 | $19,634,756 | ($3,125,123) |

Defendant alleges that, over the four tax years at issue, plaintiff lost $3,125,123.00 to the casinos. Defendant did not account for plaintiff's comps or travel in coming to this conclusion. Adding these in facilitates a better comparison with plaintiff's accounting:

| Defendant's Accounting Approach Plus Comps and Travel | | | | | |
|---|---|---|---|---|---|
| Tax Year | Plaintiff's Revenue | | Plaintiff's Expenses | | Profit (Loss) |
| | Plaintiff's Winnings Withheld by IRS | Comps | Amount Plaintiff Paid to Casinos | Travel | |
| 2007 | $4,946,530 | $82,650 | $6,093,306 | $13,102 | ($1,077,228) |
| 2008 | $4,310,356 | $106,220 | $5,406,800 | $3,414 | ($993,638) |
| 2009 | $3,120,512 | $81,156 | $3,264,500 | $932 | ($63,764) |
| 2010 | $4,132,235 | $102,821 | $4,870,150 | $2,922 | ($638,016) |
| Total | $16,509,633 | $372,847 | $19,634,756 | $20,370 | ($2,772,646) |

Using defendant's accounting approach, accounting for comps and travel, plaintiff lost $2,772,646.00 over the four years at issue, which is $1,940,605.00 more than plaintiff's accounting approach predicts he lost over the same period. Defendant, in addition, concludes that plaintiff never had a profitable year gambling in Las Vegas.

The "total amount" of plaintiff's winnings withheld by the IRS as taxes, the value of plaintiff's comps, and plaintiff's travel expenses are stipulated to by the parties. The parties, however, for the years 2007, 2008, and 2009, did not stipulate to what plaintiff "paid" to the casinos per year gambling. Defendant stated that it calculated this value for each of the three years by directly summing up plaintiff's individual Las Vegas credit line and credit and debit card withdrawal receipts per year, or, when available, used accounting reports prepared by Ms. Campos, in the record before the court, which already had done this summation. Given inconsistencies in plaintiff's accounting from year to year, defendant appears to have used different approaches each year, 2007, 2008, and 2009, to calculate this value. For example, in 2007, defendant was able to refer to trip-by-trip accounting summaries, casino credit line records, as well as testimony by Ms. Campos and casino employees, to calculate what plaintiff paid to the casinos gambling. In 2008, however, defendant was able to rely on a summary report from Ms. Campos, created only for 2008, that listed, directly, plaintiff's payments to the casinos for the year. In 2009, defendant again had to rely on casino credit line records, as well as individual credit and debit card withdrawal receipts; but since there was no

confirming testimony, defendant used other documents, such as Currency Transaction Reports, to estimate how much plaintiff paid the casinos in 2009. Defendant asserts that its calculations represent only what plaintiff paid to the casinos through slot machine gambling, and does not include any amounts plaintiff may have given to his family while in Las Vegas.

Defendant claims in 2007 that plaintiff paid $6,093,306.00 to the casinos. Defendant states that it calculated this amount "by combining the amounts plaintiff withdrew from his credit cards and the amounts plaintiff withdrew from his credit lines at each of the casinos" in 2007. Based on a review of the exhibits in the record, in combination with testimony offered by Ms. Campos, plaintiff withdrew $2,549,306.00 solely from his credit cards during his eight trips to Las Vegas in 2007. Ms. Campos indicated in her testimony that $2,549,306.00 in "withdrawals from a credit card" were recorded in her trip-by-trip accounting summaries as "CONTRIBUTIONS FOR GAME" for 2007. (capitalization in original). Ms. Campos further confirmed that the items listed under "CONTRIBUTIONS FOR GAME" in her accounting summaries were "amounts that he [Mr. Free] contributed to his slot machine gambling." (capitalization in original).

A review of the record also indicates that plaintiff withdrew $3,544,000.00 for gambling purposes from plaintiff's credit lines in 2007, and paid this amount to the casinos that year. The record indicates that $870,000.00 was withdrawn from the Bellagio credit line in 2007, which was not paid back through plaintiff's gambling winnings. The record indicates that plaintiff withdrew an additional $1,680,000.00 from his credit line at the Mirage, $840,000.00 from his credit line at the Wynn, and $154,000.00 from his credit line at the Venetian, all of which were not paid back through plaintiff's gambling winnings. The record indicates that the aggregate sum of these credit line withdrawals, $3,544,000.00, was paid back to the casinos through wire transfers by plaintiff, during periods plaintiff was not in Las Vegas, indicating that these were gambling losses plaintiff repaid using his comingled funds.

Although plaintiff argues that the money plaintiff withdrew from the casino credit lines could have been used for a number of things, not just gambling, defendant maintains that, "[a]s witnesses from each of those casinos [the Mirage, Wynn, and Bellagio] testified, credit extended by the casinos is intended to be used solely for gambling and the casino is very vigilant in that regard." The record supports defendant's contention. Mr. Aguilar, speaking about his time at the Mirage, testified at trial that credit line withdrawals are "strictly for play." He further testified that he tracked credit line withdrawals to make sure the amounts withdrawn from the Mirage credit lines were spent gambling, before more credit was issued to plaintiff. Ms. Morejon from the Wynn casino testified, similarly, that credit withdrawn from a credit line at the Wynn is "supposed to be used to play at the Wynn" and that the Wynn tracks withdrawals and play to ensure that this is the case. Mr. Clinton added that, at the Bellagio, when a customer draws money from a credit line, the "understanding is that it is intended for play at the Bellagio and that the markers are being issued for the purposes of gambling . . . ," and that the casino can use a players card to track usage. Mr. DeCastroverde also testified that at the Mirage and at the Bellagio plaintiff's credit line withdrawals

were, according to the rules of the casinos, to be used for gambling purposes. In sum, the record supports that plaintiff paid $6,093,306.00, the aggregate of his credit line and credit card withdrawals outlined above, to the casinos in 2007 for gambling purposes.

Defendant claims that plaintiff paid $5,406,800.00 to the casinos in 2008. In determining this amount, defendant appears to have relied primarily on a summary report created by Ms. Campos contained in the record before the court.[24] The summary report, jointly submitted to the court, lists under "2008 SUMMARY," a "TOTAL INITIAL INVESTMENT" of $5,886,800.00, which "does not include reinvested income." (capitalization in original). Defendant states that he calculated what plaintiff paid to casinos "by taking the $5,886,800 plaintiff recorded . . . and subtracting therefrom $480,000 that plaintiff drew from his credit lines in 2007, not 2008." The court reviewed the summary report created by Ms. Campos, as well as the individual wire transfer receipts that were compiled by Ms. Campos in the report and attached to the same exhibit. It appears that, of plaintiff's reported 2008 "TOTAL INITIAL INVESTMENT" of $5,886,800.00, $480,000.00 of this was comprised of payments made in 2008 for credit line withdrawals for gambling in 2007; therefore, as defendant indicated, that amount should not have been included in Ms. Campos' 2008 chart, and, instead, is part of the amount plaintiff paid to the casinos in 2007. (capitalization in original).

A review of the record indicates that, of the $5,406,800.00 defendant alleges plaintiff paid to the casinos in 2008, $4,845,000.00 came from casino credit lines, and the remainder, $561,800.00, appears to therefore have come from credit or debit card withdrawals. While many credit and debit card withdrawal receipts are contained in the record, and are appended to the same joint exhibit that contains Ms. Campos' 2008 summary chart, it is unclear if all of the receipts are contained in the record. Plaintiff maintains that it is unclear whether or not Mr. Free used his credit and debit withdrawals from ATMs for gambling purposes. According to plaintiff, "the evidence establishes that Mr. Free would routinely give to his daughters and their husbands thousands of dollars each trip," although Ms. Campos' report reflects that all $5,406,800.00 was put towards gambling purposes.

Defendant claims that plaintiff paid $3,264,500.00 to the casinos in 2009, the vast majority of which defendant maintains was supplied by the casinos' credit lines. Based on a review of the record, in 2009, plaintiff withdrew $1,300,000.00 from his credit line at the Bellagio, $1,110,000.00 from his credit line at the Mirage, and $550,000.00 from his credit line at the Wynn, for a total of $2,960,000.00, all of which was not paid back by gambling winnings, but, instead, through wire transfers from plaintiff's assistant when he was back in Los Mochis, Mexico. As discussed above, the trial testimony indicates that plaintiff's credit line withdrawals were used primarily for gambling purposes.

---

[24] From a review of the record, it appears Ms. Campos created this summary of plaintiff's credit card and credit line withdrawals for gambling purposes only for the 2008 calendar year, and not for any of the other years at issue.

Defendant claims that the remaining $304,500.00 plaintiff allegedly paid to the casinos in 2009 came from credit and debit card withdrawals. Based on a review of the receipts in record, plaintiff withdrew $210,000.00 from "global cash access" ATM machines at the Bellagio and Wynn casinos in 2009. The record also indicates that plaintiff withdrew an additional $20,000.00 in credit card advances, and an additional $14,500.00 from plaintiff's Merrill Lynch checking account while in Las Vegas in 2009,[25] for a total of $244,500.00. Defendant maintains that the remaining $60,000.00 in credit and debit card withdrawals receipts were lost by plaintiff. Specifically, defendant claims that plaintiff withdrew $130,000.00 on July 14, 2009, although the receipts in the record only substantiate $70,000.00 of withdrawals.[26] In support, defendant points to a Currency Transaction Report from the Bellagio from July 14, 2009, showing a conversion of $130,000.00 in negotiable instruments towards the "[p]urchase(s) of casino chips, tokens, and other gaming instruments." Mr. Hudson from the Wynn casino testified that if someone "comes in with cash, either buys in for gaming instruments or cashes out chips, purchase tickets, we log those," and that transactions of a "single incident of $10,000 or more multiple incidents of $10,000" over a single day would trigger a Currency Transaction Report.[27] Plaintiff questions defendant's methodology, stating that there is no evidence that plaintiff's ATM withdrawals were used for gambling purposes, instead of given to his family. Defendant responds that plaintiff's alleged $304,500.00 in credit and debit withdrawals in 2009 were solely for gambling purposes. In support, defendant states that, for $115,000.00 worth of withdrawals, "the documents show that the amounts were withdrawn either at the start of or during one of plaintiff's gambling sessions," and for another $170,000.00 worth of withdrawals, they were reflected in Currency Transaction Reports as for the purchase of "casino chips, tokens, and other gaming instruments."

---

[25] It is unclear from the record whether plaintiff relied exclusively on debit or credit cards for these withdrawals from ATMs. Although at the trial Ms. Campos stated that plaintiff withdrew from "credit cards," and plaintiff indicated at his deposition that he primarily relied on credit card cash advances, apart from his credit line withdrawals, while in Las Vegas, plaintiff also indicated at his deposition that "I had a debit card from that [Merrill Lynch] account, which I would use to pay the casinos, but that was for 20- or $30,000. That was the -- the credit card . . . ."

[26] Defendant repeats Ms. Campos' testimony that sometimes plaintiff would throw away receipts. Ms. Campos stated: "sometimes they [the withdrawal receipts] were missing because he withdraws money and then gets gambling and . . . . [t]he money disappears in the machine."

[27] Mr. Hudson stated that the casinos' requirement to create Currency Transaction Reports stems from "Title 31." Pursuant to 31 C.F.R. § 103.22(b)(2), "[e]ach casino shall file a report of each transaction in currency, involving either cash in or cash out, of more than $10,000." 31 C.F.R. § 103.22 (2010) (effective March 1, 2011, the text of regulation is now located at 31 C.F.R. § 1021.311).

The amount plaintiff paid to casinos in 2010 was stipulated to by the parties. Defendant's accounting approach, like plaintiff's, for all the years at issue, does not count as expenses the value of the time of Ms. Campos, Mr. Dominguez, the Procopio law firm, or Mr. Jimenez, the rent or utility costs of plaintiff's office, the costs of the doctor, who occasionally travelled with plaintiff to Las Vegas, any credit card withdrawal fees, or any others costs of plaintiff's travel to Las Vegas that was not comped.

Plaintiff argues that defendant's method of calculating plaintiff's gambling profit is not appropriate under the tax laws. Plaintiff argues that a "taxpayer is required to compute income in accordance with the method that most clearly reflects income," citing I.R.C. § 446 (2006). Plaintiff claims that his method is reliable and has been used "consistently from year-to-year." Plaintiff claims that defendant is merely estimating plaintiff's gambling profits from plaintiff's borrowing in Las Vegas, and that this court only can estimate profits or losses "when it is reasonably certain that net [profits or] losses were in fact sustained, but only its precise amount lacks direct proof," citing Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Plaintiff asserts that the United States Tax Court has held that "[t]he amount a gambler borrows during a given tax year is simply insufficient evidence to indicate that his total losses for the year exceeded his winnings." (emphasis in original; quotations omitted). Plaintiff cites to Schooler v. Commissioner, 68 T.C. 867 (1977), and Klabacka v. Commissioner, T.C. Memo. 1987-77, 1987 WL 40137 (1987) for support. Plaintiff also notes that defendant's calculations put plaintiff's loss over the four years at 18.8%, (a loss of $3,125,123.00 from a total amount paid to casinos of $19,634,756.00) and that this is an unrealistically high loss. Plaintiff maintains, instead, that plaintiff "gambled on slot machines that are engineered to 'hold' roughly only **5%** over time," although plaintiff fails to point to any support for his statement.[28] (emphasis in original).

Defendant, in reply, argues that Schooler v. Commissioner and Klabacka v. Commissioner do not claim that taxpayers cannot estimate profit. Defendant alleges that, "[i]nstead, Schooler and Klabacka are evidentiary cases that stand for the proposition that a taxpayer may not rely upon evidence of debt without also providing admissible, corroborative evidence showing that debt was actually spent gambling." Defendant claims that it has adequately corroborated its calculations. Additionally, defendant claims that plaintiff's comingling of funds by using money from a single source for both personal and gambling purposes does not undermine defendant's method of estimating income. Defendant states that, "[i]n an effort to demonstrate that he has kept complete and accurate books and records, plaintiff now contends that the

---

[28] Moreover, the court notes that if plaintiff were to attempt to calculate his loss rate, a more correct calculation would be to divide his overall loss over his pool of total wagers, or his coin-in, not over the amount of money borrowed from casinos, which was wagered multiple times and therefore incurred compounding losses. Dividing defendant's estimate of plaintiff's losses over the four years at issue, $3,125,123.00, by plaintiff's stipulated coin-in over the same period, $85,896,490.00, would result in a loss rate, or casino hold, of 3.6%.

records of amounts he spent gambling are incomplete and inaccurate and may commingle funds that he used for nongambling, personal uses."

The burden is on the taxpayer to maintain records. See I.R.C. § 6001 (2006) ("Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe."); Schooler v. Comm'r, 68 T.C. at 870–71 ("We appreciate that many taxpayers do not keep a detailed record of their wagering winnings and losses. Yet, section 1.6001—1(a), Income Tax Regs., imposes on all taxpayers the duty of maintaining 'permanent books of account or records . . . as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information.'"); Klabacka v. Comm'r, 1987 WL 40137 ("Petitioner claims that the realities of the gambling world make it impossible for compulsive gamblers, such as he, who often wager large sums of money fast and furiously, to maintain the records required by respondent. This argument, however, has been rejected based on the general record keeping requirements imposed on all taxpayers." (citing Treas. Reg. § 1.6001-1(a), (e)) (footnote omitted)).

Decisions in the United States Tax Court cited by plaintiff stand for the proposition that although blind estimates cannot substitute for other forms of recordkeeping, estimates of a taxpayer's profit and loss when reasonably determined from the record before the court are permitted. See Schooler v. Comm'r, 68 T.C. 867; Klabacka v. Comm'r, 1987 WL 40137. Both cases refer to the seminal "Cohan rule," from the United States Court of Appeals for the Second Circuit in Cohan v. Commissioner, 39 F.2d 540. See Schooler v. Comm'r, 68 T.C. at 871; Klabacka v. Comm'r, 1987 WL 40137. In Cohan, a classic decision by Judge Learned Hand, the taxpayer deducted a loan in relation to his theatre business from his income, and it was challenged by the IRS, and decided initially in favor of the government at the United States Board of Tax Appeals, a precursor to the United States Tax Court. See Cohan v. Comm'r, 39 F.2d at 543. The Board did not allow a deduction of the loan, which was supposed to be used for business purposes, "on the ground that it was impossible to tell how much he had in fact spent, in the absence of any items or details." Id. Judge Hand concluded that: "Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. But to allow nothing at all appears to us inconsistent with saying that something was spent." Id. at 543–44. In Schooler, the taxpayer bet on dog and horse races, and the taxpayer borrowed money frequently, "some of which was used for gambling." See Schooler v. Comm'r, 68 T.C. at 868. The taxpayer, however, "maintained no records of his racetrack winnings or losses" for the year at issue. Id. at 869. The court in Schooler denied plaintiff's request to claim the money he borrowed as losses, because "the evidence is vague and inadequate." Id. at 871. The court, however, reaffirmed the Cohan rule allowing estimates, if the evidence was sufficient to support it:

We recognize that this Court has applied the rule of <u>Cohan v.</u>
<u>Commissioner</u>, 39 F.2d 540, 543—544 (2d Cir. 1930), and permitted
deductions based on estimates where it was convinced that net losses
were in fact sustained; however, the record in the case before us provides
no satisfactory basis for estimating the amount of the petitioner's winnings
or losses.

<u>Id.</u> In <u>Klabacka</u>, the taxpayer also "kept no records of his winnings and losses during
1981 and 1982," the years at issue, but tried to claim deductions "using a crude
variation of the net worth method often used by respondent to reconstruct income."
<u>Klabacka v. Comm'r</u>, 1987 WL 40137. The court was "unable to conclude that the
$20,000 of checks cashed at the El Cortez was either lost entirely or not spent on
nondeductible personal expenditures," as opposed to gambling. <u>Id.</u> The court
specifically noted that the taxpayer's borrowing statements by themselves were
insufficient, in part because "'the evidence is vague and inadequate.'" <u>Id.</u> (quoting
<u>Schooler v. Comm'r</u>, 68 T.C. at 871). The court, nonetheless, affirmed the Cohan rule,
and stated that, "the Court may estimate the amount of a deduction when satisfactory
evidence of the alleged expenditure has been made." <u>Id.</u>; <u>see</u> <u>also</u> <u>Hom v. Comm'r</u>, T.C.
Memo. 2013-163, 2013 WL 3387857, at *9 (2013) ("Petitioner was a skillful and
seemingly successful poker player. Unlike cases involving slot machine players with
continuous play but occasional jackpots, petitioner did not necessarily suffer any losses
from playing casino poker in 2007 or 2008. We therefore have no basis upon which to
estimate petitioner's gambling losses for those years." (internal citations omitted)). In
<u>Hardwick v. Commissioner</u>, the United States Tax Court stated: "Generally, a claimed
expense (other than those subjected to heightened scrutiny under section 274) may be
deductible even where the taxpayer is unable to fully substantiate it, if there is an
evidentiary basis for doing so." <u>Hardwick v. Comm'r</u>, 2007 WL 4257478, at *3. The
<u>Hardwick</u> court, however, found that "[t]here are too many omissions and discrepancies
among the documents petitioners have presented as substantiation," primarily bank
statements, to make an estimate as to the taxpayers' slot machine gambling losses.
<u>See id.</u> at *4; <u>see also</u> <u>Lutz v. Comm'r</u>, T.C. Memo. 2002-89, 2002 WL 506881, at *7
(2002) ("The record provides no satisfactory basis for estimating petitioners' gambling
losses in excess of the amount we have allowed as a downward adjustment and the
amount conceded by respondent. Consequently, we do not apply the rule of <u>Cohan v.</u>
<u>Commissioner</u>, <u>supra</u>, to estimate the amount of losses.").

A number of United States Tax Court decisions have applied the Cohan rule
directly to slot gambling. In <u>Briseno v. Commissioner</u>, T.C. Memo. 2009-67, 2009 WL
792049 (2009), the taxpayer was a recreational slot gambler who was cited by the IRS
for a deficiency in reporting her income from gambling. <u>See id.</u> at *1. The taxpayer did
not produce logs showing gambling losses to offset her winnings. <u>See id.</u> at *2. In
<u>Briseno</u>, a United States Tax Court judge cited <u>Cohan v. Commissioner</u>, 39 F.2d at
543–44, and stated:

[I]f the trial record provides sufficient evidence that the taxpayer has
incurred a deductible expense, but the taxpayer is unable to substantiate

adequately the precise amount of the deduction to which he or she is otherwise entitled, the Court may estimate the amount of the deductible expense, and allow the deduction to that extent. In these instances, the Court may make as close an approximation of the allowable expense as it can, bearing heavily against the taxpayer whose inexactitude is of his or her own making. Cohan v. Commissioner, supra at 544.

Briseno v. Comm'r, 2009 WL 792049, at *2 (citations omitted). The court in Briseno assigned the plaintiff a deductible expense for her gambling losses by using an estimate, despite the lack of data, stating: "We are not aware of a case in which a taxpayer received winnings from a game of chance of the magnitude petitioner received, but was not entitled to a penny of offsetting loss." See id. at *3. In other cases, the United States Tax Court has followed an estimation methodology in slot machine gambling cases where there was a reasonable evidentiary basis to do so, but refused to do so when the records presented could not lead to a reasonably confident estimate. See Rios v. Comm'r, T.C. Memo. 2012-128, 2012 WL 1537910, at *3 (2012) ("We regard it as a virtual certainty that petitioner, playing a game of chance frequently over the course of several years, placed many losing bets in addition to his winning ones. However, there is nothing in the record on which we can make an estimate of petitioner's gambling losses." (citation omitted)); Gagliardi v. Comm'r, T.C. Memo. 2008-10, 2008 WL 199722, at *10–13 (2008) (estimating taxpayer's slot machine gambling losses on the basis of expert witness testimony as to how slot machines operate); Jackson v. Comm'r, T.C. Memo. 2007-373, 2007 WL 4526507, at *1, *1 n.2 (2007) ("At trial, respondent conceded that petitioner had presented sufficient documentation to substantiate $127,165 in gambling losses. . . . This documentation consisted of casino ATM receipts, canceled checks made payable to casinos, carbon copies of checks made payable to casinos, and credit card statements stating that cash was advanced at the casinos."); Doffin v. Comm'r, T.C. Memo. 1991-114, 1991 WL 34610 (1991) (the court estimating the taxpayer's losses based on the credibility of his testimony and evidence of his lifestyle); see also Schooler v. Comm'r, 68 T.C. 868; Klabacka v. Comm'r, 1987 WL 40137. Although the use of a players card to track gambling has been allowed by the United States Tax Court, see Merkin v. Comm'r, 2008 WL 2316491, at *4; Hardwick v. Comm'r, 2007 WL 4257478, at *2, *4, it is still the taxpayer's burden to keep accurate records. See Merkin v. Comm'r, 2008 WL 2316491, at *4 ("[W]e have not accepted the argument that where a [players] card statement does not show all of the taxpayer's activity (i.e., is an incomplete statement), the taxpayer is thereby excused from providing other evidence of his winnings and losses. See Hardwick v. Commissioner, T.C. Memo. 2007-359; Lutz v. Commissioner, T.C. Memo. 2002-89."); Hastings v. Comm'r, 2009 WL 814227, at *4–5 ("Petitioner's annual player card statements and her Forms W–2G, however, were incomplete."); see also Jones v. Comm'r, T.C. Memo. 2011-77, 2011 WL 1235228 (2011) ("Unlike taxpayers in cases such as Doffin v. Commissioner, T.C. Memo. 1991-114, where evidence of the taxpayer's lifestyle and financial position allowed this Court to approximate unsubstantiated gambling losses, petitioner has failed to produce any evidence to corroborate his story. Consequently, the Court will not apply the Cohan rule to estimate the amount of petitioner's gambling losses.").

Based on a review of the record, the court finds that plaintiff's record-keeping was incomplete, and comingled gambling and other business as well as personal records. Therefore, a Cohan rule-type estimate of expenses should not be applicable in plaintiff's case. In calculating his profit, plaintiff used casino reports to measure his coin-in and coin-out. Plaintiff, however, derived his jackpot totals separately, using the Form 1042-S records. Plaintiff appears to have achieved a more accurate recording of his jackpot total, given the process plaintiff described of cataloging every Form 1042-S associated with plaintiff's jackpot winnings, and reconciling it with the casinos records. Plaintiff's coin-in and count-out data, however, appears to contain missing entries. Plaintiff admits his players card, the source of plaintiff's coin-in and coin-out data, was not properly inserted "maybe two, three percent of the time," which is not insignificant given the apparently slim profit margins resulting from plaintiff's activity. For example, in 2009, an alleged winning year, the parties stipulated that plaintiff's "documented" coin-in, which was pulled from plaintiff's players card, was $15,634,451.00. Plaintiff's documented coin-out was stipulated to be $5,348,292.00. Plaintiff's jackpot winnings, measured from the Form 1042-S records obtained and cataloged, were stipulated to be $10,401,541.00, almost twice his coin-out winnings. Plaintiff's profit from this alone was alleged to be $115,382.00. Plaintiff then added in his comps as taxable income, and subtracted his travel expenses as an additional cost.[29] Plaintiff, under his accounting approach, calculated he had a profit of $195,606.00 in 2009, a profit margin of 1.25% over his expenses. If plaintiff failed to account for just three percent of his coin in and coin out, by not using, or misusing, his players card three percent of his time in Las Vegas in 2009, which plaintiff admitted may have happened, his actual coin out and coin could have been three percent higher than reported by plaintiff, indicating plaintiff lost $112,978.77 in 2009, for a loss margin of 0.70%.

In 2010, plaintiff's other alleged winning year, his documented coin-in was $18,748,132.00, documented coin-out was $5,228,139.00, and documented jackpot winnings were $13,773,967.00, resulting in an alleged profit of $353,873.00 after accounting for travel costs and comps, an alleged profit margin of 1.89%. If plaintiff's coin-in and coin-out were just three percent higher than reported, because plaintiff failed

---

[29] The United States Tax Court has held that comps are treated as income from gambling. See, e.g., LaPlante v. Comm'r, T.C. Memo. 2009-226, 2009 WL 3152789, at *2, *7 (citing Libutti v. Comm'r, T.C. Memo. 1996-108, 1996 WL 98762, at *4 (1996) ("The comps are sufficiently related to his gambling losses for purposes of [I.R.C.] section 165(d). We hold that petitioner's comps are 'gains from . . . [wagering] transactions' under section 165(d)." (modification in original))); Merkin v. Comm'r, 2008 WL 2316491, at *5. But see Mayo v. Comm'r, 136 T.C. 81, 98 (2011) (J. Halpern concurring) (contending that the decision in Mayo creates potential future uncertainty as to whether the United States Tax Court may treat comps as gains from wagering transactions in the future), acq., 2012-3 I.R.B. 285 (2012).

properly to use his players card three percent of the time, his profit would instead turn into a loss of $51,726.79, a loss of 0.27%.[30]

Although plaintiff correctly points out that, "[t]he very nature of a slot machine and its random number generator establishes that a taxpayer cannot estimate, predict or calculate the amount of hypothetical losses during any session," that is why plaintiff has the burden to maintain comprehensive records. See Lutz v. Comm'r, 2002 WL 506881, at *3 ("Under the Internal Revenue Code, the taxpayer is required to maintain records that are sufficient to enable the Commissioner to determine the correct tax liability." (citing I.R.C. § 6001)). The record before the court in this case indicates that just a few percent of unrecorded gambling time could have changed whether plaintiff's gambling venture was profitable or unprofitable. Yet, when explaining at his deposition why he may not have inserted the players card in the slot machine property two to three percent of the time, plaintiff responded: "Because many times we don't pay attention those -- to those little details."

The court concludes that defendant more accurately determined plaintiff's profit and losses from gambling in Las Vegas from 2007 through 2010. Defendant's approach appears to have more comprehensively determined the total amount of money plaintiff obtained in Las Vegas, from his credit line and ATM withdrawals, while plaintiff's accounting approach appears to have incompletely accounted for plaintiff's coin-in and coin-out. Plaintiff appears never to have returned with money from Las Vegas, and appears to have spent all of the money he withdrew in Las Vegas at the casinos, except for a relatively small amount, "[b]etween $4,000 and $5,000," he may have given his family members each trip. The amount of money plaintiff paid the casinos that the casinos did not keep as IRS tax withholdings appears to have become the casinos' profit, and, thereby, plaintiff's losses. Defendant's analysis is relevant because it highlights a large discrepancy between what defendant more accurately accounted for

---

[30] A review of the record suggests that plaintiff, while gambling, may have not used his players card properly even more than the two to three percent of the time. A review of casino statements in the record, compiled from plaintiff's players card data, indicates plaintiff received $13,666,618.50 in jackpot winnings from the casinos in 2008. The parties stipulate, however, that plaintiff received $14,367,536.00 in jackpot winnings in 2008, pursuant to plaintiff's Form 1042-S records, which suggests that plaintiff's players card data potentially underreported plaintiff's jackpot winnings, as indicated by plaintiff's Form 1042-S records, by 4.88% in 2008. The same casino reports indicate plaintiff received $13,023,937.50 in jackpot winnings from the casinos in 2010. The parties stipulate, however, that plaintiff received $13,773,967.00 in jackpot winnings in 2010, pursuant to plaintiff's Form 1042-S records, indicating the players card potentially underreported plaintiff's jackpot winnings by 5.45% in 2010. The court notes that this analysis, by itself, cannot accurately measure plaintiff's use of his players card for any particular year, but does indicate that there was potentially some additional variability in plaintiff's use of his players card beyond what was testified to by plaintiff at his deposition.

as plaintiff's losses for the four years at issue, and what plaintiff claims it won or lost over those same four years:

| Plaintiff's Profit and Loss in Las Vegas | | | |
|---|---|---|---|
| Tax Year | Plaintiff's Approach | Defendant's Approach plus Comps and Travel | Difference |
| 2007 | ($732,999) | ($1,077,228) | ($344,229) |
| 2008 | ($648,521) | ($993,638) | ($345,117) |
| 2009 | $195,606 | ($63,764) | ($259,370) |
| 2010 | $353,873 | ($638,016) | ($991,889) |
| Total | ($832,041) | ($2,772,646) | ($1,940,605) |

As discussed above, defendant has shown that plaintiff paid to the casinos in Las Vegas up to $19,634,756.00 from 2007 through 2010.[31] This is offset by the $16,509,633.00 the casinos held as IRS tax withholdings, which the parties stipulated to in this case. Plaintiff additionally received $372,847.00 in comps over the four years, as stipulated to by the parties, which plaintiff treats as additional revenue, and paid $20,370.00 in travel costs. Under this approach, plaintiff appears to have lost $2,772,646.00 gambling in Las Vegas between 2007 through 2010, $1,940,605.00 more than the $832,041.00 plaintiff's accounting would indicate he lost over the same period. Plaintiff has not pointed to any other source of revenue to explain this difference. This leaves potentially up to $1,940,605.00 that is unaccounted for by plaintiff. This discrepancy is most noticeable in the 2010 tax year. Although plaintiff claims to have profited $353,873.00 gambling in 2010, the parties stipulated that "Plaintiff paid to casinos an aggregate $4,870,150.00 in connection with his gambling activities, excluding incidental costs." To offset this, plaintiff only points to the $102,821.00 in comps he earned gambling, and the $4,132,235.00 in jackpot winnings withheld by the IRS that year, both of which were also stipulated to by the parties, not including travel costs. The numbers defendant points to strongly suggest that Mr. Free lost $638,016.00 dollars in 2010 gambling in Las Vegas. The difference between defendant's and plaintiff's profit estimations is $991,899.00, and this difference is unexplained by plaintiff. Plaintiff contends that he gave a non-specific "thousands of dollars each trip" to

---

[31] Plaintiff argues that it is unclear whether any of plaintiff's ATM withdrawals were used for gambling purposes, versus given to plaintiff's family. Although, as discussed above, plaintiff's credit card withdrawals in 2007 and 2008 were confirmed by Ms. Campos' testimony and financial reports as being used for gambling purposes, there is no similar confirming document or testimony in the record that ties these 2009 ATM withdrawals to plaintiff's gambling activities, although defendant relies on context, such as the timing of plaintiff's withdrawals, to make this link. Nonetheless, of the $19,634,756.00 defendant alleges plaintiff paid to the casinos from 2007 through 2010, defendant only asserts that $304,500.00 of this amount was withdrawn in 2009 from ATMs in Las Vegas by plaintiff for gambling purposes. This $304,500.00 represents 1.6% of the total amount defendant alleges plaintiff paid to casinos during the four years at issue, and, therefore, does not discredit defendant's accounting approach.

his family. This cannot account for the nearly one million dollar discrepancy between what plaintiff argues was his profit in 2010, and what the record indicates he lost gambling over that same year. Plaintiff's failure to keep accurate records, resulting in nearly two million dollars going unaccounted for over four years, raises questions regarding his profitability in 2009 and 2010, and weighs against plaintiff's claim that his activity was profit-motivated. See Lutz v. Comm'r, 2002 WL 506881, at *3 (citing I.R.C. § 6001; Treas. Reg. § 1.6001-1(a)).

Plaintiff's record-keeping also suffered from other lapses and vagaries. Plaintiff did not account, on his tax returns or in his internal records, for the time his accounting team spent as an expense of the business, even though plaintiff stated in his post-trail brief that he "knew he would need help from other professionals given the nature and volume of his activity," and the fact that plaintiff referred to Ms. Campos, Mr. Dominguez, and the Procopio law firm as his "accounting department." Plaintiff stated at his interview that he paid his accounting team "[a]pproximately $150,000 dollars per year." Plaintiff also did not account for other business costs, such as the costs of his office and any expenses for his trips to Las Vegas that were not comped. Plaintiff also failed to account for the two to three percent transaction charge on his cash withdrawals from the casinos. Considering that plaintiff took out $2,549,306.00 using his credit card just in 2007, if the transaction charge was three percent, as it appears, based on the $300.00 and $600.00 fees as seen on plaintiff's $10,000.00 and $20,000.00 withdrawal receipts in the record, this would be another cost of $76,479.18 not accounted for in plaintiff's record keeping just in 2007. Plaintiff appears to have withdrawn less money using credit and debit cards in 2008 through 2010, as he relied increasingly on credit lines for capital, but Mr. Free still withdrew nearly eight hundred thousand dollars from ATMs in 2008 and 2009, which appear to have been subject to the same unaccounted for fees. Plaintiff's failure to account for these costs further casts doubt on plaintiff's intent to generate a profit from his gambling activities. Plaintiff's $150,000.00 in accounting team expenses alone almost eliminates plaintiff's profitability in 2009, even using plaintiff's own estimates of his profits.

Additionally, despite having had prior, significant, successful, business experience, plaintiff failed to keep separate bank accounts and credit cards for his various ventures, despite admitting to being instructed to do so. Plaintiff also stated at his interview, and a review of the record supports, that he never maintained a written budget or financial forecast for his gambling activities. Such actions would not only have helped plaintiff maintain accurate records, but also would have more clearly indicated a profit motive by plaintiff. See Hastings v. Comm'r, 2009 WL 814227, at *4 ("Petitioner did not have a separate bank account for her gambling activity, and occasionally, petitioner commingled personal and gambling funds."); Glenn v. Comm'r, T.C. Memo. 1995-399, 1995 WL 496037, at *3 (in which plaintiffs' failure to maintain a separate checking account contributed to a finding that plaintiffs did not have an intent to make a profit from their activity), aff'd, 103 F.3d 129 (6th Cir. 1996).

Pursuant to Treasury Regulation § 1.183-2(b)(1), a "change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a

manner consistent with an intent to improve profitability may also indicate a profit motive." As indicated in the testimony offered by several casino employees and plaintiff's own statements, Mr. Free never adopted new methods of play, even in the face of his losses in 2007 and 2008. Plaintiff testified, after being asked why he did not change his strategy after suffering losses in 2007 and 2008: "I don't know. But I just didn't." As discussed above, a review of the record indicates that plaintiff did not even stick to the informal strategies or "hunches" he developed. Although plaintiff testified at his deposition that he had a hunch that the slot machines would pay more when the casinos were "extremely busy," the record indicates that he did not necessarily travel to Las Vegas during periods in which the casinos were busier than average. Moreover, plaintiff stated that one of his hunches was to play in high-traffic areas of the casino, and testified at his deposition that "the machine located in a place where people pass by or in holidays I think you have more possibilities." The record indicates, however, that plaintiff played primarily in the "high limit" areas of the casinos, which casino employees testified are areas with less traffic than the casinos' main floors.

Plaintiff argues that he acted in a businesslike manner, but that his business model required that he receive his tax refunds in order to be profitable. In plaintiff's post-trial brief, he argues that "it is clear that Mr. Free expected that a large portion of his withheld taxes would be refunded by the government each year. Mr. Free cannot be profitable without receiving a return of his taxes." Plaintiff then argues that because the IRS did not challenge plaintiff's conduct from 2004 through 2006, plaintiff reasonably relied on the IRS' past actions for his future alleged business: "Although Tax year 2004 was not a profitable year for his business, the return of his refund confirmed to him that this necessary element of his model—the refund of withheld taxes—was in place. At that time, he thought 'that the returns were normal and more safe.'" This estoppel-type argument, however, is not persuasive. "It is settled that each tax year is another matter and that the Commissioner may challenge in a succeeding year what he condoned or agreed to in a former year." Harrah's Club v. United States, 228 Ct. Cl. 650, 653 (1981) (citing Auto. Club of Mich. v. Comm'r, 353 U.S. 180, 182–84, reh'g denied, 353 U.S. 989 (1957)); Malchow-Bartlett v. Comm'r, T.C. Memo. 2010-271, 2010 WL 5023258, at *2 (2010) ("[T]ax years generally are considered separately." (citing Harrah's Club v. United States, 228 Ct. Cl. at 653)).

Defendant also claims that plaintiff's lack of a written business plan demonstrates that he did not act in a businesslike manner. While no doubt the presence of a business plan might have been more of an indicator of a profit motive, and, thereby, a business activity, the absence or presence of a business plan alone is not dispositive, but, instead, the outcome of the analysis is dependent on the circumstances of each case. Compare Hastings v. Comm'r, 2009 WL 814227, at *4 (not finding the taxpayer had a trade or business, in part because there was no business plan), with Chow v. Comm'r, 2010 WL 985242, at *6–7 (finding that the taxpayer's slot gambling activity was a trade or business, despite the lack of a business plan). Plaintiff maintained a successful farming business, and apparently a profitable stock investing strategy, without any written business plan. Nonetheless, although not dispositive alone in the case currently before the court, plaintiff's incomplete recordkeeping, both of his actual play in Las

Vegas and of his overhead costs, the nearly two million dollars in withdrawals in Las Vegas identified by defendant that plaintiff's recordkeeping apparently cannot account for, along with plaintiff's comingling of funds and lack of change in his approach after 2007 and 2008, leads the court to question the accuracy of Mr. Free's bookkeeping for any of the years at issue, and the profit motive of Mr. Free's alleged gambling business. This factor weighs heavily against a finding that plaintiff pursued his gambling activity for the purpose of making a profit.

### *Treasury Regulation § 1.183-2 Factor 2: The Expertise of the Taxpayer or his Advisors*

Under Treasury Regulation § 1.183-2, the second factor to consider in evaluating the presence of a taxpayer's profit motive is:

> (2) *The expertise of the taxpayer or his advisors.* Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Where a taxpayer has such preparation or procures such expert advice, but does not carry on the activity in accordance with such practices, a lack of intent to derive profit may be indicated unless it appears that the taxpayer is attempting to develop new or superior techniques which may result in profits from the activity.

Treas. Reg. § 1.183-2(b)(2) (emphasis in original). Plaintiff argues that one does not need to be an expert on how slot machines work in order to be in that trade or business. At the same time, plaintiff argues that he "has developed what he honestly believes is particular expertise with slot machines" over his years gambling. Plaintiff also notes that he chose to gamble at high-limit reel-type slot machines, which, according to the parties' experts and casino employees, have a lower "theoretical hold" than slot machines of lower denomination. Plaintiff additionally argues that he did research by talking with casino employees near to where he was playing about how the machines operated. In response, defendant argues that plaintiff's expertise, consisting of "hunches," are irrelevant and that "Plaintiff did not spend any measurable amount of time studying any aspect of slot machine gambling." Defendant maintains that "where a plaintiff fails to show that he or she acquired any gambling expertise or consulted experts, that fact indicates that the activity was not engaged in for profit." (citing to Hastings v. Comm'r, 2009 WL 814227, at *4; Merkin v. Comm'r, 2008 WL 2316491, at *4; Moore v. Comm'r, T.C. Memo. 2001-173, 2011 WL 2929168, at *3 (Jul. 18, 2011)). Defendant contends that the plaintiff did not learn, or seek to learn, that slot machines operate based off of a random number generator and are "independent of any external influence," and further contends that this information is "public knowledge" that "contradict[s] and dispel[s] plaintiff's 'hunches.'"

Based on the record before the court, plaintiff appears to have done almost no research on any aspect of slot machine gambling. Plaintiff's own testimony, supported

by the observations of the casino staff, indicates that, except for reading the Slot Machine Report many years ago, and asking random questions of casino employees who were by the slot machines he was playing while in Las Vegas, plaintiff did not inquire into slot machine gambling. According to a decision of the United States Tax Court, "[i]n preparing for an activity, a taxpayer need not make a formal market study, but should undertake a basic investigation of the factors that would affect profit." Westbrook v. Comm'r, T.C. Memo. 1993-634, 1993 WL 540784, at *7 (1993) (citing Underwood v. Comm'r, T.C. Memo. 1989-625, 1989 WL 138924 (1989)), aff'd, 68 F.3d 868 (5th Cir. 1995); Burger v. Comm'r, T.C. Memo. 1985-523, 1985 WL 15145 (1985), aff'd, 809 F.2d 355 (7th Cir. 1987)); see also Heinbockel v. Comm'r, T.C. Memo. 2013-125, 2013 WL 1953732, at *9 (2013) (citing the Westbrook standard); Burrus v. Comm'r, T.C. Memo. 2003-285, 2003 WL 22272897, at *12 (2003) (same). The evidence in the record on this factor does not assist plaintiff's case.

Plaintiff, however, contends that he followed a series of "hunches," and chose a specific set of a casinos in which he wanted to play. Factor 2 of the Treasury Regulation identifies "accepted business, economic, and scientific practices," as telling on whether the taxpayer intended to make a profit with his activity. See Treas. Reg. § 1.183-2(b). Taxpayers who based their expertise on observation and talking with casino staff were found not to demonstrate expertise. See Hastings v. Comm'r, 2009 WL 814227, at *4 ("Petitioner, however, has not shown that she acquired any gambling expertise. Petitioner's strategy of observing the casino's slot machines and talking to casino employees and patrons is insufficient." (citing Calvao v. Comm'r, T.C. Memo. 2007-57, 2007 WL 701594 (2007))); Merkin v. Comm'r, 2008 WL 2316491, at *5. ("Although Dr. Merkin may have read video poker magazines and spent time on the casino floor scouting various machines, there is nothing in the record to validate petitioners' claim that Dr. Merkin is a renowned poker expert." (citing Treas. Reg. § 1.183-2(b)(2))); Busch v. Comm'r, 713 N.W.2d at 347–48 ("[T]he expertise of the taxpayer or her advisors—weighs against Busch in that she openly admits that she is not an expert on how slot machines work."). It is not clear if plaintiff even did this much.

Plaintiff's approach to slot machine gambling was markedly different than his approach to his Mexican stock market activities. Plaintiff testified at his deposition that, in managing his investments, he looked at monthly records as well as daily market reports, some of which, such as the "daily register of the transactions," appear to have been created by Ms. Campos for him. Plaintiff further testified that he tracked expenses and had a goal to make a fifty percent profit on his stock investments. According to his deposition testimony, plaintiff made stock investment decisions based on his records, as well as research into the interest rate of bank capital and stock price trends, and he checked to see if the price of a specific company was "low and if I know that it is a good company." Although plaintiff stated he did not review financial statements about his investments, his testimony indicates that he read articles on companies in which he wanted to invest. Plaintiff also testified at his deposition that he listened to the advice of his financial advisors for his stock market trading.

In contrast, based only on the little advice that plaintiff acquired, from reading the Slot Machine Report, apparently early in his slot machine gambling activity, and being around slot machines at a number of different casinos in Las Vegas, plaintiff, nonetheless, should have understood that slot machine random number generators are unpredictable. In addition, plaintiff did not even stick to his "hunches" of playing in casinos when they were busiest, or playing where casino traffic and play was higher. Plaintiff travelled at mostly unplanned times, and stuck mostly to the high-limit areas of the casino, where traffic was testified to be significantly lower than in other more active areas. Although plaintiff asserts that there was limited reading material on slot machines available in Spanish, for the slot machine gambler, there is little expertise or control which can be developed regardless, given the random number generator which controls play. This factor weighs against plaintiff's case.

*Treasury Regulation § 1.183-2 Factor 3: The Time and Effort Expended by the Taxpayer in Carrying on the Activity*

Under Treasury Regulation § 1.183-2, the third factor to consider in evaluating the presence of a taxpayer's profit motive is:

> (3) *The time and effort expended by the taxpayer in carrying on the activity.* The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit. The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity.

Treas. Reg. § 1.183-2(b)(3) (emphasis in original). Plaintiff argues that the intensity with which plaintiff played slot machines when in the casinos in Las Vegas indicates that he had a profit motive. According to plaintiff, "Mr. Free gambled intensely in the U.S. while keeping his days limited and below 122 to remain a nonresident alien. From the moment he arrived in Las Vegas, Mr. Free would start gambling." Plaintiff argues that the fact that plaintiff did not pursue this activity full time is not dispositive, stating: "For example, the husband and wife taxpayers in Kochevar v. Commissioner, T.C. Memo. 1995-607, both maintained full-time employment in addition to pursuing their slot machine gambling activities, and the court held that they were professional gamblers." Defendant, in response, refers to the same arguments discussed above, regarding the continuity and regularity of plaintiff's gambling, and adds that "[h]is sporadic trips to Las Vegas, during relatively few days of the year, were not consistent with a primary intent to generate income or profit."

The court notes that the test here is not the same test as whether plaintiff operated with continuity and regularity. The amount of capital plaintiff committed to

gambling was high, even if he did not gamble continuously and regularly. According to plaintiff, he pursued gambling more after he stepped back from his prior career at Tenabri. Factor 3 also explicitly considers the general assistance of others. "The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity." Treas. Reg. § 1.183-2(b); see also Storey v. Comm'r, 2012 WL 1409273, at *8, *11 (considering the work of others in determining the plaintiff's profit motive, but not as to whether the plaintiff's work was continuous or regular). Mr. Free did employ the help of others to manage his gambling, including administrative, accounting and tax support, made up of some portion of the time of his personal assistant, Ms. Campos, Mr. Dominguez, the Procopio law firm, and a trained United States accountant. From the record, however, it does not appear that plaintiff devoted much or any of his own time in Mexico to gambling. See Kochevar v. Comm'r, 1995 WL 760397, at *1, *3 ("Petitioners testified that they traveled to local casinos in the evenings after work and on weekends, spending 20 to 40 hours each week studying and playing slot machines."). Moreover, plaintiff's slot machine gambling at issue before this court occurred in Las Vegas, a destination to which he travelled with his family and friends on birthdays and holidays. Treasury Regulation § 1.183-2, factor 3 considers whether or not the activity is a recreational activity. Although plaintiff may have been intense about gambling in Las Vegas when there, the time spent was sporadic and also part of his vacations with family and friends, and did not take up much of his personal time in Mexico. This factor may only slightly support plaintiff's claims.

*Treasury Regulation § 1.183-2 Factor 4: The Expectation that Assets Used in the Activity May Appreciate in Value*

The parties agree, and the court accepts, that factor 4, "*Expectation that assets used in activity may appreciate in value*," Treas. Reg. § 1.183-2(b)(4), is not relevant to plaintiff's case. (emphasis in original).

*Treasury Regulation § 1.183-2 Factor 5: The Success of the Taxpayer in Carrying on Other Similar or Dissimilar Activities*

Under Treasury Regulation § 1.183-2, the fifth factor to consider in evaluating the presence of a taxpayer's profit motive is:

> (5) *The success of the taxpayer in carrying on other similar or dissimilar activities.* The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable.

Treas. Reg. § 1.183-2(b)(5) (emphasis in original). Plaintiff argues that his success as a farmer contributed to the skills he utilized as a gambler:

The success of his agricultural business undoubtedly resulted in large part from Mr. Free's diligence, initiative, consistency, foresight, financial and mathematical acumen, willingness to take calculated risks, hiring outside experts and management capabilities. It was not from a text book or an Ivy League education. Mr. Free applied these same factors to his gambling business and the results have been a profit realized in 4 of 7 years.

Defendant responds that "the taxpayer must show how the elements of that previous success translate to the activity in question, and where he fails to make such a showing, the factor either carries no weight or weighs against any profit motive." Defendant also alleges that "plaintiff could not testify to any specific skill that he acquired from potato farming and then applied to slot machine gambling."

A number of United States Tax Court decisions have addressed Treasury Regulation § 1.183-2 factor 5, and have indicated that some transferrable skill needs to be identified for a prior business success to be relevant. See Dodds v. Comm'r, T.C. Memo. 2013-76, 2013 WL 968241, at *7 (2013) ("Although petitioner successfully ran his accounting practice, his work as an accountant is not sufficiently similar to operating a horse breeding activity to indicate that he could do so successfully."); Filios v. Comm'r, T.C. Memo. 1999-92, 1999 WL 163035, at *8 (1999) ("Petitioner successfully built Westfield Gage, but he did not show how his success with Westfield Gage relates to his ability to conduct a profitable horse racing and breeding activity."), aff'd, 224 F.3d 16 (1st Cir. 2000). In Hastings v. Commissioner, the court noted that the taxpayer had previously run an accounting and consulting business, and the court did not strongly weigh his experience when applied to slot machines. See Hastings v. Comm'r, 2009 WL 814227, at *1, *5. According to the Hastings court, "Petitioner's apparent success in running ACP [Accounting & Consulting Plus, L.L.C.] is indicative of petitioner's abilities, but the transferability thereof to gambling is suspect." Id. at *5. At least one United States Tax Court decision, however, has accepted a taxpayer's past experience in creating a business, although in an unrelated field, as indicative of a profit motive in the taxpayer's new venture:

Mr. Miller [the taxpayer] is a successful businessman. He purchased Electric Pump in 1979 with sales of $400,000 and 10 employees. At the time of trial Electric Pump had $23 million in sales and 80 employees. Additionally, Mr. Miller has been successful in the real estate business. Although these businesses are dissimilar to horse breeding, their growth demonstrates Mr. Miller's business acumen and ability to develop and improve businesses. Mr. Miller also has experience in the spent-hen business as well as raising hogs for both slaughter and breeding. The hog business has some similarities with the horse business but is not entirely similar. The record shows that Mr. Miller is a successful entrepreneur who is not afraid to take risks.

We conclude that this factor is indicative of the requisite profit motive.

See Miller v. Comm'r, T.C. Memo. 2008-224, 2008 WL 4449526, at *6 (2008).

In the above captioned case, it is possible that plaintiff's prior success and risks encountered in building and running his agriculture business, and investing in the Mexican stock market, allowed him to feel comfortable with the risks associated with his gambling activities. The court, however, emphasizes that the text of the Treasury Regulation specifically considers "similar activities." Treas. Reg. § 1.183-2(b)(5). This implies that there must be either a similar challenge, circumstance, skill, or other characteristic involved between the two enterprises. The fact that plaintiff himself did not identify a transferrable skill from his agriculture business does not assist his claim. Plaintiff stated at his deposition:

Q. Okay. Well, any of the -- the experience that you gained in running your agricultural business, have you used any of that experience in playing slot machines?

A. Well, probably some.

Q. All right. Well, what types of experiences?

A. Well, I couldn't explain. But maybe –

THE INTERPRETER: "Maybe" what?

THE WITNESS: I don't remember.

Plaintiff's skills in the business of potato farming and agriculture in general are hardly relatable to slot gambling in Las Vegas. Regarding his stock market investments, although perhaps also more speculative, plaintiff testified he conducted significant research and consulted advisors when making investment decisions. Although his successes in farming and the Mexican stock market may have taught him diligence and risk-taking, these skills are too general to be the types of similar skills that should be recognized by factor 5 as relevant to slot machine gambling. As the court found in Hastings, the transferability of skills from a skill-based enterprise to a game of chance is suspect. See Hastings v. Comm'r, 2009 WL 814227, at *5. This factor does not support plaintiff's claim.

### _Treasury Regulation § 1.183-2 Factor 6: The Taxpayer's History of Income or Losses with Respect to the Activity_

Under Treasury Regulation § 1.183-2, the sixth factor to consider in evaluating the presence of a taxpayer's profit motive is:

> (6) *The taxpayer's history of income or losses with respect to the activity.* A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. A series of years in which net income was realized would of course be strong evidence that the activity is engaged in for profit.

Treas. Reg. § 1.183-2(b)(6) (emphasis in original). The Treasury Regulation states that a "series of years in which net income was realized would of course be strong evidence that the activity is engaged in for profit." Treas. Reg. § 1.183-2(b)(6). Plaintiff argues that his alleged profitability in 2005, 2006, 2009, and 2010 indicate that he pursued this activity with a profit motive. According to defendant, however, plaintiff was not profitable in "any of the years at issue," from 2007 through 2010. As discussed extensively above, the court has found that plaintiff's accounting method and conclusions were inconsistent and not fully documented for the period 2007 through 2010, therefore, plaintiff's profitability is not a foregone conclusion for each of those years.[32]

Treasury Regulation § 1.183-2(b)(6) also states: "[W]here losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit." Id. Plaintiff's documented loss of $944,560.00 in 2007 and $648,521.00 in 2008 occurred many years after plaintiff started gambling, and there is no indication in the record that those losses were part of any start-up phase for plaintiff's alleged slot machine gambling business. In professional gambling, however, large losses, if the activity is acknowledged to be a business, could be anticipated as potential "customary business risks or reverses." Id. A decision of the United States Tax Court has suggested that "[a]n activity's cumulative losses should not be of such a magnitude that an overall profit on the entire operation, including recoupment of past losses, could not possibly be achieved." Dodds v. Comm'r, 2013 WL 968241, at *8 (citing Bessenyey v. Comm'r, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 252 (2d Cir.), cert. denied, 389 U.S. 931 (1967)); Foster v. Comm'r, T.C. Memo. 2012-207, 2012 WL 3000350, at *7 (2012). At the same

---

[32] The parties have stipulated that in 2005 the IRS allowed plaintiff to claim a net income of $1,088,004.00, and that in 2006 the IRS issued a "no-change" letter in response to plaintiff's claimed income of only $43,353.00. Although defendant does not formally challenge the numbers for the 2006 tax year in this court, defendant questions the accuracy of the numbers in its briefs.

time, other United States Tax Court decisions have upheld activities with extensive periods of losses as businesses. See Waitzkin v. Comm'r, T.C. Memo. 1992-216, 1992 WL 73086 (1992) (holding that the taxpayer's operation was for the purpose of making profit under I.R.C. § 183, despite a decade of losses); Snyder v. Comm'r, 1987 WL 49151 (finding the taxpayer's horse-breeding activity to be a trade or business despite seven years of losses); Metcalf v. Comm'r, 1963 WL 702 (holding that plaintiff's farming operation was a trade or business, despite twenty-four straight years of losses). This factor does not support either party.

*Treasury Regulation § 1.183-2 Factor 7: The Amount of Occasional Profits, if any, Which are Earned*

Under Treasury Regulation § 1.183-2, the seventh factor to consider in evaluating the presence of a taxpayer's profit motive is:

> (7) *The amount of occasional profits, if any, which are earned.* The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small. Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated.

The last sentence of the regulatory subsection describing factor 7 states that, "an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated." Id. Plaintiff argues that the large amount plaintiff could win from a single jackpot, such as plaintiff's past jackpots of $1,290,661.00, $890,000.00, and $593,300.00, indicate that plaintiff participated in the venture for profit. Defendant responds that the occasional wins need to be measured "*in relation to the amount of losses incurred,*" and contends that plaintiff's larger losses are more relevant than the occasional profits he won. (citing Treas. Reg. § 1.183-2(b)(7)) (emphasis in original). Defendant maintains that the test under this factor should be whether there was "'opportunity to earn a substantial *ultimate* profit.'" (quoting Treas. Reg. § 1.183-2(b)(7)) (emphasis in original).

Defendant is correct that the factor 7 test in the Treasury Regulation looks for comparisons of the amount of profits "in relation to" losses and investment. Even taking plaintiff's representation of the facts at face value, which the court does not necessarily

accept, at best, plaintiff achieved one to two percent returns in 2009 and 2010, and larger losses in 2007 and 2008, indicating that his ultimate profit potential was likely negative. See id. The United States Tax Court, however, has liberally interpreted an activity as being for profit even if the profit was speculative, as long as it could result in a final, "ultimate," profit. See Churchman v. Comm'r, 68 T.C. 696, 703 (1977) ("It is certainly conceivable, in our view, that she may someday sell enough of her paintings to enable her 'to recoup the losses which have meanwhile been sustained in the intervening years.'" (quoting Bessenyey v. Comm'r, 45 T.C. at 274)); Bolt v. Comm'r, 50 T.C. 1007, 1015 (1968) ("It is enough if petitioner could expect within a reasonable time to recoup his losses and operate on a profitable basis."), acq., 1969-2 C.B. XXIII (1969); Waitzkin v. Comm'r, 1992 WL 73086 ("Based on the testimony of these witnesses and on other evidence in the record, we believe that at any moment, petitioner might become even more commercially successful and earn more than enough to cover any losses in prior [ten] years."). But see Hastings v. Comm'r, 2009 WL 814227, at *5 ("Petitioner's income from gambling in relation to her claimed losses does not indicate that a profit potential existed in petitioner's gambling activity."). Plaintiff, in the above captioned case, indicated at his interview and deposition that he aimed for that "big jackpot," the "deer," the ultimate progressive jackpot. Although doubtful that the broad test in this factor in the Treasury Regulation was written with slot machine gambling in mind, plaintiff can argue that his gambling activity could fit the measures of this test. This factor weighs slightly in plaintiff's favor.

*Treasury Regulation § 1.183-2 Factor 8: The Financial Status of the Taxpayer*

Under Treasury Regulation § 1.183-2, the eighth factor to consider in evaluating the presence of a taxpayer's profit motive is:

> (8) *The financial status of the taxpayer.* The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved.

Treas. Reg. § 1.183-2(b)(8) (emphasis in original). Plaintiff alleges that this factor is of little value, because its genesis is in preventing income tax sheltering. "The legislative history of IRC § 183(a) and (b) indicates a particular concern about wealthy individuals attempting to generate paper losses for the purpose of sheltering unrelated income." (citing Ranciato v. Comm'r, 52 F.3d at 25–26). According to plaintiff, "some courts treat this factor as *irrelevant and do not even address it*. (See, e.g., *Hastings v. Commissioner*, T.C. Memo. 2009-69.)." (emphasis in original). Plaintiff maintains that since he has no other source of United States tax to shelter through losses, this factor is irrelevant. Defendant, in response, argues that this factor of the Treasury Regulation is relevant outside of the tax shelter circumstance, for example, when "other income is the taxpayer's primary means of support and is used to fund the activity." Defendant quotes

from an Illinois state decision, <u>Byrd v. Hamer</u>, 943 N.E.2d at 132, for support, stating, "'[t]estimony revealed not that gambling was the Byrds' means of support but, conversely, that [taxpayers'] substantial wages supported a lifestyle that included lavish wagering,'" although the court in <u>Byrd v. Hamer</u> did not discuss the Treasury Regulation § 1.183-2 factors.

There is no indication in the regulation's language that this factor only applies to tax shelter situations. The United States Tax Court on multiple occasions has looked to this factor without regard to whether the taxpayer's activities created any tax shelter benefits. <u>See</u>, <u>e.g.</u>, <u>Dodds v. Comm'r</u>, 2013 WL 968241, at *8 ("A taxpayer with substantial income unrelated to the activity can more readily afford a hobby. . . . Petitioner's substantial income from his accounting firm allowed him to continue his horse breeding activity despite 17 years of substantial losses."); <u>Foster v. Comm'r</u>, 2012 WL 3000350, at *8 ("Petitioners' substantial income from the law firm and other sources has allowed them to continue their horse activity in spite of more than 25 years of losses, and the activity also has generated generous tax savings in the form of net losses that offset that income."); <u>Wesley v. Comm'r</u>, T.C. Memo. 2007-78, 2007 WL 968731, at *3 (2007) ("Petitioner earned a substantial income in 1996 from his employment as an engineer and had the financial means to make a large expenditure for an unrelated personal pursuit or hobby.").

The plaintiff argues that his non-gambling income sources do not preclude his gambling activity as being for a profit motive, because his net income from his farming business and Mexican stock market activities constitute only "a small percentage of his total gross income when including his gambling revenue." Plaintiff maintains that his gambling income was never less than eighty-four percent of his total gross income for any of the years at issue. Plaintiff presents the following chart in his post-trial brief, comparing his United States slot machine "**Gambling Gross Income**" to his alleged "**Total Taxable Gross Income**" from all his income sources around the world, including his Mexican stock market investments, and Tenabri dividend:

| Tax Year | Total Taxable Gross Income | Gambling Gross Income | Percent of Gambling Gross Income to Total Taxable Gross Income |
|---|---|---|---|
| 2007 | $32,833,199 | $27,655,500 | 84.2% |
| 2008 | $25,123,679 | $22,281,842 | 88.7% |
| 2009 | $16,593,234 | $15,830,989 | 95.4% |
| 2010 | $22,602,902 | $19,104,927 | 84.5% |

(emphasis in original). Defendant argues, in response, that plaintiff's Mexican stock market income "was more than sufficient to allow plaintiff to sell his agricultural business to family members at a 'cheap' discount and still enjoy a comfortable retirement while financing his gambling activities." Defendant argues that plaintiff's gambling activities

correlated with income derived from his stock market returns, and that his gambling activities declined in line with lower stock market returns in 2008 and 2009, indicating that plaintiff's gambling was a luxury afforded when stock market returns allowed for it.

The plaintiff's argument, that his non-gambling income comprised only "a small percentage of his total gross income when including his gambling revenue," is inaccurate. In his post-trial brief, plaintiff states that he is comparing his gambling "**Gross Income**" to his overall "**Gross Income**," but in doing so, treats as directly comparable his slot machine gambling revenue and Mexican income, the latter apparently comprised of plaintiff's Mexican stock market and farming profits. (emphasis in original). Plaintiff's large, claimed revenue from slot machine gambling, however, does not indicate that plaintiff would derive any profit, or net income, from the activity, after accounting for expenses, including the much larger amount of money he poured into the slot machines. Instead, the record indicates that plaintiff likely did not make a profit gambling in any of the years at issue. A more appropriate comparison can be made between plaintiff's Mexican net income, primarily composed of gains from the Mexican stock market, and plaintiff's alleged net profit from slot machine gambling:

| Tax Year | Gambling Net Profits ($) Alleged by Plaintiff | Mexican Net Income ($) (Primarily Gains from the Mexican Stock Market) | Gambling Net Profit as % of Mexican Net Income |
|---|---|---|---|
| 2007 | ($732,999) | $5,177,700 | (14%) |
| 2008 | ($648,521) | $2,841,837 | (23%) |
| 2009 | $195,606 | $755,643 | 26% |
| 2010 | $353,873 | $3,487,443 | 10% |

The court is not attempting to conclude how much plaintiff earned each year from his gambling or other activities. Considering the above comparison, however, even accepting plaintiff's alleged profits from slot machine gambling as correct, plaintiff's stock market activities still provided far more net income than plaintiff's Las Vegas, slot machine gambling activities for all the years at issue.

When discussing his strategy for playing slot machines, plaintiff indicated that he based his play on how much money was available from his Mexican stock market returns, and did not indicate that his gambling would promote his income pool or that he would reinvest his winnings in his gambling activities. Plaintiff testified at his deposition, when asked how he determined how much to spend gambling per trip, that "the extra money that I have every month for my capital and those were the amounts that I would gamble with." Plaintiff also stated at his interview that he started gambling less after 2007 "because I didn't get my money back from the taxes and also the -- the stock market in 2008 was really bad. It lost 50 percent of its value, so that's the reason I traveled less." Plaintiff further stated that one reason he stopped gambling in September of 2011 was "the lack of money from taxes and because the year in the stock market has not been that good and all that." Based on the record, the court finds that plaintiff had significant income from sources other than his Las Vegas slot machine gambling activity, and that that income "supported a lifestyle that included lavish wagering." Byrd

v. Hamer, 943 N.E.2d at 132; see also Schooler v. Comm'r, 68 T.C. at 869 ("The absence of a lavish lifestyle is also insufficient to carry the petitioner's burden of proof."). This factor weighs towards defendant's assessment of the case currently before the court.

_Treasury Regulation § 1.183-2 Factor 9: Elements of Personal Pleasure or Recreation_

Under Treasury Regulation § 1.183-2, the ninth factor to consider in evaluating the presence of a taxpayer's profit motive is:

> (9) _Elements of personal pleasure or recreation._ The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit. It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits. For example, the availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit. An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors whether or not listed in this paragraph.

Treas. Reg. § 1.183-2(b)(9) (emphasis in original). Plaintiff tries to maintain that he did not enjoy gambling, and points to the testimony of plaintiff's family and casino employees. According to plaintiff's post-trial brief, "Mr. Free was in Las Vegas to gamble for business—nothing more." Plaintiff also stated at his interview that his trips to Las Vegas were "as business," and not as a vacation. Plaintiff points out that his hobbies outside of Las Vegas did not typically include gambling. Plaintiff maintains that the trips to Las Vegas were fun for plaintiff's family, but that they were merely beneficiaries on plaintiff's business trips. In addition, plaintiff argues that "the fact that a taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit." Defendant responds that "**[e]lements of personal pleasure or recreation dominated plaintiff's trips to Las Vegas**." (emphasis in original). Defendant maintains that bringing family to Las Vegas served a recreational purpose for plaintiff, especially since "[a]s numerous witnesses testified, plaintiff _always_ brought _several_ family members and friends on his Las Vegas gambling trips." (emphasis in original).

Plaintiff's use of comps and that he brought his family and frieds along on his trips are not dispositive, but are among the considerations when weighing the evidence. The record before the court indicates that plaintiff concentrated on gambling when in

Las Vegas. Plaintiff's daughter Ms. Dolores Free Wong, his sons-in-law Mr. Vasquez and Mr. Llamas, Mr. Aguilar, speaking from when he worked at the Mirage, and Mr. Hudson from the Wynn, all testified that plaintiff did not show signs of enjoyment, "not even a smile, anything," but was instead "very focused at what he was doing" while gambling. A taxpayer's enjoyment of an activity, or lack thereof, however, also is not dispositive as to the profit motive. See Chow v. Comm'r, 2010 WL 985242, at *6 ("It is unclear from her testimony whether she derived pleasure from it, but that factor is generally neutral." (citing Strickland v. Comm'r, T.C. Memo. 2000-309, 2000 WL 1434243 (2000))). What is very relevant, however, are plaintiff's own statements about his reason for playing slot machines. Plaintiff described at his interview a unique "business motto" for his activities in Las Vegas.

Q. Do you consider your trips to Las Vegas business or pleasure?

A. Well, business, but one day -- I have the hope that one day I'm going to win because I am -- I am a hunter and it is said that who persists, gets the deer.

Q. And when you say you have the hope to win, how much money are you talking about?

A. Well, the more the better. I have seen jackpots of 20 plus million dollars. I don't want that much. I would be happy with 5, 10 percent of that.

Plaintiff's focus on capturing the large jackpot, and plaintiff's preference for high-limit progressive machines, almost as a hunt, suggests a gaming purpose that was more important than deriving a profit. The facts before the court, including plaintiff's preference for high-limit progressive machines, support an overriding gaming reason for plaintiff's gambling. It appears plaintiff, who lived off his other income, would be willing to take losses for years for the chance to get the "deer," regardless if, overall, plaintiff would not make a profit from his activities. As noted, the United States Tax Court has found that just because an activity can turn a profit does not mean that the activity was intended to turn a profit. In Calvao v. Commissioner, the United States Tax Court stated:

Petitioner's efforts and strategy are consistent with the desire to win money playing the slot machines. However, we find petitioner's desire to win money and his strategy for doing so is also consistent with gambling purely for its entertainment or recreational aspects. The time petitioner spent and the strategy he developed, by themselves, do not establish petitioner was engaged in the trade or business of gambling.

Calvao v. Comm'r, 2007 WL 701594, at *3. Plaintiff's overriding desire to catch "the deer," without any substantial indication that it was part of a larger business plan aimed towards achieving a profit, lends against characterizing plaintiff's gambling activity as particularly profit-motivated. Plaintiff's trips for his birthday and for summer vacations, and that many of the times plaintiff travelled were not busy times for the casinos, were

atypical of a business motivation. See Eastman v. United States, 225 Ct. Cl. at 304 ("[I]f the activity is carried on for personal or family recreation and the taxpayer does not show an overriding profit motivation, no deduction will be allowed." (citing Monfore v. United States, 214 Ct. Cl. at 720-21)); see also Dell v. Comm'r, 1984 WL 15199 ("While profit need not be the sole motive in undertaking or continuing an activity, it must be predominate or overriding." (citing Lemmen v. Comm'r, 77 T.C. 1326)). The record reflects that plaintiff generally had dinner with those with whom he travelled, and also some other meals. Although he spent far more time sitting and playing at the slot machines than with the groups who were travelling with him, the lack of advance planning of the trips and the fact that he never appeared to have travelled alone also weighs against a business purpose for his Las Vegas travel. Factor 9 weighs against plaintiff.

In sum, an evaluation of the record as a whole, measured against the Treasury Regulation § 1.183-2 factors and the case law, leads the court to conclude that plaintiff has not engaged in gambling for a profit motive during the years at issue, nor has plaintiff carried his burden of proof on the Groetzinger standard for continuity and regulatory, given his sporadic and often holiday-driven trips. Personal enjoyment and recreation, as well as family trips, appear to have motivated plaintiff's trips to Las Vegas, although when he gambled he appears to have taken his pleasure seriously. Plaintiff's reliable income was the result of his earlier efforts at farming and his stock market investments. The possible, but at best speculative and unreliable, income potential from slot machine gambling appears to have been a fringe benefit of an activity which provided him opportunities for adventure and family gatherings.

Presumption & Burden-Shifting

Plaintiff argues that he should benefit from a presumption that his activity was engaged in for profit, pursuant to I.R.C. § 183(d). Plaintiff alleges that section 183(d) "provides a presumption that an activity is engaged in for profit if the activity is profitable for three (3) years of a consecutive 5-year period." Plaintiff maintains that, since by joint stipulation he had a positive net income from gambling in 2005 and 2006, and because his gambling activities were, according to plaintiff, profitable in 2009 and 2010, this presumption should be operative when reviewing his 2009 refund request (because of profitability in 2005, 2006, and 2009), and 2010 refund request (because of profitability in 2006, 2009, and 2010). Defendant argues that plaintiff is not entitled to this presumption because his gambling was not profitable in 2009 and 2010. Defendant also maintains that, "more importantly, § 183 has no application to this case, which falls under § 871 and pertains to the taxation of nonresident alien income." According to defendant, "Section 183 pertains to the computation of taxable income and limits the deduction of losses from an 'activity not engaged in for profit,' and in particular, distinguishes such activities from a bona fide 'trade or business' for which all ordinary and necessary expenses are deductible under [I.R.C.] § 162(a)."

I.R.C. § 183(d) states in relevant part:

If the gross income derived from an activity for 3 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary establishes to the contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit.

Id. The court does not reach whether or not I.R.C. § 183(d) applies to a "trade or business" determination under I.R.C. § 871. As a threshold matter, plaintiff has the burden of proving that a section of the Internal Revenue Code applies to him, before he is able to benefit from its provisions. See Welch v. Helvering, 290 U.S. at 115. As discussed above, plaintiff's record keeping was inconsistent, such that the court cannot determine, based on the record before the court, that plaintiff was profitable in either 2009 or 2010. Therefore, plaintiff cannot show that he was profitable for three of any five-year period up through 2010, and the presumption under I.R.C. § 183(d) cannot apply. Moreover, even if the presumption were to apply, the record indicates that plaintiff's gambling activity was not operated with the profit intent required, and the presumption would be overcome.

Plaintiff next argues that, in the event that the evidence is in equipoise,

Rule 7 of the procedural Rules of the United States Court of Federal Claims and IRC Section 7491(a) call for the Court to shift the burden of proof from plaintiff to defendant if the plaintiff has cooperated with the IRS, complied with the IRC's substantiation and recordkeeping requirements, and introduces sufficient 'credible evidence' with respect to factual issues relevant to the case at hand.

Plaintiff explains that

IRC Section 7491 was added as part of the IRS Restructuring and Reform Act of 1998, in an effort to level the playing field in tax cases. The Senate Committee was concerned that individual taxpayers were at a disadvantage when forced to litigate with the IRS, and that shifting the burden of proof would better balance this situation.

The relevant portion of the statute, I.R.C. § 7491(a) (2006), states:

**(a) Burden shifts where taxpayer produces credible evidence**

**(1) General rule**

If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of

the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.

**(2) Limitations**

Paragraph (1) shall apply with respect to an issue only if–

(A) the taxpayer has complied with the requirements under this title to substantiate any item;

(B) the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; . . . .

I.R.C. § 7491(a) (emphasis in original).

Plaintiff maintains that the requirement for "credible evidence" under I.R.C. § 7491 is "'the quality of evidence, which after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted,'" quoting from Griffin v. Commissioner, 315 F.3d 1017, 1021 (8th Cir. 2003). Plaintiff maintains that he complied with the IRS's substantiation and recordkeeping requirements, under I.R.C. § 6001 and Treasury Regulation § 1.6001-1 (2010). According to plaintiff:

Mr. Free has engaged and is supported by accounting and legal professionals (both in the U.S. and in Mexico) that help him meticulously manage his gambling income, for compliance with United States tax laws. Mr. Free has cataloged and maintained thousands upon thousands of documents and developed hundreds upon hundreds of reports and accounting records. He has maintained these extensive records, filed tax returns and complied with rules and regulations issued by the IRS, for the Tax Years 2007, 2008, 2009, and 2010.

Plaintiff also maintains that he cooperated with the IRS in a timely manner, and that "Defendant does not dispute that Mr. Free has cooperated with reasonable requests by the IRS for, among other things, information and documents."

Defendant responds that a "'shift in the burden of preponderance has real significance only in the rare event of an evidentiary tie." (quoting Blodgett v. Comm'r, 394 F.3d 1030, 1039 (8th Cir.), reh'g and reh'g en banc denied (8th Cir. 2005)). Defendant argues that "[w]hether those activities amounted to a trade or business may be, and should be, decided based simply on this evidence, without regard to the burden of proof." Finally, defendant argues that plaintiff has not met the requirements of I.R.C. § 7491:

One of those conditions, § 7491(a)(2)(B), requires plaintiff to first demonstrate that he 'has maintained all records required under this title,' i.e. that he has kept complete and accurate books and records. . . . plaintiff has failed to carry that burden, and thus must also carry the burden of proof with respect to the remainder of his case.

The evidence in plaintiff's case currently before the court is not in equipoise, or in an "evidentiary tie." See Blodgett v. Comm'r, 394 F.3d at 1039. The preponderance of the evidence in the record before the court favors the defendant. Moreover, plaintiff has not met the requirements to be eligible for the burden-shift, available under I.R.C. § 7491(a)(2). "In coming to a determination whether these conditions have been met, '[t]he taxpayer has the burden of proving that it meets each of these conditions, because they are necessary prerequisites to establishing that the burden of proof is on the Secretary.'" Okerlund v. United States, 53 Fed. Cl. at 356 n.24 (quoting the legislative history of the Internal Revenue Service Restructuring and Reform Act of 1998, H.R. Conf. Rep. No. 105-599, at 240–41 (1998), 1998-3 C.B. 747, at 994–95). One of the requirements is that "the taxpayer has maintained all records required under this title." I.R.C. § 7491(a)(2)(B). As discussed extensively above, plaintiff comingled his bank accounts, and was unable to account for potentially almost two millions dollars borrowed and spent in Las Vegas, but which did not show up on plaintiff's gambling reports or IRS filings. Moreover, since plaintiff did not use, or correctly use, his players card at all times, he was unable to track his records with sufficient detail to allow the court to determine whether or not he was profitable in 2009 and 2010. Plaintiff, therefore, has failed to meet the record-keeping requirements specified within the Internal Revenue Code. See I.R.C. § 6001 (The taxpayer must "keep such records, as the Secretary deems sufficient to show whether or not such person is liable for tax under this title."); Treas. Reg. § 1.6001–1 ("[A]ny person required to file a return of information with respect to income, shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information."); see also Lutz v. Comm'r, 2002 WL 506881, at *3–4 (the United States Tax Court finding that plaintiffs did not meet the requirements of I.R.C. § 7491(a), because they could not show whether they had a profit or loss from their records).

Per-Bet or Per-Session Taxation of Recreational Gambling Winnings

After the trial, plaintiff presented a new legal theory to the court, to address a relatively recent decision by the United States Court of Appeals for the District of Columbia Circuit in Park v. Commissioner, 722 F.3d 384. Both parties were offered an opportunity to brief the issues raised. In Park, the taxpayer, a Korean citizen and nonresident of the United States, gambled at slot machines in United States casinos. See Park v. Comm'r, 136 T.C. 569 (trial court opinion). He was taxed on his jackpot winnings and brought a refund suit based on multiple theories, including that he was in the trade or business of gambling, that he was protected by the United States–Korea tax treaty, and that under I.R.C. § 871(a) he could offset his gambling losses from his

gambling winnings and pay taxes on the net proceeds. His claim was denied by the United States Tax Court. Id. at 584–85. On appeal to the United States Court of Appeals for the District of Columbia Circuit, the appellate court decided that I.R.C. § 871(a) allowed the taxpayer to offset his gambling losses from his gambling winnings. See Park v. Comm'r, 722 F.3d at 385–86. The United States Court of Appeals for the District of Columbia Circuit wrote:

> The IRS has persuasively interpreted the term "gains" in Section 165(d) to allow U.S. citizens to measure gains on a per-session basis. The IRS stated that "gain or loss may be calculated over *a series of* separate plays or wagers." Memorandum AM2008–11, Office of Chief Counsel, Internal Revenue Service 4 (2008).
>
> . . .
>
> Turning back to Section 871, we see again that Section 871 uses the same key term that Section 165(d) uses—"gains." And the logic and analysis of the IRS's per-session approach to U.S. taxpayers in Section 165(d) has no less force when applied to non-resident aliens in Section 871.

Id. at 385–87 (emphasis in original).[33]

Plaintiff in the above captioned case now contends that, as a result of the District of Columbia Circuit's "correct" interpretation of I.R.C. § 871(a), even if plaintiff is not found to be a professional gambler pursuant to I.R.C. § 871(b), the general thirty percent tax under I.R.C. § 871(a) should only be applied on plaintiff's net "gain" from gambling over a specific period of time. Plaintiff alleges that the tax on "gains" in I.R.C. § 871(a) does not ask for a flat thirty percent tax on all proceeds from each individual wager, or a tax "per-bet." Instead, plaintiff argues that a nonresident recreational

---

[33] A review of the tax and appellate court records of Park indicates that the taxpayers in Park first raised the per-session taxation argument, based on their interpretation of 26 U.S.C. § 871(a), at the United States Tax Court when they challenged a notice of deficiency issued by the IRS. See Park v. Comm'r, 136 T.C. at 572; Brief of Petitioners at 41, Park v. Comm'r, 136 T.C. 569. The petitioners in Park did not specifically argue for a "per-session" theory of taxation, but instead, challenged a decision of the United States Claims Court in Barba v. United States, 2 Cl. Ct. at 678, which defendant alleges adopted a per-bet approach to calculating taxes. The Barba decision has been discussed in IRS Technical Advice Memorandum 8710006 (Dec. 1, 1986), and by the United States House Ways and Means Committee in its committee report, Miscellaneous Revenue Act of 1988, House Ways and Means Committee, H.R. Rep. 100-795, at 572–73 (1988); see also Mitchell Rogovin & Donald L. Korb, The Four R's Revisited: Regulations, Rulings, Reliance, and Retroactivity in the 21st Century: A View From Within, 46 Duq. L. Rev. 323, 354 (2008) ("The most authoritative form of legal advice, and the only one for which the Service publishes an annual revenue procedure, is the Technical Advice Memorandum, or TAM.").

gambler should be able to offset his or her gambling losses from gambling winnings over a trip or a day, and be taxed on the "per-session" gains from that gambling. See id. Plaintiff argues that the per-session approach is "more logical and reasonable" compared to the IRS's per-bet approach.

In response, defendant raises a jurisdictional issue with regards to plaintiff's most recent legal theory, which was also subsequently addressed by the parties. Defendant argues that plaintiff's new legal theory is barred by the "substantial variance" doctrine, citing to Lockheed Martin Corp. v. United States, 210 F.3d 1366, 1369 (Fed. Cir. 2000). Defendant claims that, "'any legal theory not expressly or impliedly contained in the application for refund cannot be considered by a court in which a suit for refund is subsequently initiated.'" (quoting id. at 1371). Defendant argues that "[t]here can be no dispute that plaintiff did not raise this ground when presenting his refund claims to the IRS." In support, defendant points to plaintiff's accounting documents, which, according to defendant, only "purport to compute plaintiff's total profits and losses from his gambling 'business' on an aggregate, yearly basis—not divided among any gambling 'sessions' throughout the year." Defendant maintains that plaintiff is not within any of the "four limited situations under which a substantial variance will not be found." According to defendant, "[t]he Court therefore lacks subject matter jurisdiction to consider any such claim."

Plaintiff responds that the substantial variance doctrine only applies (1) "to prevent a taxpayer from attempting to raise an issue that was entirely separate and apart from any issue listed in the administrative claim for refund," and (2) "to prevent a taxpayer from litigating a refund claim when its administrative claim was so vague or so general that the IRS could only guess at the precise nature of the taxpayer's claim." Plaintiff maintains that, in the above captioned case, plaintiff's new argument is permissible because it is "'**subsidiary to, or an integral part of, the grounds presented in the [initial] refund claim**'" to the IRS. (quoting Lockheed Martin Corp. v. United States, 39 Fed. Cl. 197 (1997), aff'd, 210 F.3d 1366 (Fed. Cir. 2000)) (emphasis in original). In support, plaintiff cites Burlington Northern, Inc. v. United States, 231 Ct. Cl. 222, 225 (1982), for the proposition that the substantial variance doctrine always has allowed any new "legal theory" that is "expressly or impliedly contained in the application for refund." (emphasis in original). Plaintiff asserts that the meaning of "gains," under I.R.C. § 871(a), and whether "gains" allows for a per-bet or per-session taxation scheme, is implied within plaintiff's initial theory that plaintiff was gambling as part of a trade or business, because "[t]he determination of whether a taxpayer is a recreational gambler is a 'subset' of the determination of whether a taxpayer is engaged in the trade or business of gambling." According to plaintiff, "[a]s Defendant has always known, gambling either pursuant to a trade or business or recreationally are the only two (2) possible ways to designate a gambler." (emphasis in original). Plaintiff maintains, therefore, that "[b]y definition, a recreational gambler analysis and investigation has to be undertaken by Defendant as part of any refund claim by a taxpayer who asserts he or she is in a trade or business of gambling."

Plaintiff also maintains that the key factor in the application of the substantial variance doctrine is whether or not new facts are required to resolve the additional question presented. Plaintiff acknowledges that "a taxpayer may not substantially vary at trial the <u>factual bases</u> raised in the refund claims presented to the government," citing as support <u>Ottawa Silica Co. v. United States</u>, 699 F.2d 1124 (Fed. Cir. 1983). (emphasis in original). Plaintiff continues, "[c]ourts are especially strict where the variance is on the facts as opposed to a legal theory supported by the disclosed facts," citing as support <u>Oregon Metallurgical Corp. v. United States</u>, No. 463-85T, 1987 WL 61017 (Cl. Ct. 1987) (not reported). Plaintiff maintains that, in the above captioned case, "the only change would be in the legal consequences deduced from the same set of operative facts." Plaintiff maintains that "[t]he facts necessary to calculate the tax consequences for a recreational gambler are subsumed in the facts and investigation necessary to evaluate and, if appropriate, calculate the tax consequences for a trade or business gambler."

Finally, plaintiff argues, "[t]he purpose of the Variance Doctrine is to ensure that the government has 'notice as to the <u>nature of the claim and the specific facts upon which it is predicated</u>.'" (quoting <u>Sierra Pac. Res. & Subsidiaries v. United States</u>, 56 Fed. Cl. 366, 372 (2002)) (emphasis in original). According to plaintiff, "Defendant cannot credibly argue that it is surprised or prejudiced" by plaintiff's new argument that recreational gamblers should be taxed per-session, because defendant is the party arguing that plaintiff is a recreational gambler, and, also, because, "in purporting to calculate the time of Plaintiff's gambling activities for each day, Defendant actually characterized each time increment as an individual 'session' of play based upon the time records from the casinos." Plaintiff concludes: "*Park* does not advocate the *right* to a refund as a recreational gambler—a recreational gambler *already has the right* to a refund if excessive taxes were withheld—but rather sets forth the *method of calculating the gain* which would give rise to such a refund." (emphasis in original).

Whether or not the court can consider plaintiff's latest theory must be considered within the context of the jurisdictional requirements for plaintiffs to sue the United States for tax refunds. It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 514 (2006) (quoting <u>United States v. Cotton</u>, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." <u>Henderson ex rel. Henderson v. Shinseki</u>, 131 S. Ct. 1197, 1202 (2011); <u>see also</u> <u>Hertz Corp. v. Friend</u>, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. at 514)); <u>Special Devices, Inc. v. OEA, Inc.</u>, 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing <u>Johannsen v. Pay Less Drug Stores N.W., Inc.</u>, 918 F.2d 160, 161 (Fed. Cir. 1990))); <u>View Eng'g, Inc. v. Robotic Vision Sys., Inc.</u>, 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter

jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part, 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006).

Regarding a tax refund suit, "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax . . . until a claim for refund or credit has been duly filed with the Secretary [of the Treasury]." I.R.C. § 7422 (2006).[34] In United States v. Clintwood Elkhorn Mining Co., the United States Supreme Court indicated that:

> A taxpayer seeking a refund of taxes erroneously or unlawfully assessed or collected may bring an action against the Government either in United States district court or in the United States Court of Federal Claims. The Internal Revenue Code specifies that before doing so, the taxpayer must comply with the tax refund scheme established in the Code. That scheme

---

[34] I.R.C. § 7422 states in full:

**(a) No suit prior to filing claim for refund**

No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

(emphasis in original).

provides that a claim for a refund must be filed with the Internal Revenue Service (IRS) before suit can be brought, and establishes strict timeframes for filing such a claim.

United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 4 (2008) (citations omitted); see also RadioShack Corp. v. United States, 566 F.3d 1318, 1360 (Fed. Cir. 2009) ("[I]n the context of tax refund suits, the [United States Supreme] Court has held that the Court of Federal Claims' Tucker Act jurisdiction is limited by the Internal Revenue Code, including I.R.C. § 7422(a)."); United States v. Dalm, 494 U.S. 596, 609–10, reh'g denied, 495 U.S. 941 (1990); Buser v. United States, 85 Fed. Cl. 248, 256 (2009). "[S]ection 7422(a) creates a jurisdictional prerequisite to filing a refund suit." Gluck v. United States, 84 Fed. Cl. 609, 613 (2008) (citing Chi. Milwaukee Corp. v. United States, 40 F.3d 373, 374 (Fed. Cir. 1994) (citing Burlington N., Inc. v. United States, 231 Ct. Cl. at 225)).

Congress has provided strict statutory guidelines laying out the statute of limitations for the filing of a federal tax refund claim:

> Read together, the import of these sections is clear: unless a claim for refund of a tax has been filed within the time limits imposed by § 6511(a), a suit for refund, regardless of whether the tax is alleged to have been "erroneously," "illegally," or "wrongfully collected," §§ 1346(a)(1), 7422(a), may not be maintained in any court.

United States v. Dalm, 494 U.S. at 602. "In other words, a party seeking to recover any internal-revenue tax, penalty, or sum from the United States must pursue and exhaust its administrative remedies pursuant to the IRS's regulations prior to filing a complaint in federal court." Strategic Hous. Fin. Corp. v. United States, 608 F.3d 1317, 1324 (Fed. Cir. 2010).

"[N]ew claims or theories raised subsequent to the initial refund claim are not permitted where they substantially vary from the theories initially raised in the original claim for refund." Cencast Servs., L.P. v. United States, 729 F.3d 1352, 1367 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2013), cert. denied, 2014 WL 978501 (U.S. June 23, 2014); Blakley v. United States, 593 F.3d 1337, 1342 (Fed. Cir. 2010) ("And when a taxpayer's refund claim is denied, the taxpayer is limited in subsequent litigation to the grounds contained within the refund claim by the variance doctrine."); In Lockheed Martin Corp. v. United States 210 F.3d at 1371, the United States Court of Appeals for the Federal Circuit declined to entertain theories that "'substantially vary' the legal theories and factual bases set forth in the tax refund claim presented to the IRS." Id. (quoting Cook v. United States, 220 Ct. Cl. 76, 85–86 (1979)). "'[A]ny legal theory not expressly or impliedly contained in the application for refund cannot be considered by a court in which a suit for refund is subsequently initiated.'" Yamagata v. United States, 114 Fed. Cl. 159, 177 (2014) (quoting Burlington N., Inc. v. United States, 231 Ct. Cl. at 225; citing Lockheed Martin Corp. v. United States 210 F.3d at 1371); Heger v. United States, 103 Fed. Cl. 261, 264 (2012); Dominion Res., Inc. v. United States, 97 Fed. Cl.

239, 246 (2011), rev'd on other grounds, 681 F.3d 1313 (Fed. Cir. 2012). Nonetheless, a "court may treat issue [sic] first raised at the trial stage as part of the initial administrative claim if 'derived from or is integral to the ground timely raised in the refund claim.'" Yamagata v. United States, 114 Fed. Cl. at 177–78 (quoting Ottawa Silica Co. v. United States, 699 F.2d at 1139 n.6). In the Federal Circuit, "this aggregation of rules has come to be known as the substantial variance doctrine." Computervision Corp. v. United States, 445 F.3d 1355, 1363–64 (Fed. Cir. 2006), cert. denied, 549 U.S. 1338 (2007).

> As a Judge of this court has stated:
>
> The purpose of the substantial variance rule is threefold: (1) to provide the IRS notice as to the nature of the claim and the specific facts underlying the claim; (2) to provide the IRS with an opportunity to correct any errors; and (3) to limit "any subsequent litigation to those grounds that the IRS had an opportunity to consider and is willing to defend."

Yamagata v. United States, 114 Fed. Cl. at 178 (quoting Lockheed Martin Corp. v. United States, 210 F.3d at 1371); see also Cencast Servs., L.P. v. United States, 729 F.3d at 1367 ("This requirement '"is designed both to prevent surprise and to give adequate notice to the [IRS] of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination."'" (quoting Computervision Corp. v. United States, 445 F.3d at 1363 (quoting Alexander Proudfoot Co. v. United States, 197 Ct. Cl. 219, 227 (1972))) (modification in original)). Therefore, "the refund claim must detail each claimed ground for a refund, and provide sufficient facts to apprise the IRS of its basis," in order to satisfy the jurisdictional requirements of 26 U.S.C. § 7422(a). See Chi. Milwaukee Corp. v. United States, 40 F.3d at 374–75. The Federal Circuit in Chicago Milwaukee Corp. v. United States also noted that "section 7422(a) requires only that the taxpayer provide fair notice of his asserted grounds for a refund. The purpose of jurisdictional requirements imposed by regulation under section 7422(a) is 'to prevent surprise and to give adequate notice' to the IRS." Id. at 375 (quoting Burlington N., Inc. v. United States, 231 Ct. Cl. at 225)); see also Dominion Res., Inc. v. United States, 97 Fed. Cl. at 246 ("However, as long as the 'claim fairly apprises the Commissioner of the ground on which recovery is sought, then the claim is adequate for the purposes of bringing suit under section 7422(a).'" (quoting Burlington N., Inc. v. United States, 231 Ct. Cl. at 228)). The notice, however, must be specific: "'[T]he Secretary by regulation requires that claims for refund "set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis [of the refund claim].'"" Cencast Servs., L.P. v. United States, 729 F.3d at 1367 (quoting Computervision Corp. v. United States, 445 F.3d at 1363 (quoting Treas. Reg. § 301.6402–2(b)(1) (2013))) (emphasis and modification in original).

"The doctrine permits consideration of a claim for refund despite failure to timely file detailed formal claims with the IRS when a substantial variance from the requirements of the regulation is not involved." Computervision Corp. v. United States,

445 F.3d at 1364. There are only a few, limited exceptions to the substantial variance doctrine, however. "Each of these has itself come to be identified as a separate doctrine." See Computervision Corp. v. United States, 445 F.3d at 1363–73. In Computervision, the Federal Circuit identified four exceptions: First, when the taxpayer files "a timely claim with purely formal defects;" second, when "the IRS considers that specific claim within the limitations period" even though it was not identified by the taxpayer; third, when the taxpayer files a "general claim," which does not "set forth any specific ground," but that eventually forms "the basis of an investigation which disclosed facts necessary to his [the IRS Commissioner's] action in making a refund," and, later, the taxpayer files an amendment "outside the limitations period that makes the general claim more specific;" and fourth, when the taxpayer introduces a new, germane legal theory while the IRS still has jurisdiction. See id. (quotations omitted). The United States Court of Appeals for the Federal Circuit has also identified a fifth exception, not discussed in Computervision: "equitable recoupment, which 'exists only when the Government raises a new issue that the plaintiff could not have anticipated and, therefore, could not have . . . asserted as grounds for its [original] refund [claim].'" Cencast Servs., L.P. v. United States, 729 F.3d at 1367 (quoting Cencast Services, L.P. v. United States, 94 Fed. Cl. 425, 441 (2010), aff'd, 729 F.3d 1352 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2013), cert. denied, 2014 WL 978501 (U.S. June 23, 2014)) (modifications in original). The Federal Circuit has explained further that "equitable recoupment only applies when the government raises a new taxation theory in its counterclaims," and, in doing so, "the government raises new and inconsistent theories of taxation." See id.

The first three exceptions to the substantial variance doctrine, as well as the fifth exception, do not apply to plaintiff. First, neither party alleges that there were any technical or formal defects in plaintiff's refund claim with the IRS. Second, there is no evidence that the IRS considered plaintiff's new theory beforehand in prior dealings with plaintiff. Indeed, it is unlikely this theory was discussed prior to the issuance of the appellate decision in Park. Third, there is no evidence that plaintiff filed a general claim with the IRS, which could have formed the basis of an investigation leading to a refund under plaintiff's new legal theory. Plaintiff's January 17, 2012 letter to the IRS, and Mr. Schimmer's discussions with the IRS, appear to have revolved around the specific trade or business question under I.R.C. § 871(b). The "general claim" doctrine does not apply "where the original timely claim asserted a specific ground." Computervision Corp. v. United States, 445 F.3d at 1369. There is also no evidence that plaintiff ever filed a more specific claim with the IRS regarding an alternative meaning of "gains" in I.R.C. § 871(a).

The fifth exception to the substantial variance doctrine also does not apply. The purpose of the "equitable recoupment" doctrine is to allow the taxpayer a chance to introduce new theories and evidence in response to a new counterclaim filed by the government, after the case has left the jurisdiction of the IRS, and when "'the Government has taxed a single transaction, item, or taxable event under *two inconsistent theories*.'" See Cencast Servs., L.P. v. United States, 729 F.3d at 1367 (quoting United States v. Dalm, 494 U.S. at 605 n.5) (emphasis in original). In Cencast,

the substantial variance doctrine barred the plaintiff from bringing a second, novel argument for an employment tax refund, in response to a counterclaim filed by the IRS when the case was at the United States Court of Federal Claims, because the counterclaim filed by the IRS introduced no new, inconsistent legal theories not already discussed at the administrative level. See id. at 1357–38, 1367. The United States Court of Appeals for the Federal Circuit explained:

> The principle underlying equitable recoupment, as articulated by the Ninth Circuit in a related context, is that "[i]t would be unfair to allow the Government to assert a new defense to a taxpayer's claim at pretrial and simultaneously to prevent the taxpayer from making appropriate responses to it, because the taxpayer had not previously anticipated the defense." Brown v. United States, 427 F.2d 57, 62 (9th Cir.1970). However, where "the government does not raise a[ ] [new] offset issue . . . , a taxpayer could not raise any setoff." Union Pac. R.R. Co. v. United States, 389 F.2d 437, 447 (Ct. Cl. 1968).

Id. at 1367 (modifications in original). The Federal Circuit concluded in Cencast that: "No new and inconsistent theories were raised by the government in its counterclaims. Accordingly, the equitable recoupment exception is inapplicable." Id. at 1368. In the above captioned case, defendant has not introduced any new counterclaims or new legal theories as to plaintiff's tax liability. Defendant has consistently, argued that between 2007 and 2010 plaintiff was a recreational gambler, not in the trade or business of gambling. Instead, plaintiff is the party introducing a new legal theory.

Plaintiff's new legal theory, also, is not allowed under the fourth exception to the substantial variance doctrine. Id. at 1365. This exception, called the "germaneness doctrine," was described by the United States Court of Appeals for the Federal Circuit in Computervision Corp.:

> This fourth exception only applies where the taxpayer (1) files a formal claim within the limitations period making a specific claim; and (2) after the limitations period but, while the IRS still has jurisdiction over the claim, files a formal amendment raising a new legal theory-not specifically raised in the original claim-that is "germane" to the original claim, that is, it depends upon facts that the IRS examined or should have examined within the statutory period while determining the merits of the original claim.

Computervision Corp. v. United States, 445 F.3d at 1370. The appellate decision in the Park case was issued after this case was in litigation with this court. After a refund claim is filed in this court the IRS no longer has jurisdiction, and control over case-related decisions moves to the United States Department of Justice. See 28 U.S.C. § 516 (2012) ("Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the

direction of the Attorney General."); 28 C.F.R. § 0.70 (2013) ("The following functions are assigned to and shall be conducted, handled, or supervised by, the Assistant Attorney General, Tax Division: (a) Prosecution and defense in all courts, other than the Tax Court, of civil suits, and the handling of other matters, arising under the internal revenue laws, and litigation resulting from the taxing provisions of other Federal statutes . . . ."). This fourth exception to the substantial variance doctrine has been strictly limited by the Court of Appeals for the Federal Circuit to new legal theories put forward while the case was still in the jurisdiction of the IRS. See Computervision Corp. v. United States, 445 F.3d at 1370.

The origin of the "germaneness doctrine" lies in the United States Supreme Court decision in Bemis Brothers Bag Co. v. United States, 289 U.S. 28, 53 (1933); see also Computervision Corp. v. United States, 445 F.3d at 1370. In Bemis Brothers Bag Co., the taxpayer filed a timely claim of refund with the IRS, asking for the IRS to perform a "special assessment" to estimate taxpayer's business invested capital, because, according to the taxpayer, the value of certain assets "could not be measured with complete precision," and the usual determination of invested capital would cause unjust injury. Id. at 30–31. After the IRS rejected plaintiff's claim, and after the limitations period had expired, but before plaintiff had filed a refund claim in federal court, plaintiff stated: "In the event of a denial of a special assessment, the taxpayer now demanded that the items 'improperly eliminated from invested capital should be restored to invested capital, and the excess profits tax recalculated on that basis.'" Id. at 31–32 (internal citations omitted). The United States Supreme Court, in an opinion by Justice Cardozo, allowed this new legal theory, finding that the "claim as amended does not differ in matter of substance from the claim as first presented." Id. at 33. The court drew a parallel between IRS administrative processes and court pleadings, stating:

> If we look to the analogy of pleadings in a lawsuit, the conclusion is not doubtful. The claim as first presented gives notice to the Commissioner that assets of great value have been omitted from invested capital. It tells him what those assets are, and even estimates their value, though imperfectly and roughly. There is no failure to make disclosure of the substance of the grievance, no dearth of information as to the facts that should be the prelude to inquiry.

Id. The United States Supreme Court in Bemis Brothers Bag Co. concluded that "[t]he rule is now general that at a trial upon the merits the suitor shall have the relief appropriate to the facts that he has pleaded, whether he has prayed for it or not." Id. at 35. In Computervision, the United States Court of Appeals for the Federal Circuit interpreted the decision in Bemis Brothers Bag Co. as allowing amended legal theories in tax suits when "the taxpayer's amendment did not require inquiry into a new set of facts, but simply adapted the form of relief to the facts which would have to be examined during investigation of the original claim." Computervision Corp. v. United States, 445 F.3d at 1370; see also Addressograph-Multigraph Corp. v. United States, 112 Ct. Cl. 201, 220 (1948) ("'Where the facts upon which the amendment is based would necessarily have been ascertained by the commissioner in determining the merits

of the original claim, the amendment is proper.'" (quoting Pink v. United States, 105 F.2d 183, 187 (2d Cir. 1939) (citing Bemis Bros. Bag Co. v. United States, 289 U.S. 28; United States v. Memphis Cotton Oil Co., 288 U.S. 62 (1933); United States v. Factors and Finance Co., 288 U.S. 89 (1933)))); cf. United States v. Andrews, 302 U.S. 517, 524 (1938) ("On the other hand, a claim which demands relief upon one asserted fact situation, and asks an investigation of the elements appropriate to the requested relief, cannot be amended to discard that basis and invoke action requiring examination of other matters not germane to the first claim."). Recent decisions by this court discussing the germaneness exception have emphasized that the decision to allow the new legal theory presented by plaintiff should be based on whether or not a new legal theory requires ascertaining new facts. See, e.g., Williams v. United States, 112 Fed. Cl. 67, 76 n.4 (2013) (stating that an issue is germane if "'it depends upon facts that the IRS examined or should have examined within the statutory period while determining the merits of the original claim.'" (quoting Computervision Corp. v. United States, 445 F.3d at 1370)); Blue v. United States, 108 Fed. Cl. 61, 68 n.5 (2012).

In order to determine whether or not Mr. Free was engaged in a trade or business, the court examined the trial testimony and exhibits in detail, including the records of plaintiff's travels to Las Vegas, plaintiff's trip-by-trip spending, all of his available credit line and credit card withdrawals, and plaintiff's revenue, losses, and net profits at a granular level. Plaintiff's credit card and credit line withdrawals are recorded down to the day and, sometimes, the minute. Not only yearly activity summaries, but also trip-by-trip activity summaries, are in the record. Although the "amount of taxes withheld in connection with Plaintiff's gambling activities" was stipulated to by the parties on a per-year basis, all of plaintiff's 1042-S submissions were presented to the court, each of which records the day and minute the tax withholding was taken out by the casinos. Given the record developed during the trial, it would be possible for the parties and the court to recalculate plaintiff's IRS withholdings on a per-session basis.

A more critical issue, however, is the timeliness of plaintiff's new legal theory. The Federal Circuit's germaneness doctrine has generally only been applied "while the IRS still has jurisdiction over the claim." Computervision Corp. v. United States, 445 F.3d at 1370. Additionally, the United States Court of Appeals for the Federal Circuit has made clear that "the IRS's jurisdiction over the claim necessarily terminates on the date a refund suit is filed." Id. at 1372. Our predecessor, the United States Court of Claims, also has held: "It is a rule of long standing that once a refund claim has been disallowed, it is not subject to amendment." Allstate Ins. Co. v. United States, 213 Ct. Cl. 96, 104 (1977); see also Union Pacific R. Co. v. United States, 182 Ct. Cl. 103, 116–17 ("The disposition of a taxpayer's refund claim by allowance of the amount requested in full, however, precludes an amendment asserting an additional amount after the expiration of the statutory period for refund."). Views on this fourth exception to the substantial variance doctrine vary somewhat among the federal courts. As the Federal Circuit stated in Computervision, "[w]e recognize that, as the taxpayer urges, two of our sister circuits have adopted a different rule, holding that an amendment is effective for purposes of the germaneness doctrine after the IRS has lost jurisdiction over the claim," citing to Mutual Assurance Inc. v. United States, 56 F.3d 1353 (11th Cir.1995), nonacq.,

1999-41 I.R.B. 496 (1999), and St. Joseph Lead Co. v. United States, 299 F.2d 348 (2d Cir. 1962). The United States Court of Appeals for the Second Circuit also stated: "After having timely filed an initial claim, a taxpayer may make an amendment that relates back to the prior claim, provided that 'the facts upon which the amendment is based would necessarily have been ascertained by the commissioner in determining the merits of the original claim.'" AmBase Corp. v. United States, 731 F.3d 109, 118 (2d Cir. 2013) (quoting St. Joseph Lead Co. v. United States, 299 F.2d at 350 (citing Bemis Bros. Bag Co. v. United States, 289 U.S. 28)). The Court of Appeals for the Eleventh Circuit, in Mutual Assurance, Inc. v. United States, also stated that "'"[w]here the facts upon which the amendment is based would have been ascertained by the commissioner in determining the merits of the original claim, the amendment is proper."'" Mutual Assurance, Inc. v. United States, 56 F.3d at 1357 (quoting United States v. Ideal Basic Industries, Inc., 404 F.2d 122, 124 (10th Cir. 1968) (quoting Pink v. United States, 105 F.2d at 187), cert. denied, 395 U.S. 936 (1969)); see also id. at 1356 ("In *Bemis Brothers,* the Court expressly rejected the prayer for relief test as a basis for determining the limits of permissible amendments: 'the suitor shall have the relief appropriate to the facts that he has pleaded, whether he has prayed for it or not.'" (quoting Bemis Bros. Bag Co. v. United States, 289 U.S. at 34)).

Plaintiff tries to argue that his new legal theory was "*implied*" within, or integral to, his original claim in front of the IRS, and, therefore, proper notice to the IRS was given. (emphasis in original). Plaintiff argues that, "[b]y definition, a recreational gambler analysis and investigation has to be undertaken by Defendant as part of any refund claim by a taxpayer who asserts he or she is in a trade or business of gambling." Just because two legal questions are similar or appear related to each other, however, does not mean one implies the other, or is integral to the other. A good example can be found in a decision by a Judge of this court in Yamagata v. United States, 114 Fed. Cl. 159. In Yamagata, the taxpayers argued that their business entity was a partnership, not a corporation, and therefore should be taxed in a different manner. See id. at 174–81. When arguing in the United States Court of Federal Claims, the taxpayers introduced a new legal theory, not presented to the IRS, that a feature of Japanese law, called the "essential asset" theory, made their entity look more like a partnership than a corporation. See id. at 175. According to plaintiff, this theory was similar to a legal theory previously presented to the IRS regarding "piercing the corporate veil." See id. at 175–77. The court declined to hear this argument, holding that, regardless of whether or not the factual basis was pleaded to the IRS, "the bases of plaintiffs' refund claims expressly rely on the application of local law," and, therefore,

> plaintiffs were obligated to provide the IRS with adequate notice of the specific local law theories on which their refund claims are based. Plaintiffs' "essential assets" theory, however, was neither a subsidiary of, nor integral to, the specific theories actually placed before the IRS: the "denial of transaction" rule and "piercing the corporate veil."

See id. at 177–79 (internal citation omitted). The decision in Yamagata stands for the proposition that a new legal theory, even if it is similar to other previously pled legal

theories, is not integral to them if it requires a unique, separate legal analysis that the IRS was not given notice of by the taxpayer. See id.

In the above captioned case, while the parties did not make the full record of their past interactions with the IRS available to the court for any of the years at issue, from the record available to this court, in particular the January 17, 2012 letter from Mr. Schimmer to Mr. Turpin at the IRS, it is apparent that the discussion centered around whether or not plaintiff's activity constituted a "trade or business" under I.R.C. § 871(b). As in Yamagata, Mr. Free did not give notice to the IRS that he would argue the meaning of "gains" in I.R.C. § 871(a) as per-session versus per-bet. Indeed, plaintiff admits that "the newly adopted and endorsed Per Session Approach" did not even occur to plaintiff until the release of the appellate decision in Park v. Commissioner, 722 F.3d 384, very late into the proceedings of this case. Plaintiff's new legal theory would have required the IRS to perform a new investigation based on a different section of the Internal Revenue Code, I.R.C. § 871(a), and an entirely new set of dollar numbers to be calculated; neither the legal analysis nor the calculations were undertaken by the IRS. Moreover, the per-session approach was not implied within or integral to the trade or business issues which the IRS was asked by plaintiff to consider.

Plaintiff separately argues that his new "per session" legal theory only impacts the amount of recovery, not the right of recovery, and, therefore, should be allowed, despite being presented after the case left IRS jurisdiction. (internal quotation omitted). The United States Court of Claims considered a similar argument in Red River Lumber Co. v. United States, 134 Ct. Cl. 444, 446 (1956). In this case, the taxpayer was arguing for a refund regarding land it had sold to the Pacific Gas & Electric Company. See id. at 149. In Red River, the plaintiff argued for the first time in the United States Court of Claims that the sale price was actually lower than stated in the initial claim, and defendant claimed that this argument was barred by the substantial variance doctrine. The United States Court of Claims allowed plaintiff's new legal theory, holding that:

> When a ground set forth in the claim for a refund is sufficient to support recovery, the reason for this rule has been satisfied. The Commissioner has had his opportunity to consider the ground and dispose of the case administratively. If the Commissioner fails to allow the refund and the case comes to court, we see no reason why errors which do not affect the right of recovery, but only the amount of recovery, should be perpetuated.

Id. This decision, however, is distinguishable from the above captioned case. In Red River, the taxpayer argued for an enhanced recovery given that the taxpayer was already successful on the underlying cause of action. See id. In the above captioned case, plaintiff is not arguing for an enhanced recovery given that he already was found to be in a trade or business. Instead, plaintiff is arguing that since he is not successful on the trade or business theory under I.R.C. § 871(b), he should recover at least a portion of his original claim under a new, alternative theory, based upon the language of I.R.C. § 871(a). Thus, plaintiff is making a new claim as to the right of recovery, not only the amount. See also Ottawa Silica Co. v. United States, No. 272-78, 1982 WL 19302

(Ct. Cl. Trial Div. 1982) ("The <u>Red River Lumber</u> case does not allow a taxpayer to introduce new factual bases of another ground for recovery for the first time at trial."), <u>aff'd</u>, 699 F.2d 1124 (Fed. Cir. 1983).

Neither the United States Court of Federal Claims, nor the United States Court of Appeals for the Federal Circuit, appear to have addressed this particular circumstance in a tax case, when the grounds for the new legal theory first become apparent after the case has left the jurisdiction of the IRS. The record indicates that plaintiff made a good faith effort to be open and fair in its discussions with the IRS, despite suffering numerous delays and the need to make repeated inquiries. Nonetheless, the United States Court of Appeals for the Federal Circuit has been explicit that the exception carved out of the substantial variance doctrine only applies to germane new legal theories introduced "while the IRS still has jurisdiction over the claim." <u>See</u> <u>Computervision Corp. v. United States</u>, 445 F.3d at 1370; <u>see</u> <u>also</u> <u>Union Pacific R. Co. v. United States</u>, 182 Ct. Cl. at 116–17. Plaintiff, in theory, could have brought up the per-session taxation theory approved by the United States Court of Appeals for the District of Columbia Circuit in <u>Park</u> in front of the IRS, yet did not. Unfortunately for plaintiff, precedent in the United States Court of Appeals for the Federal Circuit does not support his ability to argue his case based on <u>Park</u> now.

## CONCLUSION

Based on a review of the testimony and record developed at trial, plaintiff has not carried his burden of proof that his slot machine gambling activities during the years of 2007 through 2010 constituted a trade or business, pursuant to I.R.C. § 871(b). Plaintiff's activity was not carried out with continuity and regularity, and plaintiff did not demonstrate a sufficient intent to generate a profit through his gambling. This court does not have jurisdiction to hear plaintiff's new legal theory, that he should be taxed as a recreational gambler on a per-session basis pursuant to I.R.C. § 871(a), instead of on a per-bet basis, because plaintiff did not raise this theory at the IRS before bringing suit in this court. Therefore, the Clerk of the Court shall enter **JUDGMENT** for defendant consistent with this opinion.

**IT IS SO ORDERED**.

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**